## STATE OF CONNECTICUT v. DENNIS HODGE
### (SC 15266)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.

Argued March 18, 1998—officially released April 6, 1999

*Mark Rademacher*, special assistant public defender, for the appellant (defendant).

*Rita M. Shair*, assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and *Ann Mulcahy*, legal intern, for the appellee (state).

*Richard A. Reeve, Michael O. Sheehan* and *Ann M. Parrent* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Opinion*

PALMER, J. Following a jury trial, the defendant, Dennis Hodge, was convicted of one count of murder

in violation of General Statutes § 53a-54a (a),[1] one count of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1),[2] and carrying a pistol without a permit in violation of General Statutes § 29-35.[3] The trial court rendered judgment in accordance with the jury verdict, and the defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).[4] On appeal, the defendant claims that he is entitled to a new trial because: (1) the state, in selecting the twelve person jury that convicted him, improperly used its peremptory challenges in a discriminatory manner; and (2) the trial court improperly instructed the jury with respect to the affirmative defense of extreme emotional disturbance. We reject these claims and, accordingly, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On or about January 29, 1992, the defendant's mother, Willie Mae Hodge Perry, who resided in New Haven, contacted the defendant to inform him that her kitchen had sustained damage as a result of a fire. Several days thereafter, the defendant, who was living in New Jersey at the time, returned to Connecticut and

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . .

"(c) Murder is punishable as a class A felony . . . ."

[2] General Statutes § 53a-55 provides in relevant part: "Manslaughter in the first degree: Class B felony. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . ."

[3] General Statutes § 29-35 provides in relevant part: "Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] General Statutes § 51-199 (b) provides in relevant part: "The following matters may be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

took up residence with Perry. Perry, in the meantime, had retained the services of Biller Associates, an independent insurance adjuster,[5] to assess the extent of the fire damage and to process a claim with Perry's insurance company. Over the next several days, the defendant met with the victims, Lawrence Biller, the owner and president of Biller Associates, and Bruce Horowitz, who was employed by Biller Associates as an adjuster, at Perry's residence. Biller and Horowitz already had arranged for an independent cleaning contractor, known as Servpro, to clean Perry's house and, according to the defendant, had received an assignment form, signed by Perry, authorizing payment of a portion of the insurance proceeds directly to Servpro.

During March and April, 1992, questions arose concerning the amount of the insurance settlement and the manner in which payment to Servpro was to be made. Because the defendant and Perry had expected to receive approximately $20,000 from Perry's insurer, they were disappointed to learn from Horowitz, on April 8, that Perry, instead, would be receiving a total net settlement of approximately $15,500. Horowitz assured them, however, that he had done all that he could. When asked by the defendant about the payment for cleaning services, Horowitz stated that Servpro's bill of $4700 already had been paid.

Later in April, 1992, however, the defendant learned from an agent of Perry's insurance company that the insurer had prepared two checks, one payable to Perry in the approximate amount of $12,500, and the other payable to Servpro in the approximate amount of $4700. The defendant telephoned Biller Associates several times in an unsuccessful effort to discuss the apparent

---

[5] Independent insurance adjusters, who are not affiliated with insurance underwriters, assist insureds in processing claims and obtaining settlements with their insurers in exchange for a fee, usually equal to a percentage of the insured's recovery.

discrepancy in the payment to Servpro, which the defendant believed was the reason why Perry was to receive $3000 less than she had been promised originally. When the defendant telephoned the company on April 29, he indicated that he would be away for a short period of time, and provided the company with a telephone number where he could be contacted. The defendant expressly requested, moreover, that Biller Associates contact him, rather than Perry, to resolve the matter. Notwithstanding this request, Horowitz contacted Perry during the defendant's absence. Upon the defendant's return, he arranged a meeting at Horowitz' office on May 4 to discuss further the matter of the payment to Servpro.

On the morning of May 4, 1992, the defendant met with Horowitz and Biller in Biller's office. After expressing his dissatisfaction with the fact that Perry stood to receive $3000 less than she had expected, the defendant proposed that Biller Associates remit one half of that amount, $1500, to Perry. Biller asked the defendant whether he expected Biller to pay the defendant $1500 of Biller's own money, and inquired as to what measures the defendant expected to take if the defendant and Biller Associates were unable to resolve the matter. The defendant responded: "I would go to war with you. I will cause you and your company as much pain as you've caused me and my family." The defendant added that he would file a civil suit if necessary. Biller replied that no one had ever prevailed in a lawsuit against Biller Associates. After some further discussion, Biller stated that the matter would not be resolved that day. The defendant then inquired: "[S]o that's the way it is?" Biller replied: "[T]hat's the way it is." As the defendant rose to leave, he pulled out a nine millimeter handgun and shot and killed both Biller and Horowitz. The defendant immediately left the scene and, thereafter, fled to Costa Rica.[6]

---

[6] The defendant traveled to Costa Rica because of his belief that no extradition treaty existed between the United States and Costa Rica.

After a police investigation of the killings, the defendant was charged with two counts of murder in violation of § 53a-54a (a), one count of capital felony in violation of General Statutes § 53a-54b (8)[7] and one count of carrying a pistol without a permit in violation of § 29-35. Three weeks after the shootings, the defendant, who had returned to the United States from Costa Rica, was arrested.[8]

At the defendant's trial, several employees of Biller Associates testified regarding the events leading up to and culminating in the deaths of the victims. The testimony of these witnesses, who were present in the Biller Associates office at the time of the shootings, established the defendant as the shooter. In addition, Edward McDonough, a physician with the state medical examiner's office, testified that both victims had died as a result of multiple gunshot wounds. McDonough concluded that Biller's body had seven entry wounds, one of which was from a bullet that had severed Biller's spinal cord. McDonough located three entry wounds on Horowitz' body, including one from a bullet that had entered his back and penetrated his aorta.

The defendant, who testified in his own defense, admitted that he had shot the victims, but sought to establish the affirmative defenses of mental disease or defect[9] and extreme emotional disturbance.[10] In support

---

[7] General Statutes § 53a-54b provides in relevant part: "Capital felony. A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[8] The defendant, having decided to turn himself in, was arrested while he and his lawyer were on their way to the Hamden police department.

[9] General Statutes § 53a-13 provides in relevant part: "Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

[10] General Statutes § 53a-54a provides in relevant part: "Murder. (a) . . . [I]n any prosecution under this subsection, it shall be an affirmative defense

of these defenses, the defendant presented the testimony of Ezra Griffith, a psychiatrist and the director of the Connecticut Mental Health Center (mental health center), who opined that the defendant was legally insane at the time of the shootings and, further, that he had acted under an extreme emotional disturbance. The defendant also adduced the testimony of John Cegalis, a clinical psychologist, who testified that the defendant, although not legally insane when he shot the victims, was suffering from an extreme emotional disturbance. In rebuttal, the state presented the testimony of Donald Grayson, a psychiatrist, who refuted both affirmative defenses.

The trial court instructed the jury on capital felony, murder, first degree manslaughter as a lesser included offense of murder and carrying a pistol without a permit. After deliberating for nine days, the jury, which twice had indicated that it was deadlocked, returned a verdict of guilty of murder with respect to the death of Biller and of first degree manslaughter with respect to the death of Horowitz. The jury also found the defendant guilty on the charge of carrying a pistol without a permit. The trial court rendered judgment sentencing the defendant to consecutive prison terms of life on the murder count, twenty years on the manslaughter count and five years on the count of carrying a pistol without a permit.[11] Additional facts will be set forth as necessary.

---

that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

[11] The trial court granted the defendant's motion for a judgment of acquittal on the capital felony charge.

# I

## THE PEREMPTORY CHALLENGES CLAIM

The defendant first claims that he is entitled to a new trial under the equal protection clause of the fourteenth amendment to the United States constitution[12] because the state, during jury selection, improperly discriminated against six minority venirepersons by exercising its peremptory challenges to strike those prospective jurors from the jury array in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny. We reject the defendant's claim.

The following additional facts are relevant to our resolution of this claim. Jury selection for the defendant's trial, which involved the potentially racially charged shooting deaths of two white men by the defendant, who is African-American, took place over thirty-eight days, during which thirty-three panels were summoned, approximately 400 venirepersons were sworn and seventy-two persons were fully voir dired. In light of the capital felony charges, the court granted each party thirty-one peremptory challenges. Of those, the state used twenty-four, six of which were challenged by the defendant as discriminatory under *Batson*. The trial court rejected the defendant's *Batson* challenges, concluding that, in each case, the state had provided credible, race neutral reasons for exercising its peremptory challenge. The final jury of twelve regular and three alternate jurors included four African-Americans and two Hispanics. Additional facts specific to the state's allegedly improper use of its peremptory challenges are set forth below.

---

[12] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

## A

### Background

We begin our analysis of the defendant's claim with an overview of our jury selection process and the use of peremptory challenges. "Voir dire plays a critical function in assuring the criminal defendant that his [or her] Sixth Amendment right to an impartial jury will be honored. *Rosales-Lopez* v. *United States*, 451 U.S. 182, 188, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981)." (Internal quotation marks omitted.) *State* v. *Mercer*, 208 Conn. 52, 61, 544 A.2d 611 (1988). "Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Morgan* v. *Illinois*, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992)." *State* v. *Patterson*, 230 Conn. 385, 391, 645 A.2d 535 (1994). "Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine the venireperson's fitness to serve on the jury. Conn. Const., art. I, § 19;[13] General Statutes § 54-82f;[14] Practice Book § 848 [now § 42-12]."[15] *State* v. *Robinson*, 237

[13] Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right to question each juror individually by counsel shall be inviolate."

[14] General Statutes § 54-82f provides: "Voir dire examination. In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

[15] Practice Book § 42-12 contains language that is substantially similar to that of General Statutes § 54-82f.

Conn. 238, 247, 676 A.2d 384 (1996). Because the purpose of voir dire is to discover "if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case." (Internal quotation marks omitted.) *State* v. *Rogers*, 197 Conn. 314, 318, 497 A.2d 387 (1985). "After the completion of the voir dire of a particular venireperson, a party may challenge the venireperson for cause. The court must excuse that juror if the judge . . . is of the opinion from the examination that [the] juror would be unable to render a fair and impartial verdict . . . . Unless one of the parties exercises a peremptory challenge to remove the venireperson, a venireperson who has not been excused for cause must be accepted by the parties as a prospective member of the jury panel. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Robinson*, supra, 247–48.

Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as "one state-created means to the constitutional end of an impartial jury and a fair trial." *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). Although such challenges generally may be based on subjective as well as objective criteria; see, e.g., *Burks* v. *Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994), cert. denied, 513 U.S. 1160, 115 S. Ct. 1122, 130 L. Ed. 2d 1085 (1995); they may not be used to exclude a prospective juror because of his or her race or gender. *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 146, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) (gender); *Batson* v. *Kentucky*, supra, 476 U.S. 89 (race).

"In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution[16] in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause[17] forbids the prosecutor to challenge potential jurors solely on account of their race . . . . *State* v. *Hinton*, 227 Conn. 301, 323, 630 A.2d 593 (1993); *State* v. *Smith*, 222 Conn. 1, 10–11, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Gonzalez*, 206 Conn. 391, 394, 538 A.2d 210 (1988)." (Citation omitted; internal quotation marks omitted.) *State* v. *Robinson*, supra, 237 Conn. 243–44. Relying on the rationale underlying *Batson*, the United States Supreme Court has held that gender-based challenges also are impermissible. *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 146.

Under Connecticut law, "[o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine

---

[16] The United States Supreme Court subsequently extended the prohibition against race based peremptory challenges to criminal defendants; *Georgia* v. *McCollum*, supra, 505 U.S. 59; and to civil litigants. *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614, 616, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

[17] Discriminatory challenges implicate the equal protection rights of both the criminal defendant and the prospective juror. See generally *Powers* v. *Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

if the [party asserting the *Batson* claim] has established purposeful discrimination."[18] (Citations omitted; internal quotation marks omitted.) *State* v. *Hinton*, supra, 227 Conn. 323; accord *State* v. *Robinson*, supra, 237 Conn. 244–45. "The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted

[18] Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. See, e.g., *Hernandez* v. *New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 96–98. Pursuant to this court's supervisory authority over the administration of justice, we have eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. *State* v. *Holloway*, 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Thus, in this state, after the party contesting the use of the peremptory challenge has raised a *Batson* claim, the party exercising the challenge must proffer a race neutral explanation for its decision to strike the venireperson from the jury array. Id., 646. In Connecticut, therefore, the party objecting to the exercise of the peremptory challenge satisfies step one of the tripartite process simply by raising the objection.

In *Batson*, the United States Supreme Court specified that, although the reason for a peremptory challenge "need not rise to the level justifying exercise of a challenge for cause"; *Batson* v. *Kentucky*, supra, 476 U.S. 97; it must be " 'clear and reasonably specific' "; id., 98 n.20; and "related to the particular case to be tried." Id., 98. In *Purkett* v. *Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), the court explained the manner in which the second procedural step required under *Batson* should be applied: "Under our *Batson* jurisprudence . . . [t]he second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. . . . It is not until the *third* step that the persuasiveness of the justification becomes relevant . . . . At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 767–68.

by purposeful discrimination."[19] *State* v. *Gonzalez,*

[19] The dissent incorrectly asserts that we have applied the wrong test in reviewing the defendant's claim under *Batson* and *State* v. *Holloway,* 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). See part II of the dissenting opinion. The dissent suggests that we apply the test enunciated by the dissenting opinion in *Purkett* v. *Elem,* 514 U.S. 765, 770, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (Stevens, J., dissenting), whereby the party offering the race neutral reason at step two of the process would be required to demonstrate, at that second step, that the reason was related to the trial of the case. Id., 775 (Stevens, J., dissenting). This contention is flawed for several reasons. First, the defendant has not raised this claim. On the contrary, the defendant's sole and exclusive argument is that he is entitled to prevail under the majority holding in *Purkett,* which indicates that case relatedness is to be considered by the trial court at step three. See id., 768; see also footnote 18 of this opinion. Indeed, the defendant expressly concedes that "the state has met its burden" of establishing a legitimate, race neutral reason for the exercise of the challenge under step two of the *Batson-Holloway* test, claiming only that the state "has failed under step [three]." Second, the defendant has challenged the state's exercise of its peremptory challenges under the United States constitution only; he makes no claim under the state constitution and does not ask us to invoke our supervisory authority. Consequently, we are bound to apply the *Batson* test as explicated by the majority in *Purkett,* subject, of course, to the modification to step one of that test as previously approved by this court in *Holloway.* Furthermore, contrary to the assertion of the dissent, *Purkett* did *not* effect a change in the court's *Batson* jurisprudence; in fact, the court in *Purkett* expressly and emphatically explained that it was applying the *same* three step procedure that it previously had adopted in *Batson. Purkett* v. *Elem,* supra, 767. Thus, as the court in *Purkett* stated in concluding that the Circuit Court of Appeals had used an improper test, "[t]he Court of Appeals erred by combining *Batson*'s second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, i.e., a 'plausible' basis for believing that 'the person's ability to perform his or her duties as a juror will be affected." Id., 768. The court in *Purkett* went on to explain that "[t]he Court of Appeals appears to have seized on our admonition in *Batson* that to rebut a prima facie case, the proponent of a strike must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges . . . and that the reason must be related to the particular case to be tried . . . . *This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What* [Batson] *means by a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 768–69. The dissent, in mischaracterizing the holding of the court in *Purkett,* see

supra, 206 Conn. 395; accord *State* v. *Beltran*, 246 Conn. 268, 278, 717 A.2d 168 (1998).

footnote 15 of the dissenting opinion; ignores the unambiguous language of the *Purkett* majority and, instead, chooses to rely on the *Purkett dissent's* characterization of the majority opinion. Finally, even if the defendant had raised a claim under the state constitution, he could not prevail because, as we recently have reiterated, "[a]fter the burden shifts to the state to demonstrate that its challenges were race-neutral, the defendant's *Batson* claim is treated similarly under the state and federal constitutions." (Internal quotation marks omitted.) *State* v. *Robinson*, supra, 237 Conn. 245 n.6; accord *State* v. *Hinton*, supra, 227 Conn. 322 n.23.

The dissent also contends that, in *State* v. *Gonzalez*, supra, 206 Conn. 404, we indicated our approval of what has since become the test advocated by the dissent in *Purkett* for purposes of state law. See footnote 21 of the dissenting opinion. This assertion is false. We expressly noted in *Gonzalez* that our decision in that case rested solely upon *Batson's* interpretation of the *federal* constitution and not any independent ground under state law. *State* v. *Gonzalez*, supra, 393–94 n.2. Because the defendant makes no claim that article first, § 8, of the constitution of Connecticut affords him any additional protection from discriminatory jury selection, our decision today rests on federal grounds. Indeed, the language that the dissent takes from *Gonzalez* to support its contention is a direct quote from *Batson*. See id., 404; footnote 21 of the dissenting opinion. Moreover, in *Gonzalez*, we *rejected* a case-relatedness argument nearly identical to the argument advanced by the dissent. *State* v. *Gonzalez*, supra, 404. Thus, as we stated previously, our state jurisprudence differs from *Batson* only in that, under state law, we dispense with the requirement that the defendant make a prima facie showing of discrimination.

The dissent further asserts that, in *State* v. *Beltran*, 246 Conn. 268, 717 A.2d 168 (1998), this court adopted the test advocated by the dissent in *Purkett*. We disagree. Although we acknowledge that *Beltran* contains some discussion of case relatedness during the analysis of step two of the process established under *Batson* and *Holloway*; id., 279–80; our decision in *Beltran* was predicated solely upon the federal constitution; id., 277 n.7 ("[b]ecause the defendant has failed to provide any independent analysis under the state constitution [appellate review is limited] to the federal constitution"); and, therefore, we were not free to deviate from the test enunciated by the majority in *Purkett*. Moreover, no claim was made by either party in *Beltran* that the state was required to demonstrate case relatedness at step two of the process rather than at step three. Accordingly, we reject the dissent's contention that *Beltran* requires a showing of case relatedness prior to step three.

Finally, it is true, as the dissenting justice states, that the dissenting justice moved, sua sponte, to request the filing of supplemental briefs and reargument regarding his assertion, not raised by the defendant either in the trial court or on appeal, that we should apply the test advocated by the

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]." (Internal quotation marks omitted.) *State* v. *Hinton,* supra, 227 Conn. 325. Moreover, "[a]lthough the racial composition of the jury impaneled is certainly not dispositive of the issue[20] . . . it is a factor that we must consider in assessing the . . . explanation [of the party who exercises the allegedly unconstitutional peremptory challenge]." (Citation omitted; internal quotation marks omitted.) Id., 332; see

dissent in *Purkett* rather than the test enunciated in *Batson* as explicated by the majority in *Purkett.* The dissenting justice did not do so, however, until a full ten months after oral argument in this case; indeed, his failure to raise the issue in a timely manner is the *sole* reason for the delay in the issuance of this opinion. Contrary to the approach belatedly advocated by the dissenting justice, we defer consideration of the argument he advances until it is properly before us.

[20] The racial composition of the jury is not dispositive because "the striking of even one [prospective] juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated . . . ." (Internal quotation marks omitted.) *State* v. *Hinton,* supra, 227 Conn. 332.

also *United States* v. *Alvarado*, 951 F.2d 22, 26 (2d Cir. 1991) ("[t]he waiving of [a peremptory] challenge when minority venirepersons were available for challenge . . . is a factor that can lend some support to a finding of race neutral challenges").

In assessing the reasons proffered in support of the use of a peremptory challenge, we note that "[a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances." (Citation omitted; internal quotation marks omitted.) *United States* v. *Alvarado*, supra, 951 F.2d 26.

In reviewing a trial court's finding that the reasons given by a prosecutor for the use of a peremptory challenge were not pretextual, this court previously has declined to review all of the reasons given by the prosecutor in support of his or her use of the peremptory challenge once we concluded that at least one of the reasons articulated was race neutral. E.g., *State* v. *Smith*, supra, 222 Conn. 14 n.8 (refusing to consider validity of state's second proffered reason after concluding first was valid); *State* v. *Gonzalez*, supra, 206 Conn. 405 (same). To clarify any possible ambiguity regarding the proper role of the *trial court* in resolving *Batson* claims, we emphasize that, in evaluating such a claim, the trial court must consider all of the proffered reasons together in determining whether, as a factual

matter, the party exercising the peremptory challenge was motivated, in whole or in part, by impermissible discriminatory considerations.[21]

Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. *Hernandez* v. *New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *United States* v. *Alvarado*, supra, 951 F.2d 25; *State* v. *Gonzalez*, supra, 206 Conn. 395. Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, supra, 227 Conn. 323–24; see *State* v. *Gonzalez*, supra, 406–407. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *United Components, Inc.* v. *Wdowiak*, 239 Conn. 259, 263, 684 A.2d 693 (1996).[22]

---

[21] The dissent, in reliance on *State* v. *Gonzalez*, supra, 206 Conn. 400–407, contends that a trial court "should analyze each proffered reason for exercising the challenge in isolation from one another, but within the context of the entire record." In *Gonzalez*, we discussed each of the prosecutor's two reasons for exercising a peremptory challenge separately, solely in order to effectuate a thorough appellate review. We did not state, or otherwise intimate, that a trial court should evaluate each reason in isolation when determining whether it is pretextual. Thus, the dissent misrepresents the import of *Gonzalez* in claiming that each reason must be analyzed "in isolation."

[22] The dissent asserts that our application of the clearly erroneous standard in this case is "incorrect." On the contrary, we have expressly stated that the finding of the trial court regarding a claim of pretext under *Batson* and *Holloway* is to be afforded deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, supra, 227 Conn. 323–24. Indeed, this is the standard explicitly mandated by the United States Supreme Court for

## B

### The Individual *Batson* Challenges

We now address the propriety of the state's exercise of each of the six peremptory challenges that gave rise to the defendant's *Batson* claims. We conclude that, with respect to each challenge, the trial court's rejection of the defendant's *Batson* claim was not clearly erroneous.

Two preliminary issues require resolution prior to our consideration of the defendant's arguments. First, with respect to each of his *Batson* claims, the defendant contends that *none* of the reasons articulated by the state constituted a neutral, nondiscriminatory ground for the exercise of the peremptory challenge. The defendant therefore contends that the trial court was required to find, in light of the allegedly pretextual nature of all of the reasons proffered by the state, that the state's exercise of each of the six peremptory challenges was the product of purposeful discrimination. The defendant relied solely upon this argument in the trial court in support of his *Batson* claims.

---

*Batson* claims, like this one, raised under the federal constitution. E.g., *Hernandez* v. *New York*, supra, 500 U.S. 364–65, 369; see also *United States* v. *Franklyn*, 157 F.3d 90, 97 (2d Cir. 1998).

In addition, the dissent, quoting *State* v. *Ellis*, 232 Conn. 691, 701, 657 A.2d 1099 (1995), maintains that we should subject the trial court's findings to the same "independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . ." The defendant, however, has not sought such heightened review in this case; the dissent simply concludes that we should apply it. Moreover, in cases in which we have invoked the heightened review urged by the dissent, we have done so within the broader context of the clearly erroneous standard. See, e.g., *State* v. *Webb*, 238 Conn. 389, 448–50, 680 A.2d 147 (1996); *State* v. *Ellis*, supra, 700–701; *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). In any event, even if it is assumed, arguendo, that the trial court's findings, which led to the rejection of the defendant's claims of discriminatory intent, are subject to the same heightened review generally reserved for constitutional fact-finding, our "independent and scrupulous examination of the entire record" persuades us that the defendant may not prevail on those claims.

In the alternative, the defendant, for the first time on appeal, asserts that he is not required to establish that the state exercised each of the allegedly improper peremptory challenges solely for discriminatory reasons. He claims, instead, that he must show only that the use of the peremptory challenge was at least partially motivated by impermissible discriminatory considerations and that, upon such a showing, the burden then shifts to the state to establish that it nevertheless would have exercised the peremptory challenge solely for nondiscriminatory reasons. In support of this argument, the defendant relies on *Howard* v. *Senkowski*, 986 F.2d 24, 25 (2d Cir. 1993), a federal habeas corpus case in which a state prosecutor, after a trial that had been conducted prior to the United States Supreme Court's decision in *Batson*, acknowledged that he had exercised a peremptory challenge to excuse an African-American venireperson due, in part, to the prospective juror's race.

We do not doubt that, in certain circumstances, a trial court, after hearing the reasons why a peremptory challenge was used to remove a particular venireperson, reasonably could conclude that the use of that challenge was based on both impermissible discriminatory reasons and valid, nondiscriminatory reasons. In such circumstances, the dual motivation analysis set forth in *Howard* v. *Senkowski*, supra, 986 F.2d 24, would be applicable. In this case, however, the defendant failed to raise a dual motivation claim in the trial court; the defendant asserted only that the reasons articulated by the state's attorney compelled the conclusion that the state's attorney had engaged in purposeful discrimination. Moreover, the trial court expressly found that the reasons given by the state's attorney for striking the six minority venirepersons were not pretextual. Because the defendant failed to raise a dual motivation

claim, the trial court never addressed it and, consequently, the record is inadequate for consideration of the defendant's unpreserved claim. See *State* v. *Golding*, 213 Conn. 233, 240, 567 A.2d 823 (1989) ("The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim.").

Second, in support of his contention that the trial court improperly rejected his *Batson* claims, the defendant relies, to a considerable degree, on the argument that the state failed to exercise peremptory challenges against certain white venirepersons with characteristics similar to the minority venirepersons who were the subject of the defendant's *Batson* claims. See *State* v. *Hinton*, supra, 227 Conn. 325 (pretext may be shown where "persons with the same or similar characteristics but not the same race as the challenged juror were not struck"). The defendant articulated this disparate treatment claim in connection with three of his *Batson* challenges; see parts I B 3, I B 5 and I B 6 of this opinion; thereby enabling the trial court to consider the facts of his claim with respect to those three venirepersons. Accordingly, the record is adequate for our review of the defendant's claim with respect to those three venirepersons. Because, however, the defendant failed to raise a disparate treatment claim with respect to the other three venirepersons, the record is inadequate for appellate review of his claim with respect to those venirepersons. See *State* v. *Golding*, supra, 213 Conn. 240.

The defendant, nevertheless, urges us to review his unpreserved disparate treatment claims in light of our

recent decision in *State* v. *Robinson*, supra, 237 Conn. 238, in which we concluded that a defendant may renew a disparate treatment claim regarding the state's use of a peremptory challenge even at the conclusion of voir dire because such a claim "require[s] knowledge of the state's use of all of its peremptory challenges." Id., 250. Although, under *Robinson*, a defendant may renew a disparate treatment claim at the end of the voir dire process, the defendant in this case failed to do so. Because a disparate treatment claim raises factual questions that must be decided by the trial court, the defendant's failure to raise the claim in the trial court is fatal to his claim on appeal.[23] Accordingly, in determining the propriety of the trial court's findings on the defendant's *Batson* claims, we do not consider the defendant's disparate treatment claim in those instances in which the defendant failed to raise that claim in the trial court.[24]

[23] In *State* v. *Gonzalez*, supra, 206 Conn. 406, we reviewed and summarily rejected a disparate treatment claim under *Batson*, which was raised for the first time on appeal. *Gonzalez*, however, was decided prior to *State* v. *Golding*, supra, 213 Conn. 240, wherein we concluded that we will not review an unpreserved constitutional claim requiring a predicate factual determination. Because the defendant's unpreserved disparate treatment claim raises undecided questions of fact, we will not review it.

[24] According to the dissent, this court, in evaluating the defendant's disparate treatment claims, should consider not only those venirepersons who were expressly identified by the defendant in the trial court in support of his claim, but, in addition, any other venirepersons whose selection by the state's attorney might support the defendant's claim of disparate treatment. We disagree. It would be both unfair and unreasonable to require the trial court to conduct a comparative evaluation of the backgrounds of venirepersons who have not been identified by the defendant in support of his *Batson* claim. Because a party is entitled to raise a *Batson* challenge at any time prior to the swearing in of the jury; *State* v. *Robinson*, supra, 237 Conn. 250; there is no reason why the burden of identifying, with reasonable specificity, those venirepersons whose selection by the opposing party tends to support the moving party's *Batson* claim should be on the trial court, rather than on the party making the *Batson* claim. Moreover, because a claim of purposeful discrimination under *Batson* raises issues of fact to be decided by the trial court, the moving party's failure to inform the trial court of the full factual basis for the claim renders that claim unreviewable. See footnote 23 of this opinion.

1

## Venireperson C.W.[25]

On the eighth day of voir dire,[26] the state claimed that venireperson C.W., an African-American female, should be excused for cause. The trial court disagreed, and the state exercised a peremptory challenge to remove C.W. from the panel. In response to the defendant's request for a race neutral explanation for the exercise of the peremptory challenge, the state's attorney reiterated the reasons that he had articulated in support of his challenge for cause, namely, that: (1) C.W. initially had indicated that she would hold the state to a standard of proof higher than proof beyond a reasonable doubt;[27] (2) C.W. had expressed reluctance, based on her religious convictions, to voice her personal opinion or to judge another person;[28] (3) both C.W.'s son and brother had criminal convictions; and (4) C.W. believed that her cousin, who had been indicted for a homicide in New York, had been treated harshly by the police in light of his claim of self-defense. The state's attorney further observed that, although C.W. had expressed the belief that she could be fair, she also had expressed some concern over the possibility that the defendant might be required to serve time in prison. The state's attorney emphasized that "we have not . . . had a juror where all these circumstances existed in

---

[25] For each venireperson, we use that individual's initials to protect his or her legitimate privacy interests.

[26] At this time, five venirepersons had been selected, one of whom was African-American, and one of whom was both African-American and Native American.

[27] C.W. indicated that she would need to be 100 percent certain of the defendant's guilt before she could vote for a conviction. Thereafter, C.W., in response to questioning by the defendant, indicated that she could follow the court's instructions on reasonable doubt.

[28] Thereafter, C.W., in response to further questioning by the court, stated that her religious beliefs would not prevent her from following Connecticut law.

[his or her] life, nor have we taken a juror where there has been doubt about whether they understand proof beyond a reasonable doubt. There is no one who has been accepted who in any way remotely approaches [C.W.] as far as her background . . . ." The state's attorney also observed that two of the five jurors who already had been accepted were members of a minority group.

In response, the defendant sought to downplay the role that police testimony would play in the case by stating that, because the defendant admitted that he had shot and killed the victims, the crux of the case was the defendant's mental state at the time he fired the shots. He characterized C.W. as "fair minded, intelligent, and introspective," disputed that she had demonstrated any indication that she was biased against the state, and disagreed with the conclusion of the state's attorney that C.W. would not apply the appropriate standard of proof. The defendant asserted, moreover, that the selection of two jurors who were members of a minority group was irrelevant to the determination whether the state's use of a peremptory challenge to exclude C.W. from the panel was racially motivated. The trial court upheld the state's use of the peremptory challenge to excuse C.W., concluding that the state had exercised the challenge for valid, race neutral reasons.[29]

---

[29] The trial court, in its ruling on this and the defendant's other *Batson* challenges, failed to address, in express terms, each and every one of the reasons given by the state's attorney in support of the state's use of a peremptory challenge. The defendant maintains that the trial court was required to address explicitly each reason given by the state's attorney for exercising the allegedly discriminatory peremptory challenge. The defendant, however, cites to no authority in support of his claim. Moreover, the defendant, having failed either to raise this argument in the trial court or to request a further, more specific articulation by that court regarding its findings, is not entitled to review of his claim.

The defendant also asserts that the record tends to demonstrate that the trial court, after concluding that one of the reasons proffered by the state's attorney for the use of the peremptory challenge was legitimate, ended its inquiry instead of considering whether all of the reasons given by the state's

We agree with the state that the record supports the trial court's finding that the reasons given by the state's attorney for excusing C.W. were legitimate. Courts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against prosecuting authorities generally. See, e.g., *Lovejoy* v. *United States*, 92 F.3d 628, 631 (8th Cir. 1996); *United States* v. *Johnson*, 941 F.2d 1102, 1109 (10th Cir. 1991); *United States* v. *Hughes*, 911 F.2d 113, 114 (8th Cir. 1990); *People* v. *Chambie*, 189 Cal. App. 3d 149, 156, 234 Cal. Rptr. 308 (1987); *Henry* v. *State*, 265 Ga. 732, 733–34, 462 S.E.2d 737 (1995); *State* v. *Brown*, 507 So. 2d 304, 309 (La. App. 1987). C.W testified that her son, brother and cousin each had a prior arrest record and that her son had been prosecuted by the New Haven office of the state's attorney, the same office involved in prosecuting the present case. In addition, C.W. characterized her cousin's treatment at the hands of the prosecutor who handled his case as unfair. Although C.W. stated that she would not allow these considerations to affect her impartiality as a juror, a prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters. See *State* v. *Hinton*, supra, 227 Conn. 326–27 ("[t]he fact that a prosecutor distrusts a juror or finds [the juror's] responses not to be credible [may] be a sufficiently race-neutral reason for using a peremptory challenge" [internal quotation

attorney, taken together and in light of all of the circumstances, gave rise to an inference of discriminatory intent. We reject the defendant's contention because it is not supported by the record. The record indicates that the trial court considered all of the reasons tendered by the state's attorney for exercising the peremptory challenges. The record also indicates that the trial court gave the defendant a full opportunity to demonstrate, in the case of each of his *Batson* challenges, why, in his view, the reasons proffered by the state's attorney were pretextual.

marks omitted]); *State* v. *Smith,* supra, 222 Conn. 14–15 ("[a] venireperson's assessment of his [or her] own prejudices may be untrustworthy for a variety of reasons"). Furthermore, C.W.'s son, like the defendant, had been represented by a public defender, a legitimate ground for suspecting that C.W. might favor the defense. Additional support for the state's attorney's reasonable apprehension regarding C.W.'s impartiality may be found in the concern expressed by C.W. over the possibility that the defendant, upon conviction, might be faced with a prison term. Finally, C.W.'s equivocation with respect to holding the state to a higher burden of proof than proof beyond a reasonable doubt and her expressed reluctance to judge others also were valid, nondiscriminatory reasons for excusing her. See *United States* v. *Blackman,* 66 F.3d 1572, 1574 (11th Cir. 1995), cert. denied, 517 U.S. 1126, 116 S. Ct. 1365, 134 L. Ed. 2d 531 (1996). In light of the foregoing, we conclude that the trial court's rejection of the defendant's *Batson* claim with respect to C.W. was not clearly erroneous.

2

### Venireperson J.G.

On the tenth day of voir dire, the state, after unsuccessfully challenging venireperson J.G., an African-American female, for cause, exercised a peremptory challenge to excuse her. In response to the defendant's claim of a *Batson* violation, the state's attorney explained that he had exercised the peremptory challenge due to: (1) J.G.'s confusion regarding the standard of proof; (2) J.G.'s statement, which she later retracted, that her employer had conducted business with Biller Associates; (3) J.G.'s eagerness to serve as a juror on the case; (4) J.G.'s acquaintance with two persons employed in the public defender's office; (5) J.G.'s background in insurance adjusting; and (6) J.G.'s familiarity with the crime scene.

The defendant asserted that these reasons were pretextual, claiming that the state's line of questioning concerning the standard of proof was confusing, and that J.G., who was college educated, had assured the court that she would follow its instructions. He attributed J.G.'s contradictory responses regarding her employer's prior dealings with Biller Associates to her initial misunderstanding of the questions asked by the state's attorney. Furthermore, the defendant observed that J.G. had reassured the court that her knowledge of the insurance industry would not affect her objectivity. The defendant noted, moreover, the state's ostensible proclivity to excuse minority venirepersons. The court, however, found the reasons proffered by the state's attorney to be race neutral and not pretextual, and overruled the defendant's *Batson* challenge.

A review of the transcript of J.G.'s voir dire examination supports the trial court's determination that the state's decision to strike J.G. was not racially motivated. A prosecutor may challenge a juror who appears unable to understand questions or who demonstrates confusion. *Baynard* v. *State*, 518 A.2d 682, 685–86 (Del. 1986); *People* v. *Mack*, 128 Ill. 2d 231, 240, 538 N.E.2d 1107 (1989), cert. denied, 493 U.S. 1093, 110 S. Ct. 1170, 107 L. Ed. 2d 1072 (1990); *State* v. *Lindsey*, 543 So. 2d 886, 898–99 (La. 1989), cert. denied, 494 U.S. 1074, 110 S. Ct. 1796, 108 L. Ed. 2d 798 (1990). J.G. repeatedly expressed confusion in response to questions asked by the defendant, the state's attorney and the trial court concerning the applicable standard of proof. Although J.G. stated that she would follow the court's instructions, she also indicated that, in light of the seriousness of the case, she would be inclined to hold the state to a higher standard than proof beyond a reasonable doubt. In evaluating J.G.'s suitability as a juror, the state's attorney was entitled to rely on J.G.'s entire voir dire testimony to determine whether, in light of all of J.G.'s responses,

she would be willing and able to apply the proper standard of proof.

J.G., moreover, had considerable work experience in the field of insurance adjusting; she had been employed as an in-house claims adjuster for various organizations. Regardless whether her employer had had any business dealings with Biller Associates,[30] and notwithstanding her assurances that her employment background would not affect her performance as a juror, it was reasonable for the state's attorney to have concluded that J.G.'s close familiarity with the industry in which the victims were employed might color her perception of them. Finally, J.G.'s acquaintance with two employees of the public defender's office, her familiarity with the crime scene and her eagerness to serve as a juror,[31] reasons that are concededly less closely related to the issues in the case and upon which the state's attorney appeared to place less reliance, nonetheless lend support to the trial court's determination that the state did not excuse J.G. because of her race. The record, therefore, supports the trial court's finding that the reasons proffered by the state's attorney in support of exercising a peremptory challenge to strike J.G. from the jury panel were not pretextual.

3

Venireperson I.M.

On the twenty-first day of voir dire, after ten venirepersons had been selected,[32] I.M., an African-American

---

[30] J.G. initially appeared to indicate that her employer had had some contact with Biller Associates, but later denied it. It is entirely possible that J.G.'s initial statement stemmed from her misunderstanding of the question posed by the state's attorney.

[31] The state's attorney explained that J.G.'s eagerness to be selected as a juror may have caused her to overstate her willingness to follow the court's instructions.

[32] Of these, four were African-American.

female, was voir dired. At the conclusion of her examination, the state exercised a peremptory challenge to excuse her. In response to the defendant's request for a race neutral explanation for removing I.M. from the panel, the state's attorney provided the following reasons: (1) I.M. either did not understand or was confused by a number of questions; (2) I.M. had an eighth grade education; (3) I.M. testified that she was not familiar with psychiatric defenses, which, the state's attorney suggested, reflected a general lack of sophistication; (4) I.M. would be predisposed to favor Griffith, a key defense witness who was the director of the mental health center, the facility at which her son had been treated; (5) I.M. had expressed contradictory views as to whether persons who, like her son, suffered from a mental illness, should be held accountable for their actions; and (6) I.M. would be biased toward the defendant in light of her experience with her mentally ill son.

In response, the defendant observed that W.V., a white juror with a sixth grade education, already had been selected to serve on the jury.[33] The defendant also challenged the assertions made by the state's attorney that I.M. was confused by the questioning and that she was unlikely to hold persons with mental illnesses accountable for their actions. The defendant also questioned whether the particular circumstances of her son's mental health treatment were relevant. The trial court, concluding that the explanations given by the state's attorney were not pretextual, rejected the defendant's *Batson* challenge.

We agree with the state that the record supports the trial court's conclusion that the reasons offered by the

---

[33] W.V. had been chosen as a juror approximately one week prior to I.M.'s voir dire. Although the defendant did not identify W.V. by name in connection with his argument that I.M. was subject to disparate treatment relative to W.V., the record reflects that W.V. had been described in sufficient detail to alert the trial court as to W.V.'s identity, thereby providing the court with a basis to consider meaningfully the defendant's claim.

state's attorney for excluding I.M. from the jury panel were valid. In view of the psychiatric testimony that the defendant was expected to adduce at trial and the subtle distinctions in mental condition upon which the case turned, the concern expressed by the state's attorney over I.M.'s ability to understand the evidence and the applicable legal principles was legitimate. A fair reading of the record supports the state's claim that I.M. was confused at various points during her voir dire. For example, I.M. did not understand the question posed by the state's attorney about whether the nature of the charges in the case would predispose her toward one party or the other. Later, after I.M.'s unresponsive answer to a question concerning the presumption of innocence, the state's attorney attempted to explain and rephrase his question. I.M. indicated that she was still confused and did not understand the point that the state's attorney was trying to make. Furthermore, although the lack of familiarity with a complex psychiatric defense might not, in and of itself, provide a strong basis upon which to exercise a peremptory challenge, the state's attorney was entitled to consider that issue along with the other relevant aspects of I.M.'s background and experience in ascertaining her suitability as a juror.

Closely related to the foregoing was the concern expressed by the state's attorney over I.M.'s eighth grade education. Several courts have held insufficient formal education to be a race neutral reason for striking a prospective juror from the jury array. See, e.g., *United States* v. *Hunter*, 86 F.3d 679, 683 (7th Cir.), cert. denied, 519 U.S. 985, 117 S. Ct. 443, 136 L. Ed. 2d 339 (1996); *United States* v. *Lane*, 866 F.2d 103, 106 (4th Cir. 1989); *United States* v. *Harrell*, 847 F.2d 138, 139 (4th Cir.), cert. denied, 488 U.S. 944, 109 S. Ct. 371, 102 L. Ed. 2d 360 (1988); *State* v. *Lindsey*, supra, 543 So. 2d 898. Although the defendant observed that the white juror,

W.V., had been selected notwithstanding his sixth grade education, the failure "to strike a white juror who shares *some* traits with a struck black juror does not itself automatically prove the existence of discrimination." (Emphasis added.) *United States* v. *Stewart*, 65 F.3d 918, 926 (11th Cir.), cert. denied, 516 U.S. 1134, 116 S. Ct. 958, 133 L. Ed. 2d 881 (1995); cf. *United States* v. *Jimenez*, 77 F.3d 95, 100–101 (5th Cir. 1996); *Hollingsworth* v. *Burton*, 30 F.3d 109, 112–13 (11th Cir. 1994), cert. denied, 513 U.S. 1131, 115 S. Ct. 944, 130 L. Ed. 2d 888 (1995). Moreover, W.V. had expressed strong negative feelings about guns. In light of the fact that the defendant was charged with two fatal shootings, it would be reasonable for the state's attorney to conclude that W.V.'s views on firearms outweighed whatever concerns he may have had about W.V.'s educational background. Furthermore, notwithstanding his sixth grade education, W.V. had owned an autobody repair business for many years, which he operated out of his backyard. Thus, the state had strong reason to select W.V. notwithstanding his limited formal education. The same cannot be said for I.M.

The state's attorney also provided the trial court with a reasonable basis to conclude that I.M. might be favorably disposed toward the defense. First, although I.M. acknowledged that she was not acquainted with Griffith, a key defense witness, and it was not established that Griffith was in charge of the mental health center when her son was treated there, I.M. indicated that she would look kindly on Griffith, raising the possibility that she would accord his testimony greater weight than that of other witnesses. The state's attorney's belief that I.M. might be reluctant to convict the defendant, in light of his psychiatric defense, was reasonable, because I.M., who had a mentally ill son, initially had equivocated with respect to whether a person with a mental illness should be held accountable for his or

her actions.[34] Although it is by no means clear that I.M. would have been unable to put aside her personal experiences regarding mental illness, we cannot say, in light of I.M.'s entire voir dire examination, that the contrary belief expressed by the state's attorney was unreasonable or otherwise lacking support in the record. Upon consideration of all of the reasons cited by the state's attorney for excusing I.M., we are satisfied that the trial court was not clearly erroneous in concluding that the state's use of a peremptory challenge against I.M. was not the product of racial discrimination.

## 4

### Venireperson M.F.

The state, on the twenty-fourth day of voir dire,[35] exercised a peremptory challenge to excuse M.F., an African-American male who was a member of the Islamic faith. In response to the defendant's *Batson* challenge, the state's attorney explained that he had excused M.F. principally on the basis of his prior criminal record and because of concerns that if a conflict arose between Islamic and state law, M.F. would follow the former. Emphasizing that the challenge was premised, however, on the "collective situation," rather than on any one factor, the state's attorney provided the following additional reasons for excluding M.F.: (1)

---

[34] Initially, I.M. indicated that a person with a mental illness should be held accountable for his or her conduct. Later, however, I.M. indicated that her son lost control of his actions because he suffered from hallucinations. When the state's attorney then asked whether she believed her son, therefore, should not be held responsible for his conduct, I.M. responded "yes." The state's attorney then asked I.M. whether, as a general matter, people with mental illnesses should not be held accountable for their conduct. I.M. agreed. The trial court interjected and, in an attempt to elicit a clarification of I.M.'s views on the matter, asked I.M. a different question, to which I.M. responded that some mentally ill persons should be held accountable for their actions, while others should not.

[35] At this point, ten venirepersons had been selected, four of whom were African-American.

M.F. had equivocated with respect to his experiences with police officers, legal concepts and sympathy for the defendant; (2) M.F. had referred to, but did not elaborate on, "bad things" he had done in the past; (3) M.F. was acquainted with homicide victims and with a person serving a life sentence; (4) M.F. previously had been represented by a public defender; (5) M.F. was confused about the standard of proof applicable to criminal cases; and (6) M.F. had a girlfriend and a sister with ties to the mental health center at which Griffith, one of the defense witnesses, served as the director. The state's attorney acknowledged that, at times, M.F. had endeavored to reassure counsel that he would not be influenced by some of these factors, but the state's attorney nevertheless expressed his belief that "too much was unknown," and, therefore, was disinclined to rely on these reassurances.

The defendant countered that the state's challenge was motivated by improper racial and religious considerations.[36] Observing that this was the fourth challenge the state exercised to exclude an African-American venireperson, and claiming that the state's attorney had not similarly examined the religious beliefs and practices of any other venireperson, the defendant argued that the questioning undertaken by the state's attorney was calculated to elicit responses that would provide grounds for a challenge. Moreover, the defendant attributed M.F.'s confusion to the duration of the voir dire and underscored M.F.'s repeated assertions that he would follow the trial court's instructions. The court observed that the state's attorney had questioned M.F. more extensively than he had questioned previous venirepersons, but concluded that none of the reasons offered by the state's attorney for excusing M.F. was pretextual.

[36] In the trial court, the defendant claimed that the state's lengthy voir dire also "[violated M.F.'s] first amendment rights to freedom of religion." The defendant, however, did not raise this claim on appeal.

Accordingly, the court overruled the defendant's *Batson* challenge.

Turning first to the defendant's claim of impermissible religious discrimination, we note that the United States Supreme Court has not addressed whether the equal protection clause of the fourteenth amendment to the United States constitution prohibits the use of peremptory challenges on the basis of religion. For the reasons that follow, however, we conclude that a peremptory challenge based on a venireperson's religious affiliation is unconstitutional.

In *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 146, the United States Supreme Court extended the scope of *Batson* beyond race to encompass intentional discrimination on the basis of gender.[37] Acknowledging that this country's "long and unfortunate history of sex discrimination . . . warrants the heightened scrutiny [afforded] all gender-based classifications";[38] (citation omitted; internal quotation marks omitted) id., 136; the court employed traditional equal protection analysis, observing that "the only question is whether discrimina-

[37] *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 127, involved a paternity and child support action filed by the state of Alabama on behalf of the mother of a minor child, T.B., against the child's putative father, J.E.B. During jury selection, the state used nine of its ten peremptory challenges to strike male venirepersons, while J.E.B. used all but one of his peremptory challenges to excuse prospective female jurors. Id., 129.

[38] The court discussed the historical exclusion of women from jury service and, in so doing, drew an analogy to the manner in which African-Americans also had been treated. We do not interpret the court's holding, however, to turn on whether a particular group historically has been excluded from jury service. Indeed, the court framed much of its discussion condemning stereotypical treatment in broad terms. See generally *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 137–42. Moreover, the case focused, to a large degree, on the use of peremptory challenges to excuse *male* venirepersons; indeed, the jury that had been selected by the parties in that case was comprised exclusively of females. Finally, the court expressly declined the state's invitation to limit its holding to women, concluding instead that the right to be free from discriminatory jury selection applied equally to men. Id., 141.

tion on the basis of gender in jury selection substantially furthers the State's legitimate interest in achieving a fair and impartial trial." Id., 136–37. The court rejected the justification offered by the state that jurors would be likely to sympathize along gender lines in a paternity action, declaring that "[w]e shall not accept as a defense to gender-based peremptory challenges the very stereotype the law condemns." (Internal quotation marks omitted.) Id., 138. Emphasizing the harm that race or gender-based discrimination in jury selection causes "the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process"; id., 140; the court concluded that "[f]ailing to provide jurors the same protection against gender discrimination as race discrimination could frustrate the purpose of *Batson* itself. Because gender and race are overlapping categories, gender can be used as a pretext for racial discrimination." Id., 145. Moreover, the court noted: "Equal opportunity to participate in the fair administration of justice is fundamental to our democratic system. It not only furthers the goals of the jury system. It reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy. . . . [T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. As with race, the core guarantee of equal protection, ensuring citizens that their State will not discriminate . . . would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' [gender]." (Citation omitted; internal quotation marks omitted.) Id., 145–46. Finally, the court expressly rejected the claim that its holding was likely to result in the

elimination of all peremptory challenges, stating that "[p]arties may . . . exercise their peremptory challenges to remove from the venire any group or class of individuals normally subject to 'rational basis' review." Id., 143.

One month after its decision in *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 127, the United States Supreme Court denied a petition for certiorari;[39] *Davis* v. *Minnesota*, 511 U.S. 1115, 114 S. Ct. 2120, 128 L. Ed. 2d 679 (1994); from the Minnesota Supreme Court's decision in *State* v. *Davis*, 504 N.W.2d 767 (Minn. 1993), in which that court concluded that the federal constitution does not prohibit a party from exercising a peremptory challenge on the basis of religion.[40] See generally id., 770–72.

Justice Thomas, who, joined by Justice Scalia, dissented from the denial of the petition for certiorari,

---

[39] "It is well settled that [the United States Supreme Court's] decision to deny a petition for writ of certiorari does not in any sense constitute a ruling on the merits of the case in which the writ is sought." *Bethley* v. *Louisiana*, 520 U.S. 1259, 117 S. Ct. 2425, 138 L. Ed. 2d 188 (1997) (Stevens, J.).

[40] In *State* v. *Davis*, supra, 504 N.W.2d 767, which was decided before the United States Supreme Court issued its decision in *J.E.B.*, the state exercised a peremptory challenge to excuse an African-American venireperson who also was a Jehovah's Witness. Id., 768. Although denying that race played a part in her decision to exclude the venireperson, the prosecutor admitted that "it was highly significant to the State . . . that the man was a [Jehovah's] Witness. . . . I would never, if I had a [peremptory] challenge left . . . fail to strike a [Jehovah's] Witness from my jury. . . . In my experience [Jehovah's Witnesses] are reluctant to exercise authority over their fellow human beings in this Court House." Id. In declining to apply *Batson* to religion-based challenges, the Minnesota Supreme Court observed that the United States Supreme Court had not extended the reach of *Batson* beyond race. Id. The court also noted that "[t]he use of the peremptory strike to discriminate purposefully on the basis of religion does not . . . appear to be common and flagrant. . . . [T]he nature of the bias sought to be eliminated by a *Batson* challenge is particularly illusive in the case of religion. . . . Furthermore, religious affiliation . . . is not as self-evident as race or gender." Id., 771. Finally, the court stated that "[o]rdinarily, at common law, inquiry on voir dire into a juror's religious affiliation and beliefs is irrelevant and prejudicial, and to ask such questions is improper." Id., 772.

observed that "*J.E.B.* was explicitly grounded on a conclusion that peremptory strikes based on sex cannot survive heightened scrutiny under the [equal protection clause] . . . because such strikes are not substantially related to an important government objective . . . . In breaking the barrier between classifications that merit strict equal protection scrutiny and those that receive what we have termed heightened or intermediate scrutiny, *J.E.B.* would seem to have extended *Batson*'s equal protection analysis to all strikes based on the latter category of classifications—a category which presumably would include classifications based on religion. Cf. *Larson* v. *Valente*, 456 U.S. 228, [244–46, 102 S. Ct. 1673, 72 L. Ed. 2d 33] (1982); *Batson* [v. *Kentucky*, supra, 476 U.S.] 124 (Burger, C. J., dissenting). It is at least not obvious, given the reasoning in *J.E.B.*, why peremptory strikes based on religious affiliation would survive equal protection analysis. . . . *J.E.B.* itself provided no rationale for distinguishing between strikes exercised on the basis of various classifications that receive heightened scrutiny . . . . Once the scope of the logic in *J.E.B.* is honestly acknowledged, it cannot be glibly asserted that the decision has no implications for peremptory strikes based on classifications other than sex, or that it does not imply further restrictions on the exercise of the peremptory strike outside the context of race and sex."[41] (Citations omitted; internal quotation marks omitted.) *Davis* v. *Minnesota*, supra, 511 U.S. 1117–18 (Thomas, J., dissenting); see also *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 161 (Scalia, J., dissenting) (suggesting that because classification on basis of religion is subject to heightened scrutiny, peremptory challenge based on religion, like

---

[41] Justice Thomas expressed the view that the judgment in *State* v. *Davis*, supra, 504 N.W.2d 767, should be vacated and the case remanded to the Minnesota Supreme Court "to consider explicitly whether a principled basis exists for confining the holding in *J.E.B.* to the context of sex." *Davis* v. *Minnesota*, supra, 511 U.S. 1117 (Thomas, J., dissenting).

challenge based on gender, presumably would be pro-
hibited).

We cannot discern, nor has the state brought to our
attention, any "principled basis . . . for confining the
holding in *J.E.B.* to the context of sex."[42] *Davis* v. *Min-
nesota,* supra, 511 U.S. 1117 (Thomas, J., dissenting).
Courts uniformly have employed strict scrutiny in evalu-
ating the constitutionality of state interference with or
involvement in religion.[43] Accordingly, in order for the

---

[42] In a brief concurrence to the court's denial of the petition for certiorari
in *Davis* v. *Minnesota,* supra, 511 U.S. 1115, Justice Ginsberg noted two
"key" observations made by the majority in *State* v. *Davis,* supra, 504 N.W.2d
767, that, she indicated, Justice Thomas had failed to articulate in his dissent
from the denial of the petition for certiorari: (1) religious affiliation is not
as self-evident as race or gender; and (2) questions into religious affiliation
ordinarily are irrelevant, prejudicial and improper. *Davis* v. *Minnesota,*
supra, 1115 (Ginsberg, J., concurring). Although we agree with both of these
observations, we are not persuaded that they provide a meaningful basis
upon which to distinguish, for equal protection purposes, between the use
of peremptory challenges to exclude venirepersons based on their race or
gender, on the one hand, and their religious affiliation, on the other. Although
it is true that the religious affiliation of a prospective juror is not as readily
discernible as a venireperson's race or gender, and questions about a venire-
person's religion may be objectionable, it is by no means improbable that
an attorney, through the expert use of the voir dire process or otherwise,
could ascertain a venireperson's religion. Indeed, this is especially true in
this state due to the constitutional right to question prospective jurors
individually and the statutory right to question prospective jurors outside the
presence of other prospective jurors. See footnotes 13 and 14 of this opinion.

[43] Because religion-based constitutional challenges generally are raised
under the free exercise or establishment clauses of the first amendment to
the United States constitution, "[r]eligious discrimination rarely is chal-
lenged under the [federal] equal protection clause." Note, "Applying the
Break: Religion and the Peremptory Challenge," 70 Ind. L.J. 569, 591 (1995);
see note, "Religion-Based Peremptory Challenges After *Batson* v. *Kentucky*
and *J.E.B.* v. *Alabama*: An Equal Protection and First Amendment Analysis,"
94 Mich. L. Rev. 191, 204 (1995). Government action that discriminates on
the basis of religion under either the free exercise clause or the establishment
clause is, however, subject to strict scrutiny. E.g., *Church of the Lukumi
Babalu Aye, Inc.* v. *Hialeah,* 508 U.S. 520, 531–32, 113 S. Ct. 2217, 124 L.
Ed. 2d 472 (1993) (for purposes of free exercise challenge, law restrictive
of religious practice must be "narrowly tailored" to advance "compelling
governmental interest"); *Larson* v. *Valente,* supra, 456 U.S. 246 (for purposes

removal of a venireperson on the basis of his or her religious affiliation to survive equal protection analysis, we would have to be persuaded that allowing the use of a peremptory challenge in such circumstances constituted a narrowly tailored means to serve the compelling state interest of ensuring a fair and impartial jury. Although one's religious *beliefs* may render a prospective juror unsuitable for service in a particular case, one's religious *affiliation*, like one's race or gender, bears no relation to that person's ability to serve as a juror. See *Georgia* v. *McCollum*, supra, 505 U.S. 59 ("[i]n our heterogenous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or *the choice of religion*" [emphasis added; internal quotation marks omitted]). Moreover, to allow the exclusion of an otherwise qualified venireperson simply on account of that person's religious affiliation would amount to permitting jury selection procedures that promote "state-sponsored group stereotypes rooted in, and reflective of, historical prejudice"; *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 128; a practice that the United States Supreme Court expressly has rejected as violative of the equal protection clause. Absent a showing that the holding of *J.E.B.* is not logically applicable to religion, we conclude that the equal protection clause of the fourteenth amendment to the United States constitution prohibits the exercise of a peremptory challenge to excuse a venireperson because of his or her religious affiliation.[44]

---

of establishment clause, strict scrutiny is applied to state law granting denominational preference).

[44] Our research has revealed only a few cases decided after *J.E.B.* that address this question under the federal constitution. See *United States* v. *Somerstein*, 959 F. Sup. 592, 595 (E.D.N.Y. 1997) (holding that *Batson* applies to religion-based challenges); *People* v. *Martin*, 64 Cal. App. 4th 378, 384–85, 75 Cal. Rptr. 2d 147 (1998) (holding that *Batson* extends to religion-based challenges but that challenge on basis of juror's beliefs is legitimate); see

Having so concluded, however, we agree with the trial court that the state's attorney did not excuse M.F. on the basis of his religious affiliation. It is true that the state's attorney, upon learning of M.F.'s adherence to the Islamic faith,[45] questioned him extensively about his religious beliefs. The trial court found, however, that he had done so to determine whether those beliefs were likely to affect adversely his ability to serve as a juror.[46] Indeed, a review of the state's attorney's voir dire of M.F. reveals that his questions concerning religion—*to which no objections were made on relevancy grounds*—were motivated primarily by a concern that the teachings of the particular Islamic sect to which

---

also *United States* v. *Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) (stating in dicta that use of peremptory challenge on basis of religious affiliation would be improper, and perhaps unconstitutional, whereas challenge on basis of religious belief that would interfere with performance as juror would be permissible). Contra *Casarez* v. *State*, 913 S.W.2d 468, 495–96 (Tex. Crim. App. 1995) (declining to extend *Batson* to religion-based challenges). The weight of scholarly authority supports the view that the exercise of a peremptory challenge on the basis of a venireperson's religious affiliation is impermissible under the federal constitution. See, e.g., note, "Religion-Based Peremptory Challenges After *Batson* v. *Kentucky* and *J.E.B.* v. *Alabama*: An Equal Protection and First Amendment Analysis," 94 Mich. L. Rev. 191, 216 (1995); note, "The *Batson* Analysis and Religious Discrimination," 74 Or. L. Rev. 721, 727, 739 (1995); comment, "The Equal Protection Clause, the Free Exercise Clause and Religion-Based Peremptory Challenges," 63 U. Chi. L. Rev. 1639, 1672 (1996). But see note, "Applying the Break: Religion and the Peremptory Challenge," 70 Ind. L.J. 569, 570 (1995) (*Batson* should not be extended to religion-based challenges).

[45] M.F. had revealed that he was a member of the Islamic faith in response to a remark by the trial judge who had observed, prior to the commencement of M.F.'s voir dire, that M.F. was wearing a hat. The trial judge had stated that headwear was prohibited in the courtroom unless worn for religious reasons.

[46] Although counsel must be afforded whatever "latitude is reasonably necessary to fairly accomplish the purposes of the voir dire"; (internal quotation marks omitted) *State* v. *Dolphin*, 203 Conn. 506, 512, 525 A.2d 509 (1987); inquiry on voir dire is limited "to questions which are pertinent and proper for testing the capacity and competency of the juror." (Internal quotation marks omitted.) *Bleau* v. *Ward*, 221 Conn. 331, 341, 603 A.2d 1147 (1992). In circumstances in which inquiry into a venireperson's religious *beliefs* are relevant, the trial court must take care to prevent questioning that may be harassing or otherwise inappropriate.

M.F. belonged might prevent him from rendering a verdict in accordance with the law. Although it is true that several of the questions asked by the state's attorney regarding M.F.'s religious background were of dubious relevance,[47] the great majority of the questions addressed beliefs held by M.F. that might affect his ability to serve impartially as a juror and follow the court's instructions.[48] In addition, although certain lines of questioning appeared to stem from either the state's attorney's lack of knowledge about the Islamic faith or possible misconceptions about it, the entire record supports the trial court's determination that the in-depth questioning put to M.F. by the state's attorney did not give rise to an inference that the state had exercised a peremptory challenge against M.F. on account of M.F.'s religious affiliation.

---

[47] For example, the state's attorney inquired as to whether the leader of the religious sect to which M.F. belonged had a mosque, and whether M.F. was a member of a local mosque.

[48] For example, despite M.F.'s reassurances that Louis Farrakhan, who, in 1978, formed a new branch of the Nation of Islam and assumed leadership over it; 2 Encyclopedia of African-American Culture and History (J. Salzman et al. eds., 1996) pp. 934–35; was not affiliated with the Islamic sect to which M.F. belonged, the state's attorney inquired as to whether M.F.'s religious beliefs embraced anti-Semitism, observing that Farrakhan espoused anti-Semitic views and that the victims in the case were Jewish. Later, the state's attorney inquired into the beliefs held by Warith Muhammed, the leader of the sect to which M.F. belonged. Specifically, he asked whether Warith Muhammed shared the views of his father, Elijah Muhammed, whom the state's attorney considered to be an extremist.

Resuming his inquiry into the Nation of Islam, the state's attorney explored M.F.'s views concerning the status of women:

"[Mr. Dearington, State's Attorney]: [T]raditionally, the Nation of Islam, and this may not apply to you, considered women on a lower level than men. Is that not—

"[M.F.]: That's a—they might have done that but I think that's an Arabian view of Islam. No. There [are] women doctors, lawyers in positions of the . . .

* * *

"[Mr. Dearington]: Okay. As far as deliberating then, you don't—you wouldn't have a problem with women. Obviously there are men and women on a jury.

"[M.F.]: No. I have personal views but, no. I think I can put them aside."

Finally, M.F. expressly indicated that, in the event of a conflict between the court's instructions and his religious beliefs, he would seek guidance from his religious leader about how to handle the situation.[49] This response alone provided a reasonable basis for the state's attorney to doubt whether M.F. could follow the court's instructions, including the requirement that he not discuss the case with anyone during the pendency of the trial. Accordingly, the trial court properly concluded that, to the extent that the state's attorney had excused M.F. for reasons related to his religion, those reasons were not based upon M.F.'s religious affiliation, but, rather, upon certain views that could impair his ability to decide the case solely on the facts and the applicable law.

We also reject the defendant's claim that the other reasons given by the state's attorney in support of the peremptory challenge were so unfounded as to be pretextual. The state's attorney was principally concerned with M.F.'s prior arrest record,[50] a consideration that,

---

[49] The relevant portion of the voir dire is as follows:

"[Mr. Dearington, State's Attorney]: Suppose the court gave you the appropriate law in this case and it didn't entirely agree with your religious beliefs. How would you deal with that?

"[M.F.]: I would refer to our [Imam] and address him with my claim.

"[Mr. Dearington]: Who is—I—

"[M.F.]: My [Imam], our [Imam], you know, our spiritual spokesman and our local master and, you know, break to him the situation and see if I could—"

Although M.F. subsequently reassured the state's attorney that he would follow the court's instructions, the state's attorney was entitled to assess M.F.'s statement in the context of M.F.'s entire voir dire testimony, and in light of his own observations concerning the depth of M.F.'s religious convictions.

[50] M.F. testified that he had been arrested on four separate occasions on charges associated with the possession of marijuana, burglary, sexual assault, and driving with an expired registration and without automobile insurance. The sexual assault charge, which stemmed from an alleged incident twenty years earlier, and the possession of marijuana charge, subsequently were dismissed. M.F. had agreed to a plea with respect to the

for obvious reasons, generally has been recognized as a proper ground for the exercise of a peremptory challenge. See *United States* v. *Ferguson*, 935 F.2d 862, 864–65 (7th Cir. 1991), cert. denied, 502 U.S. 1045, 112 S. Ct. 907, 116 L. Ed. 2d 807 (1992); *State* v. *Smith*, supra, 222 Conn. 14; *State* v. *Thompson*, 516 So. 2d 349, 354 (La. 1987), cert. denied, 488 U.S. 871, 109 S. Ct. 180, 102 L. Ed. 2d 149 (1988). In connection with one of M.F.'s arrests, he testified that, although he did not believe that the police or the prosecutor treated him unfairly, he was frustrated with the manner in which the police had handled the arrest. Moreover, M.F.'s obscure reference to past misdeeds,[51] some of the details of which were not disclosed, his prior representation by a public defender in connection with his burglary conviction, and his acquaintance with a person serving a sentence of life imprisonment provide support, in varying degrees, for the concerns of the state's attorney regarding M.F.'s ability to serve impartially and objectively as a juror. Finally, the other reasons given by the state's attorney to justify the exclusion of M.F., namely, M.F.'s equivocal responses to questions about whether he might harbor any sympathy for the defendant,[52] his

burglary charge, and had served a period of probation. The motor vehicle related charges had been brought within the preceding year.

[51] M.F.'s comments in this regard were made in response to the questions of the state's attorney concerning M.F.'s ability to judge another person:

"[M.F.]: I [have] made so many mistakes myself . . . .

"[Mr. Dearington, State's Attorney]: As far as many mistakes, I'm not sure what you are talking about.

"[M.F.]: In general. Well, we all make them, you know.

"[Mr. Dearington]: Well, that's true.

"[M.F.]: I didn't want to get particular.

"[Mr. Dearington]: Okay. All right. But in terms of—

"[M.F.]: Let me just say. I would hate to think that I would have to judge a person because of their cultural background or because of some other [person's] actions which weren't directly related to [him or her]."

Although the state's attorney did not press M.F. for any greater detail regarding the nature of his past "mistakes," M.F. had revealed a history of drug and alcohol use, and gambling.

[52] The reservations expressed by the state's attorney over the role that sympathy might play in M.F.'s decision making are supported by the record

apparent confusion over the applicable standard of

of M.F.'s voir dire testimony, the relevant portion of which is set forth below:

"[Mr. Dearington, State's Attorney]: Now as far as sympathy. A case such as this lends itself to sympathy. Families on both sides. Two families on one side and then there's the . . . defendant's family. Sympathy cannot be a factor in your deliberations. It cannot influence your judgment in this case. It cannot be something that controls how you decide this case. Can you assure us that you would not let sympathy influence your judgment in this case?

"[M.F.]: Can I assure you?

"[Mr. Dearington]: Right.

"[M.F.]: No. There's no certainty about that. I myself struggle, you know, with emotions and, you know, hopefully when I do see them arise, I don't let it cloud my judgment. And I'm not saying that, you know, it wouldn't affect my decision making, but I would like to think that, you know, as I struggle to rise above my own, that I can struggle and rise above somebody else's also and not lose focus on the real matter that's being dealt with.

"[Mr. Dearington]: Well, when you say [you] would like to think that you would not [let] sympathy, I guess, cloud your decision is what you said.

"[M.F.]: You are asking me for a guarantee or—

"[Mr. Dearington]: No. No one can guarantee. This is the first time you've ever done this. We don't expect guarantees but you know yourself better than anyone, [M.F.]. If you feel that [you] can't with certainty or can't say with a fair measure of certainty that sympathy won't affect [your] judgment, that's what we're interested in.

"[M.F.]: Okay.

"[Mr. Dearington]: We're not looking for 100 percent guarantees but do you think it might be a problem? That's all we want to know.

"[M.F.]: Yes. I think it could be a problem.

"[Mr. Dearington]: Even though the court will tell you it shouldn't be a problem?

"[M.F.]: Right.

"[Mr. Dearington]: It's easy for the court to say that. It's you who [has] to deal with the situation.

"[M.F.]: I'd like to think [of] myself as compassionate. Yes, it could be a problem.

"[Mr. Dearington]: Do you think it would be a problem to the point that you might not want to sit on this case or [it] might interfere with your ability to follow the rules in this case?

"[M.F.]: I wouldn't like to think that. No. I would hope that it wouldn't be."

Later, defense counsel inquired: "Can you assure us that you would be able to put sympathy aside, whatever natural sympathies that you might have, and not let that affect your objective determination of the facts in this case?" M.F. responded: "I could stick to the facts."

Finally, M.F. also appeared to be uncertain about whether he would be concerned with the sentence that might be imposed in the case, remarking:

proof[53] and his potential bias toward Griffith, the director of the mental health center,[54] all have a sufficient basis in the record. In light of the foregoing, we conclude that the trial court properly determined that the state had not rejected M.F. on account of either his race or his religious affiliation.

## 5
## Venireperson G.D.

On the twenty-seventh day of voir dire,[55] the state exercised a peremptory challenge to excuse G.D., a twenty-three year old Hispanic male. The defendant, exercising his right under *Batson*, requested that the state's attorney articulate the reasons for excluding G.D. from the jury. The state's attorney initially asserted

"I would like to think not. A lot of my decisions, right, are from a spiritual point of view and in Islam we have a saying . . . if it's [Allah's] will, and that's pretty much where I try to leave it . . . ."

[53] The state's attorney questioned M.F. with respect to his understanding of the burden of proof:

"[Mr. Dearington, State's Attorney]: All right. Let me—as far as just some of the general legal propositions, we have to prove our case beyond a reasonable doubt. I'm sure you are aware of that and that's less than 100 percent certainty. Can you understand that there is a difference and accept the fact, [M.F.], that you don't have to be 100 percent certain to convict?

"[M.F.]: Yes.

"[Mr. Dearington]: Yes? Do you follow my question?

"[M.F.]: Right. You're saying, in other words, there's no absolute when you are talking in terms of—I guess that's what you referred to, Your Honor, is preponderance.

"[Mr. Dearington]: Well, it's proof beyond a reasonable doubt, but that's a lower level than being 100 percent sure. There can be some doubt and you can still convict.

"[M.F.]: Okay.

"[Mr. Dearington]: Can you accept that concept? Many people think gee, I want to be 100 percent sure.

"[M.F.]: Sure. That's why when I refer to excellence, I always say human excellence."

[54] M.F. indicated that his sister had been treated at the mental health center, and that his girlfriend was employed there.

[55] Eleven venirepersons had been chosen at this point, including four African-Americans and one Hispanic.

that he was not required to render such an articulation because, he claimed, the law does not require the state to give race neutral reasons for its use of a peremptory challenge against a minority venireperson unless the prospective juror is the same race as the defendant. The state's attorney nevertheless provided the following reasons for excluding G.D. from the jury panel: (1) G.D. likely would be overwhelmed by the medical testimony concerning the defendant's psychiatric defenses; (2) G.D. had little or no experience in making important decisions; (3) G.D. was acquainted with a murderer and the murderer's victim; (4) G.D. had had an unpleasant experience with a police officer; and (5) G.D. was the second youngest in a family of seven children, of which he was the only male.

The defendant claimed that the reasons proffered by the state's attorney were pretextual. In particular, he argued that a white juror with a sixth grade education who had "worked on cars in his backyard for his entire life" already had been accepted.[56] The defendant further observed that, although G.D. had stated that he knew a murderer and that murderer's victim, he did not claim to be a friend of either one. The state's attorney acknowledged that he had accepted a white juror with less formal education than G.D., but explained that that juror was considerably older than G.D. The trial court accepted the reasons advanced by the state's attorney and found that the peremptory challenge was not racially motivated.

We begin by observing that, contrary to the assertion made by the state's attorney during voir dire, a *Batson* claim may be made with respect to a venireperson who is not a member of the same race as the defendant. In *Powers* v. *Ohio*, 499 U.S. 400, 415, 111 S. Ct. 1364, 113

---

[56] The defendant was referring to venireperson W.V. See part I B 3 of this opinion.

L. Ed. 2d 411 (1991), the United States Supreme Court extended the *Batson* principle to prohibit the use of racially motivated peremptory challenges irrespective of the race of the defendant. Accordingly, the defendant in the present case was entitled to raise a *Batson* claim in connection with the state's use of a peremptory challenge to excuse G.D.

Turning to the reasons proffered by the state's attorney for excusing G.D., we conclude that, although the state's use of a peremptory challenge against G.D. presents a closer question than the defendant's other *Batson* claims, the trial court's ruling was not clearly erroneous. In support of G.D.'s removal from the panel, the state's attorney observed, first, that G.D. might experience difficulty understanding the expert psychiatric testimony in light of his "less than illustrious" high school career. G.D. had stated that, during high school, his principal concern was "[g]etting it over with." G.D. then elaborated: "I wasn't really too good of a student. I didn't get too involved with it. I just did my work." The defendant then asked G.D. whether he "enjoy[ed] doing a lot of reading or not really?" G.D. responded "[n]o." Although a careful review of G.D's voir dire testimony indicates that G.D. did not appear to be confused by the questions, he responded monosyllabically to most questions, thereby creating the impression that his comprehension may have been somewhat superficial.[57] We are mindful, moreover, that appellate review

---

[57] We note, however, that both the state's attorney and defense counsel frequently asked questions of G.D. that were susceptible to a yes or no answer. On at least two occasions, though, when asked more open-ended questions, G.D. did elaborate. For example, when he was asked how he would respond if he were in a minority of one on a vote by the jury, G.D. answered: "Well, I would make sure that everyone knows why I am voting against it or for it, whatever. If I was in the minority, I would try to see if they would see my point of view." When asked if he ever felt taken advantage of in purchasing goods or services, G.D. responded affirmatively, citing as examples the purchase of a car or of an item, such as a collectible, that had been falsified. He also explained that he felt that he previously had been taken advantage of because of a lack of knowledge on his part.

of a cold record is no substitute for the ability of the trial court to witness firsthand a venireperson's responses and demeanor. "A prosecutor . . . may legitimately [base his or her decision] not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror. An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge. . . . Thus, a prosecutor's explanation that a venireperson was excluded because he or she seemed, for example, inattentive or hostile to the government, if credible is sufficient." (Internal quotation marks omitted.) *State* v. *Robinson,* supra, 237 Conn. 254–55 n.15.

The state's attorney also observed that G.D. never had been "put in a position where he had to make decisions," noting that G.D.'s job did not require decision making. G.D. had testified that he had been employed for the preceding five years as a waste water treatment operator, explaining: "I take samples of the water and I get the pH [readings], mak[ing] sure everything is within range, [and] not out of regulation."[58] Although the record does not establish with specificity the extent, if any, to which G.D.'s job entailed independent decision making, his description was of work that appeared to be routine and perfunctory, rather than supervisory or managerial. Accordingly, the record provides sufficient grounds for inferring that G.D.'s employment required little or no decision making.[59] Because jurors in a criminal case are called upon to make critical decisions about the accused's guilt or innocence, the

[58] G.D. also stated that, during high school, he had been employed as a cook and as a bank teller.

[59] Consequently, we disagree with the defendant that, because the state's attorney did not inquire further into G.D.'s job responsibilities, the state's attorney was not entitled to rely on the evidence, albeit modest, that was in the record regarding the nature of G.D.'s employment.

perceived lack of a demonstrated ability to make decisions constitutes one reasonable basis upon which to gauge the suitability of a prospective juror.

The defendant also contends that his claim of pretext is supported by the fact that the state already had accepted a venireperson with less formal education than G.D. Specifically, he claims that the state's acceptance of W.V., a white juror who possessed a sixth grade education, indicates that G.D.'s purported lack of education simply was a makeweight argument designed to mask the real reason why the state sought to exclude G.D., namely, because he is Hispanic.

The record indicates, however, that W.V. and G.D. were markedly different in certain other key respects. In particular, W.V., who was forty-six years old, was significantly older than G.D., who was twenty-three. Moreover, W.V., who had been married for many years, had managed his own automotive repair business and raised two children to adulthood. Consequently, it was reasonable for the state's attorney to conclude that W.V., by virtue of his greater maturity and life experience, would be a more desirable juror than G.D., a young, single male who lived with his parents and collected autographs and baseball cards and watched television in his spare time.[60] See *United States* v. *Hunter*, supra, 86 F.3d 683 (venireperson with limited education and who was young, single and living with parents excused for race neutral reasons); *Ex parte Brooks*, 695 So. 2d 184, 190 (Ala. 1997) (venireperson who was young, single and generally inexperienced was properly subject to peremptory challenge).

The state also proffered reasons relating to G.D.'s potential bias. First, G.D. reported that, nearly two years

---

[60] For example, in response to a question from defense counsel regarding G.D.'s "source of news . . . on a daily basis," G.D. responded: "Source of news? ESPN. I am not much of a news man. I like sports."

earlier, a police officer, while arresting G.D.'s friend for breach of the peace, used excessive force and "tried to be too macho."[61] When the case went to court, G.D. was called as a witness; the case eventually was dismissed and the police officer was reprimanded. Although G.D. maintained that this experience would have no bearing on his performance as a juror,[62] the state's attorney was entitled to rely, instead, on his own impression regarding the extent to which the incident was likely to affect G.D.'s ability to be impartial. See *State* v. *Smith*, supra, 222 Conn. 14–15 (juror's use of word "harassed" to describe encounter with police belied his assertion that he could be impartial).

We acknowledge that the remaining reasons offered by the state's attorney in support of the state's exercise of a peremptory challenge against G.D., namely, G.D.'s casual acquaintance with the victim of a homicide and the victim's perpetrator,[63] and the fact that he is the

---

[61] G.D. stated that the police officer had pulled him and his friend over without engaging the siren. The officer then "called over the megaphone and demanded my friend to get out. He didn't ask him to step out of the car. He was just real obnoxious."

[62] The state's attorney asked the following questions about the incident:

"[Mr. Dearington, State's Attorney]: As a result of that, do you have a feeling about prosecutors, that they overstep their bounds or are not fair?

"[G.D.]: No.

"[Mr. Dearington]: Do you think the prosecutor was fair to you?

"[G.D.]: Yeah.

"[Mr. Dearington]: As far as that individual officer, do you know what happened to him?

"[G.D.]: No.

"[Mr. Dearington]: Was he disciplined?

"[G.D.]: I never found out what happened.

\* \* \*

"[Mr. Dearington]: Do you have a feeling, as a result of that experience with that police officer, that might affect your judgment about all police officers?

"[G.D.]: No, I don't."

[63] G.D. testified that, although he had attended high school with these persons, his familiarity with them stemmed from weekend recreational football games. G.D. stated: "I just knew of [the perpetrator and the victim] just a couple of 'hi's, 'bye's. That's it." The state's attorney asked: "So you weren't

second youngest of six siblings,[64] lack any obvious relevance to G.D.'s qualifications as a juror. The state's attorney did not explain how these factors might have tended to affect G.D.'s performance, and neither the defendant nor the trial court sought such an explanation. Although it is difficult for us to discern the relevance of these considerations, we are not prepared to say, in light of the other reasons offered by the state's attorney, that they necessarily must give rise to a finding of pretext. Although reasons that appear unrelated or only marginally related to the issues in the case or to a juror's qualifications will, in some circumstances, result in a finding of pretext, "even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. . . . As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances." *United States* v. *Alvarado*, supra, 951 F.2d 26. Although G.D., in contrast to some of the other venirepersons who were subject to peremptory challenges, did not possess attributes strongly suggestive of an inability to fulfill the duties of a juror, we are persuaded that, in light of all of the circumstances, including G.D.'s youth, his modest academic goals and accomplishments, and his general lack of experience and sophistication, the trial court's rejection of the defendant's *Batson* claim with respect to G.D. was not clearly erroneous.

familiar with either the victim or the shooter? G.D. responded, "[I just] knew them by name."

[64] With respect to G.D.'s family situation, the state's attorney noted only that it would be "of some interest in terms of how [G.D.] would look at this case."

6

## Venireperson B.A.

On the thirty-first day of voir dire, the state exercised its twentieth peremptory challenge against B.A., an African-American female, which prompted the defendant's sixth *Batson* claim.[65] The state's attorney explained that he had excused B.A. because she had: (1) an eighth grade education and a sporadic work history; (2) two brothers with criminal records; (3) an arrest for a domestic incident; (4) received psychiatric treatment at an institution that may have been affiliated with the mental health center; and (5) given inconsistent answers during voir dire.

With respect to B.A.'s educational background, the defendant again claimed that, because the state's attorney did not excuse W.V., the white juror with a sixth grade education, his stated reliance on B.A.'s eighth grade education was pretextual. As further evidence of the state's alleged discriminatory intent, the defendant also asserted that certain white professionals[66] had not been asked about their own or their family members' experiences with the criminal justice system. As to the defendant's latter contention, the state's attorney countered that he had not asked B.A. whether she had been involved with the criminal justice system, but, rather, that she had volunteered that information when he inquired whether she or anyone in her family had ever been the victim of a crime. The state's attorney also observed that, of the nineteen peremptory challenges the state previously had exercised, fifteen had been

---

[65] At this point, thirteen venirepersons had been selected. Of those thirteen, four were African-American and two were Hispanic.

[66] Although these persons were not identified by name, defense counsel referred to a person on the panel the previous day who was "involved in nuclear plants."

used to excuse persons who were not African-American. The trial court overruled the defendant's *Batson* challenge.

The record amply supports the trial court's determination that the reasons proffered by the state's attorney for excluding B.A. from the jury were not pretextual. B.A. had two brothers with serious criminal histories; one had been arrested twelve times for burglary and both had served time in prison. In addition, B.A. and her boyfriend had been arrested for a domestic dispute two years earlier. Although the charges against her subsequently were dismissed, B.A. stated that she did not think that the police had treated her fairly. In light of these circumstances, it was reasonable for the state's attorney to conclude that B.A.'s exposure to the criminal justice system might prejudice her against the prosecution in the present case.

Furthermore, although B.A. stated that she was not acquainted with Griffith, a key defense witness who also was the director of the mental health center, she had received treatment for depression at a facility to which she had been referred by the mental health center that may have been affiliated with the mental health center. In addition, B.A. gave ambiguous or inconsistent answers to several key questions during her voir dire, including inquiries relating to the presumption of innocence, publicity concerning the crime, the psychiatric defenses and sympathy for the defendant.

Finally, the trial court was not required to conclude that the state engaged in purposeful discrimination against B.A., who had an eighth grade education, simply because the state did not exercise a peremptory challenge to excuse W.V., the white male with a sixth grade education. B.A.'s limited education was only one of several factors that prompted the state to exercise a peremptory challenge against her, and it was reasonable

for the trial court to have concluded that B.A.'s educational level, when considered with the other valid reasons articulated by the state's attorney, constituted an objective, nondiscriminatory reason for B.A.'s exclusion from the jury panel.[67] Accordingly, the defendant's sixth and final *Batson* claim must fail.

## C

### Conclusion

In concluding our discussion of the defendant's *Batson* claims, we make a few additional observations that lend support to the trial court's findings that the state did not engage in purposeful discrimination in the exercise of its peremptory challenges. First, at the time of each *Batson* challenge, the state already had accepted minority venirepersons; the final jury of twelve regular and three alternate jurors included four African-Americans and two Hispanics. As we previously have noted, the trial court, in assessing the validity of the state's proffered reasons, is entitled to take into account the extent to which the state has accepted minority venirepersons. See *State* v. *Hinton*, supra, 227 Conn. 332. Second, the state declined to exercise seven of its allotted peremptory challenges. "The waiving of a challenge when minority venirepersons were available for challenge, though it provides no insulation from judicial scrutiny, is a factor that can lend some support to a finding of race neutral challenges." *State* v. *Alvarado*, supra, 951 F.2d 26; see also *State* v. *Hinton*, supra, 332.

We again emphasize that "the issue of purposeful racial discrimination in the state's use of peremptory jury challenges is a matter of utmost seriousness, not

---

[67] Other than B.A.'s and W.V.'s limited formal education, the defendant has not claimed, and the record would not support a claim, that B.A. and W.V. were similar in any other respect. Moreover, as we previously have explained, the state had substantial reason to retain W.V. as a juror despite his sixth grade education. See part I B 3 of this opinion.

only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Holloway*, 209 Conn. 636, 645, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Because purposeful discrimination on the basis of gender and religion similarly has no place in our justice system, the use of peremptory challenges for either of those two reasons also cannot be tolerated. At the same time, however, we are mindful that the fact-bound determination concerning the propriety of the use of peremptory challenges is a matter that necessarily must be entrusted to the sound judgment of the trial court, which, unlike an appellate court, can observe the attorney and the venireperson and assess the attorney's proffered reasons in light of all the relevant circumstances. In this case, we conclude that the record supports the trial court's findings that the state did not discriminate on the basis of race or religious affiliation in the exercise of its peremptory challenges.

## II

## THE JURY INSTRUCTION CLAIM

The defendant also claims that the trial court improperly instructed the jury with respect to the affirmative defense of extreme emotional disturbance.[68] We disagree.

The following facts are relevant to our resolution of this claim. The defendant submitted a request to charge on extreme emotional disturbance, seeking the instruction that, "[a]s used in this affirmative defense, the word 'extreme' has its ordinary meaning, that is, it means great or substantial." The trial court rejected the defendant's request and, instead, provided the jury with the definition of the term "extreme" that we expressly

---

[68] See footnote 10 of this opinion.

adopted, for purposes of the affirmative defense of extreme emotional disturbance, in *State* v. *Elliott*, 177 Conn. 1, 10, 411 A.2d 3 (1979) ("[i]n its charge, the trial court should explain that the term 'extreme' refers to the greatest degree of intensity away from the norm for that individual"). Thus, the trial court, in accordance with *Elliott*, instructed the jury that "the word 'extreme' . . . means the greatest degree of intensity away from the norm, away from the normal or usual state of the defendant."[69] The defendant excepted to the court's instruction.

The defendant concedes that the court's definition of the term extreme was expressly authorized, and indeed, mandated, by this court in *State* v. *Elliott*, supra, 177 Conn. 10. He claims, nevertheless, that the definition that we adopted in *Elliott* creates an unreasonably high threshold for a defendant who claims to have acted under an extreme emotional disturbance, and that the instruction he requested provides a fairer and more accurate statement of the degree to which the emotional disturbance must be found to have affected the defendant's mental state.

We are not persuaded by the defendant's argument. The definition of extreme that we adopted nearly two decades ago in *Elliott* is, by now, well established in our jurisprudence. E.g., *State* v. *Crespo*, 246 Conn. 665, 681, 718 A.2d 925 (1998); *State* v. *DeJesus*, 236 Conn. 189, 204, 672 A.2d 488 (1996). Indeed, the legislature has taken no action to change the definition of extreme that we approved in *Elliott*. "While we are aware that legislative inaction is not necessarily legislative affirmation; see *Conway* v. *Wilton*, 238 Conn. 653, 662, 680 A.2d 242 (1996); we also presume that the legislature

---

[69] The defendant also had specifically requested that the trial court "*not* charge that extreme means the 'greatest degree of intensity away from the norm, away from the normal or usual state, for the defendant.' " (Emphasis in original.)

is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation. *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 439, 525 A.2d 91 (1987)." (Internal quotation marks omitted.) *State* v. *Morales*, 240 Conn. 727, 733–34, 694 A.2d 758 (1997).[70] Moreover, because § 53a-54a (a) contains no definition of the term extreme, "it is appropriate to look to the common understanding of the term as expressed in a dictionary." *State* v. *Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997). The definition that the defendant challenges is derived from the dictionary, which defines extreme as "existing in the highest or the greatest possible degree . . . . [S]ituated at the farthest possible point from a center . . . farthest advanced in any direction." Webster's Third New International Dictionary.

In support of his claim, the defendant relies on two out-of-state cases, *State* v. *Bishop*, 753 P.2d 439 (Utah 1988), and *State* v. *Ott*, 297 Or. 375, 686 P.2d 1001 (1984). Neither case constitutes persuasive precedent for the defendant's contention. In *Bishop*, the Utah Supreme Court did not address the validity of the trial court's definition of the word extreme in connection with the defendant's claim of extreme emotional disturbance. Instead, the court considered whether the trial court misinstructed the jury by limiting the realm of emotional disturbances recognized under the state's manslaughter statute to those triggered by external stimuli to which the defendant's reaction was reasonable. See generally *State* v. *Bishop*, supra, 467–72.[71]

---

[70] In *State* v. *Austin*, 244 Conn. 226, 243–44, 710 A.2d 732 (1998), we recently considered a similar challenge to the definition of "extreme" that we adopted in *State* v. *Elliott*, supra, 177 Conn. 10. In *Austin*, however, we declined to address the merits of the defendant's claim because the definition that he urged us to adopt was not the definition that he had requested in the trial court. *State* v. *Austin*, supra, 244. In concluding that the defendant was not entitled to review under the plain error doctrine, however, we noted that the trial court had "properly instructed the jury." Id.

[71] Indeed, the trial court in *Bishop* had instructed the jury that " '[e]xtreme' means excessive, or far advanced, or grievous." *State* v. *Bishop*, supra, 753

In *Ott*, the defendant challenged the trial court's instruction on extreme emotional disturbance on a number of grounds, including the ground that the court should not have defined the word extreme at all, but, instead, should have explained the term "extreme emotional disturbance" as a whole.[72] *State v. Ott*, supra, 297 Or. 390. The Oregon Supreme Court agreed, concluding that "a trial court . . . should pose the issue in terms of whether [the] defendant was under the influence of an emotional disturbance to the extent that he lost his self-control that would have otherwise prevented his committing the homicide." Id., 393. The court also noted that the definition of extreme used by the trial court "would seem to require a state of mind so far from the norm as to be characteristic of a mental illness. The defense was meant to be understood in more relative terms as referring to a loss of self-control due to intense feelings." Id., 392. In this case, in contrast to *Ott*, the defendant does not claim that the trial court should have refrained from providing *any* definition of the term extreme, but, rather, that it should have defined the term differently.[73] Moreover, we disagree with the dicta in *Ott* that the use of the dictionary definition of the word extreme in the context of a claim of extreme

P.2d 468. Because no challenge was made to the trial court's definition of extreme, the Utah Supreme Court did not address it.

[72] The relevant portion of the jury charge in *Ott* was as follows: "[T]he extreme disturbance must be an extreme emotional disturbance. You are instructed that there are varying degrees of emotional disturbance. Not every disturbance is an extreme emotional disturbance in the law. In determining what the term extreme means with reference to extreme emotional disturbance I instruct you that the term means the outermost or furthest, most remote in any direction, final or last . . . ." (Internal quotation marks omitted.) *State v. Ott*, supra, 297 Or. 388.

[73] Although the defendant in *Ott* also raised the alternative claim that the trial court's definition of extreme was improper; *State v. Ott*, supra, 297 Or. 390; the Oregon Supreme Court held that the trial court should have explained the term "extreme emotional disturbance" without defining the word "extreme." Id., 391. The court's comments on the defendant's alternative claim are therefore dicta.

emotional disturbance necessarily carries with it the suggestion that the defendant must establish that he or she was suffering from a mental illness at the time of the offense. See id. Furthermore, any such possibility was dispelled in this case by the totality of the trial court's jury charge, in which the court explained the difference between the defendant's insanity defense, which required proof of a mental disease or defect, and his defense of extreme emotional disturbance, which, by contrast, required proof only that the defendant acted under the influence of an extreme emotional disturbance. Specifically, the trial court, after distinguishing between the defendant's insanity defense and his defense of extreme emotional disturbance, explained to the jury that, in order to establish his claim of extreme emotional disturbance, the defendant was required to prove, by a preponderance of the evidence, that he "was exposed to an extremely unusual and overwhelming state that is more than mere annoyance or unhappiness," and that he "had an extreme emotional reaction to that state as a result of which there was a loss of self-control and his reason was overborne by intense feelings such as passion, anger, distress, grief, obsessive agitation or other similar emotions." The trial court further explained to the jury that it "should give consideration to whether the intensity of these feelings was such that the defendant's usual intellectual controls failed and his normal rational thinking no longer prevailed at the time of the act." In light of these instructions, we are persuaded that the trial court, in accordance with the dictates of *State* v. *Elliott*, supra, 177 Conn. 10, properly instructed the jury regarding the affirmative defense of extreme emotional disturbance.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN and MCDONALD, Js., concurred.

MCDONALD, J., with whom CALLAHAN, J., joins, concurring. I join in the majority opinion. I write separately, however, because it is neither necessary nor desirable to apply the holding of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), to religious beliefs or affiliation.

In this case, as the majority recognizes, the state's attorney proffered valid reasons for excusing each venireperson. We have upheld a trial court's finding that a prosecutor's use of a peremptory challenge did not run afoul of *Batson* where at least one of the nondiscriminatory reasons articulated by the prosecutor was not pretextual. See, e.g., *State* v. *Smith*, 222 Conn. 1, 14 n.8, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). This court, therefore, could have affirmed the trial court's decision without ruling on the constitutionality of peremptory challenges based upon religious beliefs or affiliation. This court has always "eschew[ed] unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *Stamford Hospital* v. *Vega*, 236 Conn. 646, 663, 674 A.2d 821 (1996). The court should do so here.

The importance of the peremptory challenge and the differences between race and gender and religious beliefs and affiliation weigh against extending *Batson* and *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), to religion-based peremptory challenges.

For centuries, the peremptory challenge has been an important means of promoting fairness and impartiality in jury trials. "The principal value of the peremptory is that it helps produce fair and impartial juries. . . . Peremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of eliminat[ing] extremes of partiality on both sides, thereby assuring

the selection of a qualified and unbiased jury. . . . The peremptory's importance is confirmed by its persistence: It was well established at the time of Blackstone and continues to endure in all the States." (Citations omitted; internal quotation marks omitted.) Id., 147 (O'Connor, J., concurring). Over one hundred years ago, the United States Supreme Court, relying on the wisdom of Blackstone, described the peremptory challenge as "an arbitrary and capricious right [that] must be exercised with full freedom, or it fails of its full purpose." *Lewis* v. *United States*, 146 U.S. 370, 378, 13 S. Ct. 136, 36 L. Ed. 1011 (1892). While the United States Supreme Court restricted the freedom to exercise peremptory challenges on the basis of race and gender in *Batson* v. *Kentucky*, supra, 476 U.S. 89, and *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 146, respectively, it has yet to do so for religious beliefs or affiliation.

The differences between race and gender and religious beliefs or affiliation are numerous and vital. A person's race and gender may be readily apparent, while "[r]eligious affiliation (or lack thereof) is not as self-evident." (Internal quotation marks omitted.) *Davis* v. *Minnesota*, 511 U.S. 1115, 114 S. Ct. 2120, 128 L. Ed. 2d 679 (1994) (Ginsberg, J., concurring). People generally do not wear their religions on their sleeves, and their beliefs are not readily apparent. Religious beliefs and affiliation also differ from race and gender in that people have control over the influence of their faith, belief or organized system of worship in their daily lives. See note, "Applying the Break: Religion and the Peremptory Challenge," 70 Ind. L.J. 569, 594–95 (1995). Religion may be a chosen affiliation, and each person has free will to decide whether, and with what intensity, to practice a faith or adhere to a belief.

Furthermore, a showing of such an unconstitutional peremptory challenge would require counsel to question a venireperson about his or her religious convictions. Such questioning is quite properly disallowed

under the first amendment to the United States constitution.[1] "Ordinarily . . . inquiry on voir dire into a [venireperson's] religious affiliation and beliefs is irrelevant and prejudicial, and to ask such questions is improper." *Davis* v. *Minnesota,* supra, 511 U.S. 1115 (Ginsberg, J., concurring). "Questions about religious beliefs are relevant only if pertinent to religious issues involved in the case, or if a religious organization is a party, or if the information is a necessary predicate for a voir dire challenge. . . . The trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. . . . [P]roper questioning for a challenge should be limited to asking jurors if they knew of any reason why they could not sit, if they would have any difficulty in following the law as given by the court, or if they would have any difficulty in sitting in judgment." (Citations omitted.) *State* v. *Davis,* 504 N.W.2d 767, 772 (Minn. 1993), cert. denied, 511 U.S. 1115, 114 S. Ct. 2120, 128 L. Ed. 2d 679 (1994). In the absence of a religious belief that may directly affect a venireperson's ability to serve on a jury in a particular case,[2] religious beliefs are not relevant to the voir dire process and questions regarding religious beliefs should be disallowed.

[1] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." The first amendment is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Cantwell* v. *Connecticut,* 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940).

[2] See, e.g., *State* v. *Skipper,* 228 Conn. 610, 625–27, 637 A.2d 1101 (1994) (upholding state's voir dire questions concerning venirepersons' views on abortion when their views were relevant to facts of case); *State* v. *Lundgren,* 73 Ohio St. 3d 474, 481–82, 653 N.E.2d 304 (1995) (upholding trial judge's voir dire questions with respect to whether jurors could participate in death penalty verdict if evidence and law so required, and if venirepersons' views on capital punishment would prevent or substantially impair performance of their duties as jurors); cf. *State* v. *Davis,* supra, 504 N.W.2d 768 (upholding peremptory challenge of Jehovah's Witness who was generally reluctant to exercise authority over others).

Because of the thin line between one's religious beliefs and one's other beliefs and biases, other problems will arise. While challenges based upon race and gender often are obvious, challenges based upon a venireperson's religion will be more difficult to evaluate. The court may be required to separate religious beliefs from other beliefs, thus attempting to determine what constitutes "religion."[3] This would force courts to make judgments concerning religious beliefs, a practice that is both difficult and constitutionally suspect.[4]

The expansion of *Batson* to religious beliefs or affiliation would lead to its application to national origin, political affiliation and philosophy as well as other things that may distinguish potential jurors. See, e.g., *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 161 (Scalia, J., dissenting) ("[the majority's decision] places *all* peremptory strikes based on *any* group characteristic at risk, since they can all be denominated 'stereotypes' " [emphasis in original]). While discrimination based on any of those differences, including religious beliefs or affiliation, is abhorrent, the continued expansion of *Batson* simply destroys the peremptory challenge. Trial lawyers have found these challenges necessary for centuries because peremptory challenges allow them to act on their intuition that a potential juror would not be sympathetic to their case. See generally *Purkett* v. *Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). I see no reason to take from Connecticut trial lawyers that time-honored privilege.

BERDON, J., dissenting. The conventional wisdom among African-Americans and other minorities is that

---

[3] The many different groups that claim "religious" status for themselves and their beliefs create a practical problem for courts in defining "religion." See generally J. Donovan, "God Is As God Does: Law, Anthropology, and the Definition of 'Religion,' " 6 Seton Hall Const. L.J. 23 (1995).

[4] See J. Donovan, "God Is As God Does: Law, Anthropology, and the Definition of 'Religion,' " 6 Seton Hall Const. L.J. 23, 28 (1995).

they are not treated fairly throughout the judicial system because of their race. To put it plainly, minorities believe that the judicial system is stacked against them. This perception is heightened when the state eliminates minorities from juries by exercising peremptory challenges based upon the race of venirepersons. The United States Supreme Court recognized this fact when it stated: "[W]e have not questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts. Despite the clarity of these commands to eliminate the taint of racial discrimination in the administration of justice, allegations of bias in the jury selection process persist." *Powers* v. *Ohio*, 499 U.S. 400, 402, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991).

A judicial branch task force recently has studied this problem within Connecticut. It found that there is "a perception of bias in jury selection." Connecticut Judicial Branch Task Force on Minority Fairness, Full Report (April 1996) p. 42. More fully, "there is a concern that minorities are being removed from the chosen jury pool through the use of peremptory challenges allowed by attorneys during the selection process." Id. The report indicates that an overwhelming percentage of judges and attorneys recognize that minorities do not feel that they are being treated fairly.[1] Id., p. 41. More

---

[1] "One of the cornerstones of our judicial system is the right to a jury trial; yet minorities do not serve on jury trials in proportion to their eligible population. This is of concern both because of the importance of minorities serving on jury duty, and because of the perception that racial and ethnic biases among non-minority jurors can have an adverse effect on civil and criminal case deliberations. An overwhelming percentage of Judicial Branch judges and attorneys reported that minority litigants felt they would not be judged by a jury of their peers. 75% of judges felt this was true more than 25% of the time; 99% of minority attorneys and 86% of Caucasian attorneys agreed. This fuels a perception that the system does not mete equal justice for all." Connecticut Judicial Branch Task Force on Minority Fairness, supra, p. 41.

generally, another survey conducted for the state judicial branch in 1998 revealed that 45.5 percent of the Connecticut residents polled agreed that "Connecticut courts discriminate against minorities."[2] Connecticut Judicial Branch, Statewide Public Trust and Confidence Study (October 1998) p. 17.

Furthermore, because the only direct contact most Connecticut citizens have with our justice system is as venirepersons, the process by which jurors are selected plays a major role in the public perception of this branch of government. "In our system of justice, not only must the accused be afforded a fair trial, but equally important there must be a perception of fairness by the community and the accused. Anything less not only undermines the credibility of this branch of government but also threatens the very fabric of our democracy." *State* v. *Tillman*, 220 Conn. 487, 514–15, 600 A.2d 738 (1991) (*Berdon, J.*, dissenting), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992).

This perception of racism is not the fault of the trial judges. Rather, to a great degree, this court must assume responsibility because it narrowly shapes the protective contours of our laws regarding jury selection and has failed repeatedly to apply those limited protections in order to assure that the selection is not tainted. Instead of firmly setting out the law for the guidance of the trial courts, this court sends mixed messages, as the majority does in the present case. Even worse, when confronted with obvious cases of the state's intentional discriminatory use of peremptory challenges in order to eliminate minorities, this court avoids reversal, as it does in this case, by affording the trial court "great deference" and refusing to overrule any trial court decision "unless it is clearly erroneous." In short, the majority of this court does nothing more than pay lip service

---

[2] The survey conducted was a telephone poll of 1201 Connecticut residents. Connecticut Judicial Branch, Statewide Public Trust and Confidence Study (October 1998) p. 4.

to the constitutional command that a peremptory challenge cannot be employed to exclude prospective jurors on the basis of race, gender or other prohibited discrimination pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and as modified by state law in *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989) (hereinafter *Batson/Holloway*).[3] Indeed, since the adoption of *Batson* by the United States Supreme Court in 1986, this court and the Appellate Court have reviewed claims of purposeful discrimination in the exercise of peremptory challenges in seventeen cases.[4] Neither court, however, has ever found impermissible discrimination in the exercise of

---

[3] Under our *Batson/Holloway* test for demonstrating purposeful discrimination, once such a challenge has been made (1) "the burden shifts to the state to advance a neutral explanation for the venireperson's removal" and (2) "[t]he defendant is then afforded the opportunity to demonstrate that the state's articulated reasons are insufficient or pretextual." *State* v. *Holloway*, supra, 209 Conn. 641. In other words, under our state law we eliminate the first prong of the three part test of *Batson*—that is, the defendant need not prove "by a preponderance of evidence that the state's use of the peremptory challenge was tainted by purposeful discrimination." Id., 640–41. Instead, as soon as the defendant raises a *Batson/Holloway* claim the court presumes a prima facie case of discrimination.

[4] *State* v. *Beltran*, 246 Conn. 268, 717 A.2d 168 (1998); *State* v. *McDougal*, 241 Conn. 502, 699 A.2d 872 (1997); *State* v. *Robinson*, 237 Conn. 238, 676 A.2d 384 (1996); *State* v. *Hinton*, 227 Conn. 301, 630 A.2d 593 (1993); *State* v. *Smith*, 222 Conn. 1, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Holloway*, supra, 209 Conn. 636; *State* v. *Gonzalez*, 206 Conn. 391, 538 A.2d 210 (1988); *State* v. *Thomas*, 50 Conn. App. 369, 717 A.2d 828 (1998); *State* v. *Rigual*, 49 Conn. App. 420, 714 A.2d 707 (1998); *State* v. *Johnson*, 44 Conn. App. 125, 688 A.2d 867 (1997); *State* v. *Patterson*, 37 Conn. App. 801, 658 A.2d 121 (1995), rev'd on other grounds, 236 Conn. 561, 674 A.2d 416 (1996); *State* v. *Rodriguez*, 37 Conn. App. 589, 658 A.2d 98, cert. denied, 234 Conn. 916, 661 A.2d 97 (1995); *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994); *State* v. *Rivera*, 23 Conn. App. 592, 583 A.2d 931 (1990), cert. denied, 217 Conn. 807, 584 A.2d 1192 (1991); *State* v. *Graham*, 21 Conn. App. 688, 575 A.2d 1057, cert. denied, 216 Conn. 805, 577 A.2d 1063 (1990); *State* v. *Tappin*, 20 Conn. App. 241, 566 A.2d 709 (1989); *State* v. *Wylie*, 10 Conn. App. 683, 525 A.2d 528, cert. denied, 204 Conn. 807, 528 A.2d 1154 (1987).

a peremptory challenge,[5] a statistical fact that lends credence to the public perception that our judicial system fosters discrimination.

The majority in this case adds fuel to the public perception that the judicial branch will tolerate racism. It refuses to review certain aspects of the *Batson/Holloway* issues in this case because it claims that they were not raised at trial or in this court. Although I take issue with my colleagues' claim that they were not raised in total, I must confess that some issues were not raised or not clearly argued.[6] As a result, I moved at conference for the court to request the filing of supplemental briefs and reargument, but my efforts were rejected.[7] I am unable to understand my colleagues and

---

[5] In the one case that we did reverse; *State* v. *Robinson*, supra, 237 Conn. 238; the reversal was not on the basis of a finding of purposeful discrimination in the exercise of the peremptory challenge. *Robinson* was reversed because the trial court had incorrectly held that the defendant had not made a timely *Batson/Holloway* claim and had thereby refused to rule specifically on the *Batson/Holloway* claim. Id., 253–54. In the one civil case that the Appellate Court reversed; *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994); its reversal was also based on a separate issue. The *Martins* court discussed the *Batson/Holloway* challenge only in order to declare that, after *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994), peremptory challenges could not be employed on the basis of gender in any civil case. *Martins* v. *Connecticut Light & Power Co.*, supra, 226.

[6] See footnote 17 of this dissent.

[7] The majority is absolutely correct that at our first conference on this case I did not move to order the parties to file supplemental briefs addressing the issue of whether we should formally adopt the dissent in *Purkett* under our state jurisprudence. I have two responses. First, work on this case has been a long, slow process for both the majority and the dissent. For example, a justice's decision to join the concurring opinion and revised drafts of the majority's opinion were circulated as recently as March, 1999—several months *after* I made the motion that the majority maligns as "belated." Moreover, the majority did not circulate its first draft opinion in this matter until July 2, 1998, followed by a second draft on July 31—the last day before the beginning of our summer recess. Accordingly, I had no opportunity to respond to the majority's sixty-four page opinion until we returned to chambers in September. I filed my thirty-six page draft dissent in relatively short order, in October.

I am sure that the African-American community will also be unable to understand their refusal, especially in view of the state's paper-thin case for murder that I shall describe herein.

More importantly, merely because a lawyer either failed to raise a claim of law or incorrectly argued the law, does not mean that we should establish law that does not comport with concepts of justice. We deal with the precious liberty of persons. Indeed, in establishing and applying the law we sometimes, unfortunately, determine who shall live and who shall die. In other words, this is no game—we have grave responsibilities and must do justice. Equally important, this opinion not only establishes the law for this case, but also for all the other relevant cases that are pending, as well as those that will arise in the future.

Furthermore, precedent does not support the majority's myopic review of this case. In the past this court has reviewed nonracial claims that were not raised in the trial court or in the Appellate Court.[8] For example,

More important than this temporal nitpicking, justice should not depend on when a matter is raised by a member of this court. I wish I had made my motion earlier. The fact that I failed to do so because of my frailties may supply a reason for chagrin, but it does not supply a legitimate reason for denying the motion. It should not be necessary to remind my colleagues that, as members of the court of last resort in the state of Connecticut, we should aspire to do justice. Among other things, this means that we should generally address all of the relevant issues of each case—especially when some of the issues go to the very heart of the perception of justice in our courts. In the present case, the African-American defendant has received a sentence of eighty-five years. Unless his conviction is overturned, he will in all likelihood spend the rest of his life in jail. The majority's assurance that they "await consideration of the argument . . . until it is properly before us" will provide little solace to the defendant. Of equal significance, the majority's failure to address this issue fuels a perception by the public, particularly by the African-American community, that the Connecticut judicial system tolerates racism in its courtrooms.

[8] Moreover, this court, albeit during a different era, recognized the problems of trial attorneys and public defenders. In *State* v. *Barrett*, 205 Conn. 437, 444–45, 534 A.2d 219 (1987), this court stated: "State constitutional law

when deciding such an issue in *State* v. *Smith*, 207 Conn. 152, 162, 540 A.2d 679 (1988), we explained: "We may ourselves determine to exercise our inherent supervisory authority over the administration of justice to review the defendant's claim. . . . To do so in this case would comport with the interests of justice."[9] (Citations omitted.) In *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993), in order to do justice the majority of this court raised on its own a statute it claimed was applicable, but was never raised by either party on appeal.[10] The majority in the present case obviously concludes that the defendant's allegedly unpreserved claims herein, which are

---

is only now emerging from the shadow of its federal counterpart. It is therefore understandable that parties may not engage in elaborate discussion and analysis of untested and novel state constitutional theories in trial court proceedings where defense counsel has other more immediately accessible and tangible targets to pursue. The reality is that time for original analysis is scarce, particularly in the ordinary criminal case; and particularly at the trial level, lawyers and courts often depend on the shorthand of case citations in preference to scrutinizing statutes and constitutional principles. *State* v. *Kennedy*, 295 Or. 260, 266, 666 P.2d 1316 (1983); see also E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583, 589–92 (1986). We therefore conclude that the defendant's claim under article first, § 8, is reviewable at this juncture, despite his failure to raise the claim *during the trial* or *on the original* appeal." (Emphasis added; internal quotation marks omitted.) Simply put, *Barrett*, decided approximately four years after the trial and eighteen months after the first appeal in the present case, is the kind of justice that should be our benchmark.

[9] *Smith* did not involve a claim of racism, but merely the question of whether the trial court properly imposed a condition of probation one year after the defendant was sentenced.

[10] In *Genovese*, I commended the majority's activism as follows: "I also write separately to endorse the procedural activism employed by the majority in this case. The plaintiff in this case failed to raise his claim under [General Statutes] § 31-51bb both in the trial court and initially before this court. We, *on our own*, raised the applicability of § 31-51bb and ordered the parties to submit supplemental briefs. Accordingly, the majority has decided this case on the basis of a claim that was never raised in the trial court and was raised in this court only as a result of our direction. Although I do not agree with the majority's interpretation of § 31-51bb, I applaud the procedural route employed in this case. We may now employ this procedure in other cases as justice demands. Certainly, if we may use this newly

predicated on claims of racism and resulted in a sentence involving the loss of the defendant's liberty for a period of eighty-five years, deserve less consideration than the claims of the plaintiff in *Genovese*, which were concerned solely with money. I wholly disagree and would, at the very least, order rebriefing and reargument. Nevertheless, on the basis of what is before us, I would reverse the defendant's conviction and order a new trial.

In the present case, the defendant, Dennis Hodge, an African-American, was charged with the murder of two Caucasian independent insurance adjusters in a highly publicized case. The murder occurred during a meeting to discuss a settlement agreement that the adjusters had made with an insurance company on behalf of the defendant's mother, whose kitchen had been damaged as a result of a fire. The defendant and his mother believed that she deserved a larger settlement than the amount procured by the two adjusters. He admitted that he killed the two Caucasian victims, but claimed that he was not guilty due to mental disease or defect; General Statutes § 53a-13 (a); or, in the alternative, was guilty only of manslaughter due to extreme emotional disturbance. General Statutes § 53a-54a (a). The jury deliberated for nine days, during which time it reported that it was deadlocked on two occasions. Nevertheless, after the trial court gave the infamous coercive "Chip Smith"[11] instruction, the jury returned a verdict finding the defendant guilty of intentional manslaughter of one

---

established procedure to achieve justice on behalf of civil litigants, where only money is involved, we must do likewise when an individual's liberty is at stake." (Emphasis in original.) *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 226 Conn. 496–97 (*Berdon, J.*, dissenting and concurring).

[11] *State* v. *Smith*, 49 Conn. 376 (1881); but see *State* v. *Beliveau*, 237 Conn. 576, 598 n.1, 678 A.2d 924 (1996) (*Berdon, J.*, dissenting) (criticizing Chip Smith and other similar charges that urge jurors in minority to listen to those in majority as being "inherently coercive in that they are imbalanced in favor of the majority position").

victim, murder of the second victim, and carrying a pistol without a permit. The defendant was sentenced to prison for an effective term of eighty-five years.

During jury selection, the defendant challenged the state's use of six peremptory challenges in excusing one Hispanic and five African-American venirepersons. The state in this case, as it typically does when a defendant challenges the constitutionality of the use of its peremptory challenges, furnished a laundry list of reasons in the hope that the court would find one to be nondiscriminatory and, therefore, uphold the peremptory challenge. Although I conclude that the trial court ruled incorrectly on all six challenges raised in this appeal, I will limit this dissent to the peremptory challenge of G.D.[12] I shall begin, however, by discussing some preliminary matters.

## I

First, I will discuss those portions of the majority opinion with which I agree, at least for the purpose of this decision. I agree with the majority that we must overrule cases such as *State* v. *Smith*, 222 Conn. 1, 14 n.8, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992), and *State* v. *Gonzalez*, 206 Conn. 391, 405, 538 A.2d 210 (1988),[13] to the extent

[12] Like the majority, I will use the venireperson's initials throughout this dissent in order to protect his privacy.

[13] I do not understand the majority's reluctance to state explicitly that it overrules these cases to the extent that they hold that *Batson/Holloway* was satisfied whenever the trial court found that one proffered reason was not pretextual. Although one justice who is part of the majority in this case was a member of the panel in *State* v. *Smith*, supra, 222 Conn. 1, I do not believe that, if it is the reason, it is sufficient to justify the failure to overrule specifically the case. This failure causes confusion for both the trial bench and the bar. In my dissent in *Smith*, I pointed out the following: "Fairness and the perception of fairness, require that black defendants be given great latitude in uncovering racial bigotry. Unfortunately, '[r]acial prejudice is a cultural malady that has shaped our history as a nation. It is a cancer of the mind and spirit which breeds as prolifically in the industrial cities of the North as in the rural towns of the South.' *Ross* v. *Massachusetts*, 414

that they explicitly or implicitly hold that *Batson/Holloway* is satisfied whenever a trial court finds that at least one of the proffered reasons for exercising a peremptory challenge was not pretextual. More specifically, I agree with the majority that "the trial court must consider all of the proffered reasons together in determining whether, as a factual matter, the party exercising the peremptory challenge was motivated, in whole or in part, by impermissible discriminatory considerations." Thus, whenever the trial court finds any one of the proffered reasons for exercising the challenge to be pretextual, at the very least the dual motivation analysis under federal law, as set forth in *Howard* v. *Senkowski*, 986 F.2d 24 (2d Cir. 1993), must be applied.[14]

---

U.S. 1080, 1085, 94 S. Ct. 599, 38 L. Ed. 2d 486 (1973) (Marshall, J., dissenting from denial of certiorari). Our courts must be sensitive to the problem of racial bigotry that may exist in the administration of our judicial system; otherwise our courts will not be courts of justice. Surely, the majority's ruling today does not enhance this sensitivity." *State* v. *Smith*, supra, 221 Conn. 31 (*Berdon, J.*, dissenting). In *Smith*, I would have reversed the conviction because the trial judge would not allow the public defender to ask the following question during voir dire: " 'How would you feel if a relative of yours, son, daughter, brother or sister . . . expressed an intent to you that he [or she] wanted to marry a black person?' " Id., 5.

[14] Because I believe the defendant is entitled to a new trial under federal law as embellished by the *Batson/Holloway* analysis, I need not reach the obvious issue of whether the state constitution requires more protection than that which is provided by *Senkowski*. See *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 57, 469 A.2d 1201 (1984); W. Brennan, "State Constitutions and the Protection of Individual Rights," 90 Har. L. Rev. 489, 491 (1977) ("[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed."). For example, we have an equal protection clause that is much more expansive than that of the United States constitution. Conn. Const., art. I, § 20; see R. Berdon, "Connecticut Equal Protection Clause: Requirement of Strict Scrutiny When Classifications Are Based upon Sex, Physical Disability or Mental Disability," 64 Conn. B.J. 386 (1990). Article first, § 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments, a powerful

In addition, I agree with the majority that the federal constitution's equal protection clause prohibits the use of peremptory challenges on the basis of religion. Of course, I also agree that a *Batson/Holloway* claim may be made when the venireperson is not of the same race as the defendant.

## II

I take issue with the majority's analysis of the law that is applicable to the present case. More specifically, I am greatly concerned with footnotes 18 and 19 of the majority opinion, wherein it sets forth the analysis required under *Batson* as modified pursuant to *Purkett* v. *Elem*, 514 U.S. 765, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995), and refuses to apply Connecticut state law. The majority correctly explains the new standard set by the majority of the United States Supreme Court in *Purkett*, a per curiam decision, which allows a party to satisfy the second step of *Batson*—our first step under *Batson/ Holloway*—by advancing an explanation that is "fantastic" or simply "silly or superstitious"; id., 768; indeed, the reason need not be "persuasive, or even plausible." Id. Of course, it follows that a reason that is fantastic, silly, superstitious or implausible is not related to the particular case at hand or even a reason that tends to recur in all criminal trials. Id., 768–69; see also *State* v. *Gonzalez*, supra, 206 Conn. 404 (relatedness encompasses reasons that recur in all criminal trials). In

equal protection clause, specifically focuses on, among other matters, "race" and "color" as follows: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." There is no such comparable language in the fourteenth amendment to the United States constitution. Therefore, a persuasive argument could be made that if a prosecutor, in exercising a peremptory challenge on behalf of the state, is motivated even in part by race, as evidenced by advancing a pretextual reason, the inquiry should end and the peremptory challenge should be stricken. In other words, there would be no necessity for a *Senkowski* analysis. Nevertheless, I leave this issue for another day.

allowing such fantastic explanations, however, the majority disregards the fact that *Purkett* significantly diluted the second step of *Batson* (step one under *Batson/Holloway*). The United States Supreme Court in *Batson* had made it clear that the state's explanation had to be "a neutral explanation related to the particular case to be tried." *Batson* v. *Kentucky*, supra, 476 U.S. 98. This requirement of relatedness was adopted as part of our state law when we gave more protection to defendants by eliminating the necessity of the first step in *Batson*. Thus, in Connecticut, whenever such a claim is made by a defendant, the state must "provide the court with a prima facie case response consistent with the explanatory mandate of *Batson*." *State* v. *Holloway*, supra, 209 Conn. 646.

In footnote 19 of its opinion, the majority tries to gloss over this departure from *Batson*, which we adopted as our state law in *Holloway*, by simply declaring that *Purkett* "explicated" *Batson*'s second step. The majority disregards the significance of this change, and summarily adopts *Purkett* as our state law without allowing defense counsel to be heard or without addressing specifically whether relatedness will continue to be a factor under Connecticut law. The majority argues in footnote 19 that *Purkett*'s majority rule, as modified by *Holloway*, should be applied in the present case because: (1) the defendant raised a claim of discrimination under the United States constitution only; (2) the defendant does not argue on appeal that the *Purkett* dissent should apply, but, rather, asserts that the state failed step three under *Batson* as modified by *Purkett*; and (3) even if a state constitutional claim was raised, the state would still prevail because a *Batson* claim is treated similarly under the state and federal constitutions.

I disagree. To begin, I must address a fundamental issue regarding this appeal; one that the majority opinion overlooks. Unless we are willing to ignore the plain

language of *Batson* requiring a prosecutor to articulate a "neutral explanation *related* to the particular case to be tried"; (emphasis added) *Batson* v. *Kentucky*, supra, 476 U.S. 98; we must admit that *Purkett* clearly changed federal law when it removed the requirement of relatedness in the second step of a *Batson* analysis. See *Hernandez* v. *New York*, 500 U.S. 352, 372, 111 S. Ct. 1859, 114 L. Ed. 2d 1859 (1991) (trial court could find pretext on sole basis that reason was not related "to the particular circumstances of the trial").[15] Accordingly, even if the present case was to be viewed through the narrow lens of federal law alone, *Purkett* would have no application to this case because voir dire was completed and a final verdict was rendered months before the United States Supreme Court decided *Purkett*.[16] Therefore, it simply is disingenuous for the majority in the present case to rely on *Purkett* and to argue that relatedness was not a requirement for *Batson*'s second step at the time of jury selection.

Furthermore, the fact that the defendant on appeal argues only that the state's proffered reasons fail the

[15] There is no question that *Purkett* changed the law of *Batson*. The dissent in *Purkett* points out "[i]n my opinion it is unwise for the Court to announce a law-changing decision without first ordering full briefing and argument on the merits of the case. The Court does this today when it overrules a portion of our opinion in *Batson* . . . ." *Purkett* v. *Elem*, supra, 514 U.S. 770 (Stevens, J., dissenting). In his dissent in *Hernandez*, Justice Stevens underscored the requirement of relatedness in step two of *Batson* as follows: "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation. . . . If the prosecutor offers no explanation, the defendant has succeeded in establishing an equal protection violation based on the evidence of invidious intent that gave rise to the prima facie case. If the prosecutor seeks to dispel the inference of discriminatory intent, in order to succeed his explanation need not rise to the level justifying exercise of a challenge for cause. . . . However, the prosecutor's justification must identify legitimate reasons that are related to the particular case to be tried and sufficiently persuasive to rebu[t] a defendant's prima facie case." (Citations omitted; internal quotation marks omitted.) *Hernandez* v. *New York*, supra, 500 U.S. 376.

[16] The voir dire for jury selection in the present case was conducted throughout the fall of 1994 and the jury returned a verdict in early January, 1995, while *Purkett* was not decided until May, 1995.

third step under *Batson,* as modified by *Purkett,*[17] does not require us to misapply the law, as I pointed out in the beginning of this dissent. It is well established that we have the authority to decide a case on a theory that was not espoused by the parties. See, e.g., *Sheff* v. *O'Neill,* 238 Conn. 1, 23–24, 678 A.2d 1267 (1996). This is especially appropriate in a case such as this when important matters are at stake—the perception of racism in our criminal justice system involving a defendant who has been given a sentence pursuant to which he will be incarcerated for the rest of his life.

It is clear that we have developed our own jurisprudence[18] in order to assure that the taint of discrimination based upon impermissible considerations is eliminated in jury selection, as evidenced by *State* v. *Holloway,*

---

[17] The majority is absolutely correct that the defendant, in his appellate brief, accepts the majority's decision in *Purkett* and argues that relatedness should be considered in step two of *Batson/Holloway.* But, as I have already pointed out, the fact that the defendant incorrectly argues the law does not mean we should so apply it. We are here to do justice.

Nevertheless, although the public defender at trial did not specifically argue that the proffered reasons were not related, he implicitly raised the issue when his argument is considered in light of the fact that the *Purkett* decision was decided approximately five months after the completion of the trial in the present case. Defense counsel implicitly raised the issue as follows: "[Thomas Ullmann, Defense Counsel]: I think that under our own case law in the state of Connecticut, which has exceeded the *Batson* requirements and which the court, our Supreme Court, has stated *they* have supervisory control of this particular issue . . . that they *would frown upon the excuses that were made* by [the state's attorney] regarding [G.D.]." (Emphasis added.) Defense counsel continued to discuss Connecticut law and its supervisory powers throughout his objection to the state's challenge of G.D. See appendix B of this dissent for the entire argument by counsel with respect to the *Batson/Holloway* hearing regarding G.D., the one venireperson on which this dissent focuses.

[18] "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984). *State* v. *Barton,* 219 Conn. 529, 546, 594 A.2d 917 (1991)." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992).

supra, 209 Conn. 645–46. When we adopted the *Batson/ Holloway* constitutional analysis as modified by our common law, we indicated that the state had the burden of proving that its reasons be "a neutral explanation related to the particular case to be tried"; *Batson* v. *Kentucky,* supra, 476 U.S. 98; see *State* v. *Holloway,* supra, 641. Accordingly, the majority simply is wrong when it states that a *Batson* claim is treated similarly under state and federal law.

The majority concedes that two of the state's proffered reasons for exercising its peremptory challenge of G.D. "lack any obvious relevance," but goes on to conclude that, notwithstanding our own jurisprudence, unrelatedness does not necessarily mean that the proffered reasons are pretextual. Unrelatedness must be viewed in light of all relevant circumstances, according to the majority.[19] Thus, the majority changes our law by removing the requirement that a proffered reason must be related to the trial at issue in order to rebut the *prima facie* case of discrimination and pass the first prong of *Batson/Holloway.*

Such a holding is amazing in light of the unanimous decision in *State* v. *Beltran,* 246 Conn. 268, 279–80, 717 A.2d 168 (1998), decided after *Purkett,*[20] in which we explicitly reaffirmed Connecticut's requirement that a proffered reason must be both race neutral *and* related to the specific case at hand in order to rebut the prima facie case of discrimination. See id., 279 ("the state must 'articulate a neutral explanation related to the particular case to be tried' "). Indeed, the majority would have us believe that *Beltran* was an aberration of sorts. Yet, as early as 1988, in *State* v. *Gonzalez,*

---

[19] The majority cites *United States* v. *Alvarado,* 951 F.2d 22 (2d Cir. 1991), for this proposition despite the fact that in that case, the Second Circuit Court of Appeals was not discussing specifically the relatedness of a proffered reason.

[20] *Beltran* does not mention *Purkett.*

supra, 206 Conn. 404, this court made it clear that "the neutral explanation given by the prosecutor must relate 'to the particular case to be tried.' *Batson* v. *Kentucky*, supra, [476 U.S.] 98." In *Gonzalez*, the sufficiency of the second step in *Batson*, the first step under *Batson/ Holloway*, was specifically at issue. This court explained that the relatedness includes whether "a particular juror is unfit for duty because of an infirmity relating to his or her general status as a discerning observer of trial activity." *State* v. *Gonzalez*, supra, 404. Once again, not only does the majority's lack of clarity add more confusion to Connecticut's law of peremptory challenges, but it also tramples on our state law and the rights of an accused. Simply put, the majority's decision today can be described only as result oriented.

In contrast, I agree with *Beltran, Gonzalez* and the dissent in *Purkett* that the explanation of the state must be at least "race neutral, reasonably specific, *and* trial related." (Emphasis in original.) *Purkett* v. *Elem*, supra, 514 U.S. 775 (Stevens, J., dissenting). Justice Stevens in his dissent pointed out the following: "Today, without argument, the Court replaces the *Batson* standard with the surprising announcement that any neutral explanation, no matter how 'implausible or fantastic,' [id., 768], even if it is 'silly or superstitious,' [id.], is sufficient to rebut a prima facie case of discrimination. A trial court must accept that neutral explanation unless a separate 'step three' [step two under *Holloway*] inquiry leads to the conclusion that the peremptory challenge was racially motivated. The Court does not attempt to explain why a statement that 'the juror had a beard,' or 'the juror's last name began with the letter "S" ' should satisfy step two, though a statement that 'I had a hunch' should not. See [id., 769]; *Batson* [v. *Kentucky*, supra, 476 U.S. 98]. It is not too much to ask that a prosecutor's explanation for his strikes be race neutral, reasonably specific, *and* trial related. Nothing less will

serve to rebut the inference of race-based discrimination that arises when the defendant has made out a prima facie case. Cf. *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253 [101 S. Ct. 1089, 67 L. Ed. 2d 207] (1981). That, in any event, is what we decided in *Batson*." (Emphasis in original.) *Purkett* v. *Elem*, supra, 775 (Stevens, J., dissenting).

Justice Stevens' dissent in *Purkett* points out that " '[w]ere facially neutral explanations sufficient without more, *Batson* would be meaningless. It would take little effort for prosecutors who are of such a mind to adopt rote "neutral explanations" which bear facial legitimacy but conceal a discriminatory motive. We do not believe the Supreme Court intended a charade when it announced *Batson*.' " Id., 773, quoting *State* v. *Antwine*, 743 S.W.2d 51, 65 (Mo. 1987). Likewise, the majority of this court now guts *Batson/Holloway* by allowing the state to satisfy its burden in step one by advancing such reasons as the prosecutor did not like the look of a venireperson's long hair or that the day was Friday the 13th.

In the magnificent words of Justice Glass, "because this issue is of such vital importance to our real and perceived adherence to the rule of law, in the exercise of our inherent supervisory authority over the administration of justice"; *State* v. *Holloway*, supra, 209 Conn. 645–46; this court should reaffirm our state law that, in order to pass *Batson/Holloway*'s first step the state's explanations for its peremptory challenge must be "race neutral, reasonably specific, *and* trial related." (Emphasis in original.) *Purkett* v. *Elem*, supra, 514 U.S. 775 (Stevens, J., dissenting); *State* v. *Beltran*, supra, 246 Conn. 279–80; *State* v. *Gonzalez*, supra, 206 Conn. 404.[21]

---

[21] The majority claims in footnote 19 that *State* v. *Gonzalez*, supra, 206 Conn. 404, did not indicate approval of the rule of law that has since become the *Purkett* dissent—that is, that the neutral reason advanced must be trial related. That is absolutely incorrect. This court quoted *Batson* in *Gonzalez*,

If the state fails to meet this test, the trial court must strike the peremptory challenge and seat the venireperson as a juror. Nevertheless, even under federal law as set forth in *Batson* and as modified by the majority in *Purkett*, I believe the defendant is entitled to a new trial.

## III

I start my analysis with this court's standard of review for the trial court's rejection of a *Batson/Holloway* challenge. The majority claims that the trial court's decisions on the *Batson/Holloway* challenges are entitled

stating that the neutral reason "must relate 'to the particular case to be tried' "; id.; and went even further. We explained in *Gonzalez* under our own jurisprudence that such relatedness not only encompasses "reasons that might arise in . . . one case [but also] those that tend to recur in all criminal cases." Id. To be perfectly clear, I quote the entire passage from *Gonzalez*: "In *Batson*, the United States Supreme Court stated that the neutral explanation given by the prosecutor must relate 'to the particular case to be tried.' *Batson* v. *Kentucky*, supra, [476 U.S.] 98. We decline to read this language as narrowly as the defendant urges. It is no doubt true that some neutral reasons for exercising peremptory challenges will impact the specific nature of the case to be tried. Just as frequently, however, the prosecutor may believe that a particular juror is unfit for duty because of an infirmity relating to his or her general status as a discerning observer of trial activity." *State* v. *Gonzalez*, supra, 404. This interpretation of *Gonzalez'* gloss on *Batson/Holloway*'s first step reinforces the fact that we reshaped *Batson*'s relatedness under state law, thereby adopting it as part of the jurisprudence of Connecticut. It simply is disingenuous for the majority to claim otherwise.

Second, the majority correctly points out that *Gonzalez* directly quotes *Batson* in order to reach its legal conclusion. The majority, however, misreads the significance of this reference when it argues that *Gonzalez* follows *Batson*, therefore, our state jurisprudence must blindly follow the majority opinion in *Purkett*. A decision that invites counsel to advance fantastic, silly or superstitious reasons evades the mandate of *Batson*, as well as that of *Gonzalez*. Thus, we should recognize that the *Purkett* majority overruled *Batson*, and should refuse to allow that mischief to undermine our well established jurisprudence that goes back to 1988, seven years before *Purkett* was decided, that requires counsel to advance neutral reasons that are based upon legitimate claims related to the trial. Our jurisprudence that requires relatedness for the neutral reason to rebut a prima facie case of discrimination, as I point out in this dissent, was confirmed in *State* v. *Beltran*, supra, 246 Conn. 279–80, three years after *Purkett* was decided. Just as we embel-

to "great deference and will not be disturbed unless it is clearly erroneous." That is simply an incorrect statement of the law and, if it was correct, inapplicable to the facts of this case.

First, the majority ignores the heightened standard with which we review findings of factual underpinnings necessary to determine constitutional issues arising from jury selection.[22] In *State* v. *Ellis*, 232 Conn. 691, 701, 657 A.2d 1099 (1995), Justice Norcott writing for a unanimous court held: "[B]ecause of the constitutional implications of the alleged defect in the jury selection process, we will subject the findings of the trial court to the same 'independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . .' *State* v. *Ross*, 230 Conn. 183, 259, 646 A.2d 1318 (1994) . . . ."[23] (Citations

---

lished *Batson* when we decided *Holloway* under state law, we likewise did so with respect to relatedness under *Gonzalez/Beltran* by implicitly rejecting the majority decision in *Purkett*. Simply put, the trial courts, wherein justice is to be dispensed, should not be required to accept reasons such as "I had a silly dream the night before that the venireperson would not be a good juror" as satisfying the first prong of *Batson/Holloway*.

[22] The majority's response in footnote 22 of its opinion that the defendant has not sought a heightened review is of no consequence. A reviewing court should not apply an incorrect standard of review simply because a party does not request such review. Within the same footnote the majority once again tries to limit this court to the federal law. As I pointed out in parts I and II of this dissent, we are not limited by the federal constitution when we are reviewing a claim that also encompasses a parallel provision in the Connecticut constitution and our state common law, as long as we grant more rights for the defendant than are provided by the federal constitution.

[23] In footnote 22 of its opinion, the majority tries to refute our standard of review by arguing that when we have applied this heightened standard it has been "within the broader context of the clearly erroneous standard." Whatever the majority means by this statement, it is of no significance. Simply put, we reviewed those factual findings under a heightened review because of the importance of the issues. *State* v. *Webb*, 238 Conn. 389, 449, 680 A.2d 147 (1996) ("[w]e will, however, subject these facts to the same searching inquiry that we apply in other instances of constitutional fact-finding"); *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994) (employing " 'an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding . . . is supported by substantial evi-

omitted.) *Ellis* is by no means an isolated case. We have recognized this heightened review in other cases. See *State* v. *Webb*, 238 Conn. 389, 449, 680 A.2d 147 (1996); *State* v. *Medina*, 228 Conn. 281, 294, 636 A.2d 351 (1994); *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). To be sure, if there is any question about our review, it clearly was put to rest in *State* v. *Mercer*, 208 Conn. 52, 58, 544 A.2d 611 (1988): "Due to the serious constitutional implications of the defendant's claim [regarding voir dire during jury selection], we 'have the duty to make an independent evaluation of the circumstances.' *Sheppard* v. *Maxwell*, 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966); *State* v. *Marra*, 195 Conn. 421, 428, 489 A.2d 350 (1985); *State* v. *Piskorski*, 177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)." I can conclude only that the majority either fails to take seriously *Batson/Holloway* claims or fails to understand that those claims have constitutional underpinnings. It simply is baffling that the majority is turning a blind eye to our former jurisprudence in this area.

Second, even if the "clearly erroneous" standard applied, which it does not, such deferential review does not mean the kind of deference that the majority applies in this case. "Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. In a plain case this discretion has no office to perform, and its exercise is limited to doubtful cases, where an impartial mind hesitates." (Internal quotation marks omitted.) *State* v. *Onofrio*, 179 Conn. 23, 29, 425 A.2d 560 (1979).

dence' "); *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993) ("[w]hen a factual issue implicates a constitutional claim, however, we review the record carefully to ensure that its determination was supported by substantial evidence").

Furthermore, at least with respect to the first step under *Batson/Holloway*, an appellate court reviewing a trial court finding should make a determination without deference. *Purkett* v. *Elem*, supra, 514 U.S. 775–76 (Stevens, J., dissenting). Justice Stevens, in his *Purkett* dissent, pointed out that the majority opinion implicitly ratified the appellate court's independent evaluation of whether the prosecutor satisfied step two of the *Batson* challenge without deference to the trial court. Id., 776. In other words, an appellate court, without any deference to the trial court, can determine whether the prosecutor's explanation is "race neutral, reasonably specific, *and* trial related." (Emphasis in original.) Id., 775 (Stevens, J., dissenting). "This presents a pure legal question, and nothing is gained by remand if the appeals court can resolve that question on the facts before it." Id., 776 (Stevens, J., dissenting). To do otherwise would result in appellate court review that is nothing more than a meaningless charade. Id., 777 (Stevens, J., dissenting). In the present case, the trial court's determinations of whether the peremptory challenge passed the first step of *Batson/Holloway* likewise should be subject to an independent review by this court based on the record.

Finally, under the facts of this case, it would be unfair to defer to the trial court decisions regarding the *Batson/Holloway* challenges because the trial court's review of the challenges raised by the defendant was superficial. For example, after the defendant made the first *Batson/Holloway* challenge, the trial court asked the prosecutor if he felt "compelled" to respond to the defendant's challenge. After a brief discussion about the *Batson/Holloway* challenge, the court commented: "I don't know whether a finding is necessary on my part in such a claim." Indeed, after each *Batson/Holloway* challenge the trial court failed to make specific findings

regarding each of the state's explanations. Consequently, the trial court did not complete the required *Batson/Holloway* analysis in order to determine whether the state's proffered reasons were pretextual. Furthermore, the trial court also did not make any further inquiries about the defendant's claims of disparate treatment of venirepersons. Instead, it summarily proceeded to find that all of the prosecutor's original explanations were not pretextual. This complete lack of analyses throughout the six *Batson/Holloway* challenges makes deferring to the trial court decisions problematic.

The trial court's analysis was particularly troublesome regarding the *Batson/Holloway* challenge of G.D., a Hispanic venireperson to be discussed in more detail in part IV of this dissent. The state argued erroneously that it did not have to respond to the charge of discrimination regarding G.D. because "[o]ur law provide[s] that one must be a member of the defendant's minority for the *Batson* rule to kick in . . . ." That is not our law. See *Powers* v. *Ohio*, supra, 499 U.S. 406 (Caucasian defendant has standing to raise *Batson* challenges regarding black jurors). While the defendant argued otherwise, the trial judge was silent on the matter, leading one to wonder whether the judge appreciated that a *Batson/Holloway* challenge was applicable.

Although I believe that the majority purposefully focuses on the wrong standard of review and deprives the defendant of a meaningful appellate review in order to reach its desired result, I would conclude, no matter what standard of review was employed, that the state exercised its peremptory challenges to exclude purposefully African-Americans and other minorities.

IV

Even though I conclude that in exercising the peremptory challenges the state purposely discriminated based

upon race with respect to all six venirepersons that are the subject of this appeal, only one such instance is necessary for this court to order a new trial. Accordingly, I will focus only on the violation regarding venireperson G.D., a twenty-three year old Hispanic male.[24] I have included in this dissent the complete transcript of (1) the voir dire of G.D. in appendix A and (2) the subsequent argument of counsel with respect to the *Batson/Holloway* hearing in appendix B in order to expose the manner in which the majority egregiously misrepresents the record.

As set forth in part III of this dissent, when the defendant originally raised a *Batson/Holloway* challenge regarding the peremptory challenge of G.D., the state argued erroneously that the law did not require it to provide any race neutral reasons for its use of a peremptory challenge against a minority venireperson of a different race than the defendant. Notwithstanding this claim, the state offered the following list of reasons for G.D.'s exclusion: (1) the feeling that G.D. might be overwhelmed by the medical testimony in the case and unable to understand the evidence, based on his education, intelligence and career; (2) G.D.'s supposed friendship with a homicide victim and his murderer, and his exposure to the publicity of that murder; (3) the fact that a friend of G.D. had an "unpleasant experience with a police officer," which G.D. had witnessed; and (4) the fact that G.D. was the second youngest and only male sibling in a family of seven children.

After hearing the list of proffered reasons for the peremptory challenge, the public defender raised the issue of disparate treatment between G.D. and the acceptance of a Caucasian juror with a fifth grade education and an employment history that consisted only

---

[24] Despite the majority's confused discussion regarding an inadequate record for review, the record with respect to G.D. is adequate for review, as the majority ultimately concedes.

of fixing cars in his backyard. The state responded that it had selected a venireperson with less than twelve years of education, but argued that the Caucasian juror was substantially older than G.D. The state then iterated its claim that *Batson/Holloway* did not apply to venirepersons who were a different race than the defendant. Immediately after the public defender responded to this latter claim, the trial court concluded that the peremptory challenge of G.D. was not racially motivated and that the reasons advanced by the state were sufficient and not pretextual. Indeed, the transcript indicates that the trial court, at best, gave short shrift to the defendant's claim and did not perform any meaningful review. It simply is incredible and disingenuous for the majority to hold that there was any consideration of the *Batson/Holloway* challenge in this case. A reading of the entire transcript pertaining to the argument of counsel on the *Batson/Holloway* challenge of G.D. demonstrates this lack of consideration. See appendix B of this dissent. Nevertheless, under any standard of review—whether it is deference, deference subject to an independent and scrupulous examination, or no deference[25]—the peremptory challenge of G.D. cannot withstand the scrutiny compelled by the *Batson/Holloway* test.

"We have identified several specific factors that may indicate that the state's excuse of a venireperson through a peremptory challenge was racially motivated. These include, but are not limited to: (1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not

---

[25] See part III of this dissent.

struck . . . (5) the prosecutor advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race. . . . *State* v. *Gonzalez*, supra, [206 Conn.] 399. . . . *State* v. *Smith*, [supra, 222 Conn. 11]." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 325, 630 A.2d 593 (1993). Pretext should also be found where the reason offered is not supported by the record. *State* v. *Jones*, 29 Conn. App. 304, 341, 615 A.2d 149 (1992) (*Norcott, J.*, dissenting and concurring); see also *Williams* v. *State*, 548 So. 2d 501, 506 (Ala. App. 1988), cert. denied, 489 U.S. 1028, 109 S. Ct. 1160, 103 L. Ed. 2d 218 (1989) (finding pretext where reason offered not supported by venireperson's answers).

When a trial court is reviewing a *Batson/Holloway* challenge it should analyze each proffered reason for exercising the challenge in isolation from one another, but within the context of the entire record. See, e.g., *State* v. *Gonzalez*, supra, 206 Conn. 400–407. If the trial court determines that any one of the proffered reasons is pretextual, it has shown that impermissible discrimination was a part of the motivation for the state's peremptory challenge. Consequently, *under federal constitutional law* the trial court should then conduct a dual motivation analysis as set forth in *Howard* v. *Senkowski*, supra, 986 F.2d 24.[26] In a dual motivation analysis the state has the burden of an affirmative defense, through which it must prove "that the same challenges would have been exercised for race-neutral [or other permissible] reasons in the absence of such

[26] See footnote 14 of this dissent. Under federal constitutional law as set forth in *Batson*, the Second Circuit Court of Appeals has adopted the dual motivation analysis. *Howard* v. *Senkowski*, supra, 986 F.2d 30. Although the United States Supreme Court has not ruled on the issue of the applicability of the dual motivation analysis, we follow the Second Circuit. See *Schnabel* v. *Tyler*, 230 Conn. 735, 743 n.4, 646 A.2d 152 (1994).

partially improper motivation." Id., 30. If the state meets that burden, under federal law no discrimination should be found. Id., 30–31.

While the majority accepts the dual motivation analysis in theory, it fails to indicate that the burden shifts to the state as required by *Senkowski*. In addition, instead of examining each proffered reason in isolation when applying the *Batson/Holloway* tests, the majority seems to believe that a finding of pretext should be based on an analysis of all the proffered reasons in aggregate. Such an analysis, however, fails to isolate adequately each proffered reason when determining whether it is pretextual. All of the proffered reasons should be considered and balanced together only when the dual motivation analysis is applied. Thus, the majority's method blurs the distinction between the *Batson/Holloway* tests and the dual motivation test that comes into play under federal law when discrimination is found in part.

In addition, a reviewing court should also consider all relevant circumstances surrounding the peremptory challenges; thus our review of the trial court's decisions requires consideration of the entire record. Because discrimination in the selection of jurors implicates the basic integrity of this branch of government, we should review a disparate treatment claim within a *Batson/Holloway* challenge no matter when the disparate treatment claim is raised, taking the prior accepted jurors as well as subsequently selected jurors into consideration, as long as the *Batson/Holloway* claim is made prior to the swearing in of the jury. *State* v. *Hinton*, supra, 227 Conn. 327 (appellate review of questioning of venireperson that occurred after *Batson/Holloway* challenge); see also *State* v. *Gonzalez*, supra, 206 Conn. 406–407 (analyzing disparate treatment claim raised for first time on appeal); see generally *State* v. *Robinson*, 237 Conn. 238, 253, 676 A.2d 384 (1996) ("we hold that

a defendant may object to the state's peremptory challenge on *Batson* equal protection grounds at any time prior to the swearing of the jury").

Nevertheless, because the disparate treatment basis of the *Batson/Holloway* claim is so compelling in this case that it would lead to reversal, the majority changes the rules and refuses to review the entire record pertaining to the selection of all the jurors. For example, the majority refuses to apply any disparate treatment analysis to the three *Batson/Holloway* challenges in which the defendant did not raise specifically a disparate treatment claim within his challenge at trial.[27] Contrary to the majority's assertions, a disparate treatment analysis is not a separate examination from a *Batson/Holloway* claim, but, rather, an integral part of any evaluation of a *Batson/Holloway* claim. The challenging party need not raise a disparate treatment claim separately when it makes a *Batson/Holloway* challenge. See, e.g., *State* v. *Gonzalez*, supra, 206 Conn. 406–407.[28]

[27] In order to maintain that the defendant's disparate treatment claims are unpreserved, the majority misconstrues *State* v. *Robinson*, supra, 237 Conn. 238. The majority tries to support its present position by arguing that in *Robinson* the court "concluded that a defendant may *renew* a *disparate treatment* claim regarding the state's use of a peremptory challenge even at the conclusion of voir dire . . . ." (Emphasis added.) In fact, in *Robinson* the court held that "a defendant *may object* to the state's peremptory challenge on *Batson* equal protection grounds *at any time prior to the swearing of the jury*." (Emphasis added.) Id., 253. Thus, *Robinson* requires only that a *Batson/Holloway* claim be made for the first time at any time prior to the swearing of the jury in order for an appellate court to review the claim and take into account other jurors who were subsequently seated.

[28] In footnote 23 of its opinion, the majority claims unpersuasively that our review in *Gonzalez* of the disparate treatment claim under *Batson* that was raised for the first time on appeal is no longer relevant to this case because *Gonzalez* was decided before *Golding*. *Golding* did not change our jurisprudence regarding the review of alleged constitutional violations that are raised for the first time on appeal. *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Rather, we merely articulated guidelines to clarify the existing law. Id. Thus, *Golding* was not a statement of new law. Id., 240, citing *State* v. *Anderson*, 209 Conn. 622, 632–33, 553 A.2d 589 (1989); *State* v. *Wilson*, 199 Conn. 417, 438, 513 A.2d 620 (1986); *State* v. *Tyler-*

More specifically, the majority compares the peremptory challenge of G.D. only with the acceptance of juror W.V., the one juror the defendant specifically mentioned in his *Batson/Holloway* challenge during voir dire. Hence, the majority refuses to review the aspects of the defendant's disparate treatment claim based upon any other juror, which includes jurors identified in the defendant's brief that were accepted before and those that were accepted after the court excused G.D. Such a refusal, as I indicated previously, departs from our prior jurisprudence in two ways. First, in *Hinton* we reviewed a disparate treatment claim based on a comparison with a juror questioned after the *Batson/Holloway* challenge without the defendant's renewal of her *Batson/Holloway* challenge. *State* v. *Hinton*, supra, 227 Conn. 327. Second, because of the importance of the issue, as I have already indicated, we previously have reviewed a disparate treatment claim within a *Batson/Holloway* challenge when the disparate treatment claim was raised for the first time on appeal. *State* v. *Gonzalez*, supra, 206 Conn. 406–407. Such a review is possible in the present case when the record is viewed in its entirety.

When the complete record is examined regarding venireperson G.D.,[29] it reveals the pretextual nature of

---

*Barcomb*, 197 Conn. 666, 675–76, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); *State* v. *Thompson*, 197 Conn. 67, 76 n.7, 495 A.2d 1054 (1985); *State* v. *Conroy*, 194 Conn. 623, 627 n.5, 484 A.2d 448 (1984); *State* v. *Baker*, 182 Conn. 52, 56–57, 437 A.2d 843 (1980); *State* v. *Evans*, 165 Conn. 61, 71, 327 A.2d 576 (1973) ("[t]his claim raises an issue of constitutional dimensions and we find that it comes within the second exception which we have mentioned in that the record is sufficiently complete for us to consider it on its merits and it involves a fundamental constitutional right"). More specifically, our statement that we will not make factual determinations was applicable only where "the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred." *State* v. *Golding*, supra, 240. In contrast to the majority, I view the determination of whether the state engaged in impermissible discrimination as a question of law.

[29] See appendix A of this dissent.

all of the state's proffered reasons for its peremptory challenge. More specifically, the pretext is evidenced by: (1) the vagueness of the state's explanations; (2) the disparate treatment of G.D. and similar Caucasian jurors who were not challenged by the state;[30] see id., 399; (3) the lack of support in the record for the state's reasons; see *State* v. *Jones*, supra, 29 Conn. App. 341 (*Norcott, J.*, dissenting and concurring); see also *Williams* v. *State*, supra, 548 So. 2d 506; and (4) the state's failure to conduct more than a perfunctory inquiry into these matters. See *State* v. *Gonzalez*, supra, 203 Conn. 399; see also *Moore* v. *State*, 661 So. 2d 770, 772–73 (Ala. App. 1994) (failure to inquire into specific bias of venireperson raises strong inference venireperson struck solely on basis of race); *Slappy* v. *State*, 503 So. 2d 350, 355 (Fla. App. 1987) (failure to ask follow-up questions in order to establish assumed trait indicates perfunctory questioning). I will next review separately each of the state's proffered reasons in order to demonstrate their pretextual nature.

A

The state's claim that it challenged G.D. because of a perceived lack of ability to comprehend the medical testimony that would be presented during the trial passes *Batson/Holloway*'s first test—because it is a neutral explanation related to the case being tried—but fails the second test. According to the state, it based its perception of G.D.'s inability on the fact that he had a "less than illustrious" high school career and held a job that "[does not] demonstrate a position where he has to make decisions." While such reasons sound like neutral, potentially valid reasons to peremptorily challenge a juror, the transcript exposes these reasons to be pretextual.

---

[30] The proper inquiry should not, as the state argues, compare the challenges of the various excused venirepersons.

First, when the record does not support a claimed reason, as in the present case, the reason may be viewed as speculative and pretextual. *State* v. *Jones*, supra, 29 Conn. App. 341 (*Norcott, J.*, dissenting and concurring); see also *Williams* v. *State*, supra, 548 So. 2d 506. For example, the description of G.D.'s job as a pollution control analyst does not support either the conclusion that such analysts are not intelligent people or the assumption that the job does not require any decision-making skills. G.D.'s job entailed performing scientific testing that involved making judgments about water quality in order to guard against pollution. Furthermore, nothing in G.D.'s testimony supports the claim that he was not intelligent. While G.D. admitted he was not very interested in high school, there is absolutely no evidence regarding his academic achievements or lack thereof.

Moreover, the disparate treatment of G.D. becomes obvious when the treatment of G.D. is compared to that of W.V. and A.T., two Caucasian venirepersons with substantially less than a high school education. This disparity is not justified and, therefore, the state's peremptory challenge of G.D. should have been found to be pretextual. See *State* v. *Gonzalez*, supra, 206 Conn. 399 (disparate treatment of challenged juror and seated jurors as evidence of pretext). The state's explanation that it did not challenge W.V., a juror with a fifth grade education, because he was substantially older than G.D., who was twenty-three years old, is not sufficient. First, four jurors ultimately chosen and two alternate jurors were also in their twenties.[31] In addition, the challenge of G.D. cannot be justified by reference to his stated leisure activities of playing softball and collecting autographs and baseball cards or by his admission that

---

[31] The four jurors were: J.O., who was twenty-four years old; D.S., who was twenty-five; J.F., who was twenty-eight; and E.B., who was twenty-one. The two alternates were M.K. and G.T., who were both twenty-eight.

he did not read a newspaper regularly. In comparison, when asked about his hobbies, accepted juror W.V. explained that his hobbies consist of "[r]eally nothing, just sitting around the house all day. I cook."

Perhaps most significantly, the state employed inexplicable disparate treatment regarding W.V. and A.T. because both of these Caucasian venirepersons displayed difficulty understanding several key legal concepts, whereas G.D.'s answers manifested no such difficulty. This disparity is especially notable with regard to A.T., who had completed high school but gave a series of confused answers that showed a complete inability to understand legal and psychiatric concepts. In contrast, even the majority concedes that G.D. did not appear to be confused by the many, sometimes legally complicated, questions that he was asked by the state. These disparities demonstrate that the state did not challenge G.D. because it feared he would not be able to understand the complicated medical testimony that would be offered during the trial.

The state's lack of meaningful questions regarding G.D.'s job and education supply further evidence of pretext;[32] in fact, the defendant asked most of the questions regarding those topics. Our court, as well as many others, has often stated that a failure to question a venireperson beyond a perfunctory manner on a relevant subject is often evidence of pretext. See, e.g., *State* v. *Gonzalez*, supra, 206 Conn. 399; see also *Moore* v. *State*, supra, 661 So. 2d 772–73; *Slappy* v. *State*, supra, 503 So. 2d 355.

In sum, both the testimony relating to G.D.'s ability to comprehend medical testimony and the selection of other jurors who demonstrated substantially less comprehension support the conclusion that the trial

---

[32] The only question the state asked regarding G.D.'s education was the name of his high school. See appendix A of this dissent.

court incorrectly failed to find that the state's first proffered reason for its peremptory challenge was pretextual.

B

The state's second reason for challenging G.D.—his alleged friendships with a homicide victim and his murderer—does not pass even the first prong of the *Batson/ Holloway* test, for it is not "a neutral explanation related to the particular case to be tried." *Batson* v. *Kentucky*, supra, 476 U.S. 98. Even if the reason was determined to have rebutted the prima facie case of discrimination or if it was determined that the *Purkett* majority somehow applied, the reason certainly would not pass the final hurdle as a valid one.

The record does not support the state's claims that either the murder victim or the perpetrator of the murder was even a friend of G.D. On the contrary, G.D., on two separate occasions, clearly stated that he was not friends with either the perpetrator or the victim of the other murder and that he "[j]ust knew them by name." Accordingly, the trial court should have found this reason to be pretextual. See *State* v. *Jones*, supra, 29 Conn. App. 341 (*Norcott, J.*, dissenting and concurring); *Williams* v. *State*, supra, 548 So. 2d 506.

Beyond very preliminary questions relating to G.D.'s relationship with these two individuals, the state failed to pursue the issue with any questions designed to elicit any bias based on G.D.'s experience with that homicide, which is strong evidence of pretext. See *State* v. *Gonzalez*, supra, 206 Conn. 399; see also *Moore* v. *State*, supra, 661 So. 2d 772–73; *Slappy* v. *State*, supra, 503 So. 2d 355.

In an effort to justify the peremptory challenge against G.D., the state offered: "I am not sure how the fact that a friend of his or an acquaintance was murdered, and he knows the fellow that murdered him,

how it took place. He indicated that he initially did follow the case and I guess lost interest." Nothing in these two sentences indicates why or how such a relationship could affect G.D.'s ability to serve as a juror. In the course of this vague explanation, the state admitted that even it was "not sure" what to think about G.D.'s knowledge of these persons and the homicide. Consequently, it is inconceivable that G.D.'s relationship to this murder constituted a legitimate reason for striking G.D. as a juror.

Moreover, the record indicates that the state treated differently several other prospective jurors with similar relationships, without accounting for this disparate treatment. See *State* v. *Gonzalez*, supra, 206 Conn. 399 (disparate treatment salient to showing of pretext). For example, the state accepted three venirepersons with similar and closer relationships with murder victims than those of G.D.[33] It also accepted two venirepersons who had been criminal defendants themselves and six other venirepersons with relatives who had been criminal defendants.[34]

In sum, an examination of G.D.'s testimony and the state's proffered reasons and explanations does not reveal any relevance between this information and the present case. The majority even concedes its lack of relevance, but nevertheless affirms the trial court's determination that it is not pretextual because it apparently examines all the proffered reasons in aggregate when applying the *Batson/Holloway* tests. As I previously have indicated, that analysis is improper. Even under that analysis, however, one must conclude that

---

[33] The three venirepersons were: J.S., a Caucasian venireperson who was accepted by the state but excused by the defendant (fireman who deals with homicide victims); J.C., a Caucasian venireperson who was accepted by the state but excused by the defendant (cousin murdered); and E.B., a Hispanic juror (two friends murdered).

[34] See part IV C and footnote 36 of this dissent.

this reason is pretextual. To conclude, I believe the fact that the explanation is unrelated to the present case prevents it from rebutting the prima facie case of discrimination, as a matter of law.[35]

## C

The state's third reason for its peremptory challenge of G.D. was G.D.'s alleged "unpleasant experience with a police officer . . . ." While this reason is race neutral, the fact that G.D. may have had an unpleasant experience with a police officer is not related to this case. *State* v. *Gonzalez*, supra, 206 Conn. 399. The police's credibility was not at issue in the present case. The defendant admitted that he shot the two victims. As a result, the sole issue at trial was the defendant's state of mind at the time of the murders. The officer's testimony, however, was related only to the crime scene and the chain of custody of the defendant. Thus, this reason cannot even rebut a prima facie case of discrimination. It, therefore, fails *Batson/Holloway*'s first test. Even if the reason did pass this first hurdle, upon further examination it would be found to violate *Batson/Holloway*'s second test as merely a pretext for discrimination.

The incident to which the state referred involved G.D.'s witnessing a friend's arrest for breach of the peace. The arresting officer, whom G.D. believed had "tried to be too macho," was charged with using excessive force regarding the arrest. While G.D. was called as a witness in court, the charge was eventually dropped, and the officer was reprimanded.

Even though it is not uncommon for the state to strike venirepersons who have had negative experiences with the police; see *State* v. *Smith*, supra, 222 Conn. 14; this fact does not give the state carte blanche to strike

---

[35] See the introduction to part IV of this dissent for a further discussion.

venirepersons based on any kind of unpleasant experience with the police. See *State* v. *Jones*, supra, 29 Conn. App. 341 (*Norcott, J.*, dissenting and concurring). In the present case, G.D. was not involved in the arrest of his friend, he was only a witness to it. Furthermore, he merely was performing his civic duty by testifying as to the circumstances surrounding the arrest when he was called as a witness in court. Moreover, there was also evidence that could have demonstrated that G.D. was biased in favor of the police because G.D. testified that he had friends who were police officers.

G.D. unequivocally denied that either his friend's arrest or his friendships with police officers would affect his objectivity as a juror. This denial is not undermined by any contrary testimony. Nevertheless, the state claimed that, despite G.D.'s assertion, "one never knows subconsciously how that would play in his judgement in this case." While it is true that the state is entitled to rely on its own impressions, such impressions must be treated like any other proffered reason. In other words, the trial court must find an asserted impression to be pretextual where the evidence does not support it. See *State* v. *Gonzalez*, supra, 206 Conn. 399. Thus, the state's refusal to accept a venireperson's assessment of his own impartiality should be based on something in the record. *Moore* v. *State*, supra, 661 So. 2d 774. In the present case, however, the state had no basis for inferring that G.D. would be biased against police officers.

The state also failed to explain its disparate treatment of other venirepersons who were Caucasian and had unpleasant experiences with the police or had relatives who were arrested. For example, the state inexplicably accepted six venirepersons who had relatives who had been arrested[36] as well as two other venirepersons who

---

[36] Those venirepersons accepted by the state (with their relatives who had been arrested identified in the parentheses) were: M.B., a venireperson

had more compelling and direct unpleasant experiences with the police. The most striking contrast to the state's treatment of G.D. is its treatment of G.T., a Caucasian alternate juror who was arrested and charged with "threatening and breach of the peace" relating to a domestic argument. The incident occurred when G.T.'s estranged wife and a friend came over to his house one evening and began banging on the door. G.T. called the police, retrieved his handgun, and waited. When a police officer arrived, he refused to listen to G.T. and falsely arrested him. Subsequently, the prosecutor did not want to listen to G.T. and gave him a "raw deal," forcing him to go through a domestic violence education program. G.T. also appeared to be angry with his lawyer who told him it would cost $5000 to go to trial. G.T. did not have the money to fight the charges in court, therefore, he agreed to attend a domestic violence education program in order to have the charges dropped. G.T.'s negative views regarding every aspect of his experience with the criminal justice system were evident throughout his testimony. G.T. twice stated that he got a "raw deal," and explained that he felt that the police officer and the prosecutor refused to listen to him. His description of the officer was that "he just came in hot headed and not thinking of what he should have done . . . ." All of this information was developed as a result of the defendant's voir dire of G.T.; the state's voir dire included only two questions relating to G.T.'s potential bias toward prosecutors.

The second venireperson with a direct unpleasant experience with a police officer was A.T., a Caucasian who lost his driver's license for four years after he was

who was accepted by the state but excused by the defendant (father); J.O., a Caucasian juror (father); F.O., a Caucasian juror (brother); G.D., a Caucasian venireperson who was accepted by the state but excused by the defendant (son); A.M., a Caucasian venireperson who was accepted by the state but excused by the defendant (brother); and C.G., a juror (son).

involved in an automobile accident. Unlike G.D.'s case, the state did not appear to be concerned with A.T.'s unpleasant experience with the police. The state merely accepted A.T. without even asking if this experience would affect the way he would view the testimony of the police in the present case.

The fact that G.D. witnessed a *friend's* arrest, as opposed to a stranger's, also cannot account for why the state tried to excuse G.D. because, as I have previously discussed, it accepted six other venirepersons who had close relatives who had been arrested. Furthermore, the charges against G.D.'s friend were eventually dropped. The state offered no reason for this disparate treatment.

The state's disparate treatment, coupled with the proffered reason's unrelatedness to this case, lead to the conclusion that the state truly was not concerned with G.D.'s negative experience. Therefore, even if it was determined that this reason was actually related to the present case, and consequently the reason rebutted a prima facie case of discrimination, it still should be held that this incident merely was a pretext for the state's discriminatory peremptory challenge.

## D

The state's most blatantly pretextual reason for the peremptory challenge of G.D. is its fourth and final one. It clearly is not trial related, and, therefore, fails *Batson/Holloway*'s first test. Furthermore, even if the court did not require trial relatedness at that step, this reason is undoubtably pretextual.

At trial the state claimed that the fact that G.D. had six sisters and was one of the youngest of the seven siblings was "of some interest in terms of how he would look at this case." I agree with the majority that this

reason also lacks any obvious relevance to G.D.'s capacity to serve as a juror in this case. I would, however, again disagree with the majority that this finding must be viewed within the context of the other proffered reasons in order to determine whether this reason is pretextual. Instead, each proffered reason must be analyzed in isolation in order to examine whether it is a pretext for discrimination. See, e.g., *State* v. *Gonzalez*, supra, 206 Conn. 400–407. A proper examination of this asserted reason strongly supports the conclusion that the trial court incorrectly found it not to be pretextual because it is totally unrelated to the present case. Nevertheless, even if the majority is correct that all the proffered reasons must be analyzed together, this reason is so egregiously pretextual that it necessitates a finding of pretext.

Not only did the state fail to relate this reason to the case, the state's questioning also reveals that G.D.'s familial status in relation to his siblings was never even a concern. Beyond the occupations of G.D.'s sisters and parents, the state failed to ask G.D. any other questions about his relationship with his family or the importance of his birth order.[37] This failure to question beyond a perfunctory manner is further evidence of pretext. Id., 399; see also *Moore* v. *State*, supra, 661 So. 2d 772–73; *Slappy* v. *State*, supra, 503 So. 2d 355.

Lastly, the state also engaged in disparate treatment between chosen jurors and G.D. concerning this topic. For example, W.V., a Caucasian male, and F.O., a Caucasian female, both had seven sisters and one brother. Yet, the state did not challenge either of these jurors. Consequently, the trial court should have found that

---

[37] The only other references to G.D.'s family occurred when he offered responses to questions that included his family, such as the fact that he lived with his parents and that one sister had been the victim of domestic violence.

G.D.'s birth order and the number and gender of his siblings could not pass *Batson/Holloway*'s first test.

## V

It is clear that, based upon the marathon deliberation of the jury (nine days) and the jurors' announcement that they were deadlocked (twice), this was a close case. The defendant will never believe that he had a fair trial before an unbiased jury; indeed, neither will the African-American community because G.D., a Hispanic, and five African-American venirepersons were not allowed to serve on the jury as a result of the state's exercise of its peremptory challenges based upon impermissible considerations. Under any standard of review, there is only one conclusion that reasonably can be drawn in this case—that the state intentionally used its peremptory challenges to eliminate minorities from the jury. I would therefore reverse the defendant's conviction and order a new trial. It is terribly troubling that the opinion of the majority is result oriented and ignores long-standing precedent in order to uphold this conviction of an African-American defendant.

Unfortunately, the majority sets that stage for the future by sending a message to the trial courts that *Batson/Holloway* challenges do not have to be taken seriously. The majority either ignores or fails to appreciate that "[r]ace [or for that matter any impermissible] discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality. . . . In the many times we have addressed the problem of racial bias in our system of justice, we have not questioned the premise that racial discrimination in the qualification or selection of jurors offends the dignity of persons and

the integrity of the courts. . . . To permit racial exclusion in this official forum compounds the racial insult inherent in judging a citizen by the color of his or her skin." (Citations omitted; internal quotation marks omitted.) *Edmonson* v. *Leesville Concrete Co.*, 500 U.S. 614, 628, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991).

Accordingly, I respectfully dissent.

## APPENDIX A

The complete transcript of the voir dire of G.D., which occurred on November 10, 1994, is as follows:

"The Court: Madam Clerk, I think it would be the desire of counsel and the court for you to start contacting these jurors that we have, perhaps during the voir dire this morning, to the extent that you can, and tell them that their tentative date for starting is the 17th, Thursday the 17th. Bring in [G.D.]. (Whereupon the next juror, [G.D.], entered the courtroom.)

"The Court: Good morning, sir, you are [G.D.]?

"[G.D.]: Correct.

"The Court: Any reason come to mind, [G.D.], why you wouldn't be able to serve on this case?

"[G.D.]: No reason.

"The Court: No reason at all, okay. Whose turn is it? Mr. Dearington?

"[Michael Dearington, State's Attorney]: Yes, Your Honor.

"VOIR DIRE EXAMINATION BY MR. DEARINGTON:

"Q. [G.D.], good morning. I am Mike Dearington. I am the prosecutor. We are not trying to pry or embarrass you, these are standard questions. You live up in Meriden?

"A. Yes.

"Q. How long have you lived up there?

"A. All my life, twenty-three years.

"Q. Your family lives in Meriden?

"A. Correct.

"Q. You're single?

"A. Yes.

"Q. You live with your family?

"A. Yes.

"Q. And I see you work for Cytec—what company?

"A. Cytec Industries in Wallingford.

"Q. How long have you been with them?

"A. Five years.

"Q. What type of work do you do?

"A. Waste water treatment operator.

"Q. Which means what?

"A. I treat chemical waters and I make it—I take the pollution out of it, so when it goes back to the Main Street, it's okay, there is no pollution in it.

"Q. What is the Main Street?

"A. Back to a river, Quinnipiac River in Wallingford.

"Q. What type of product does that company make?

"A. There's many joint ventures in Cytec. There's different buildings. There is plastic moldings. There is a resins department. There is a thermoplastic department. There is all different departments; medical fibers. There's all different buildings, each building makes a different product.

"Q. Is that part of Industrial Park?

"A. No, it's not part of Industrial Park. It's just one company.

"Q. You have been with them for five years?

"A. Yes.

"Q. And did you go with them shortly after graduating from high school?

"A. Yes.

"Q. [G.D.], what high school did you go to?

"A. Francis C. Maloney High.

"Q. Now, as far as your family, do you have any brothers and sisters?

"A. I have six sisters, no brothers.

"Q. As far as the ages, where are you?

"A. Second to the youngest.

"Q. So, you have four older sisters?

"A. Five older sisters.

"Q. Five older sisters. Are any of them working?

"A. Yes.

"Q. What type of work do they do?

"A. One is a housewife in Florida; one is a manager at some business, I don't even know the exact business she does; another one is a housewife in East Haven; two sisters are in grad school; and one is a college freshman.

"Q. And the college freshman, where does she go to school?

"A. Quinnipiac.

"Q. And the two that are in grad school, where do they go to school?

"A. New England School of Optometry in Boston, and UConn Law School.

"Q. What year is your sister in law school?

"A. Final year.

"Q. What type of law does she want to do when she gets out?

"A. Helping minorities, I forget what it's called. It's not criminal law.

"Q. Working for the state in some type of—

"A. Yes.

"Q. Equal employment or—would it be working for some type of state or federal agency?

"A. Yes, it would. It's not working for a law firm or something like that.

"Q. And the sister who is in optometry school, did she go to college before going to that school?

"A. Yes.

"Q. Where did she go to school?

"A. Gordon College.

"Q. Where is that located?

"A. Wenham, Massachusetts.

"Q. Now, as far as your parents, what type of work do they do?

"A. My mother baby-sits kids for a living, and my father works at Times Fiber Communications in Wallingford.

"Q. As far as Cytec, that is your employer. You realize if you're selected, you will be excused until some time next week and go home today. You will have to come back probably later next week and you may be here for approximately four weeks, Monday through Friday, ten to five. As far as work, will that create a hardship at work?

"A. No, it wouldn't create a hardship because we are a union shop and it allows for jury duty.

"Q. So, they will pay you?

"A. Yes.

"Q. And will you be sitting here worried or distressed about the fact that you're not back at work?

"A. Definitely not, no.

"Q. Now, have you ever been on jury duty before, [G.D.]?

"A. No, I haven't.

"Q. Have you ever been in court for any reason except for perhaps motor vehicle violations?

"A. Yes, I was in court once.

"Q. Can you tell us about that.

"A. My friend got into an altercation with a police officer. The police officer was accused of overstepping his boundaries, so we had to go to court to rectify the situation.

"Q. The police officer was accused of—

"A. Overstepping his boundaries. He tried to be too macho.

"Q. He used excessive force?

"A. Excessive force, yes.

"Q. And did he arrest your friend?

"A. Yes, he did.

"Q. And what happened—what did he arrest him for?

"A. Breach of peace.

"Q. And what happened to that case?

"A. When it went back to court, I was called on to be a witness because I was there, and the police officer was reprimanded and the case was thrown out. Nothing was filed against my friend.

"Q. How long ago was this?

"A. About, I would say, almost two years.

"Q. And was this a Meriden police officer?

"A. No, it was Middletown.

"Q. So, you went to court in Middletown?

"A. Yes.

"Q. And did you actually talk to a prosecutor? Did you personally talk to a prosecutor?

"A. I talked to his lawyer. The prosecutor questioned me on the stand.

"Q. And I am a prosecutor, obviously. As a result of that, do you have a feeling about prosecutors, that they overstep their bounds or are not fair?

"A. No.

"Q. Do you think the prosecutor was fair to you?

"A. Yeah.

"Q. As far as that individual officer, do you know what happened to him?

"A. No.

"Q. Was he disciplined?

"A. I never found out what happened.

"Q. But the case against your friend was dropped; is that correct?

"A. Yes.

"Q. Now, obviously we are going to call a number of police officers, not from Middletown but probably from Hamden, maybe the state police, maybe a federal agent. As the court indicated yesterday, you've got to treat a police officer like any other witness. You don't give them any special credit, but on the other hand, you don't put him at a disadvantage. Do you think that you could follow that law and treat a policeman like anyone else?

"A. Yes, I could.

"Q. Do you have a feeling, as a result of that experience with that police officer, that might affect your judgment about all police officers?

"A. No, I don't.

"Q. I assume that you were present when the officer made the arrest of your friend?

"A. Yes, I was.

"Q. Where were you when that occurred?

"A. I was on the street in Middletown, I don't know the exact street name, but we were heading one place, and the whole thing took place there. He just pulled us over without ever putting on a siren. He called over the megaphone and demanded my friend to get out. He didn't ask him to step out of the car. He was just real obnoxious.

"Q. Do you realize there are obnoxious people in every profession?

"A. Yes, it's not just a police officer.

"Q. Have you ever had any other unpleasant experience with a police officer?

"A. No.

"Q. Are you friendly with or related to any police officers?

"A. I know a couple of police officers, yeah.

"Q. From what town?

"A. From Meriden.

"Q. Have you ever discussed their work with them?

"A. No, I haven't.

"Q. How about the rest of your family, your sisters and your parents, have any of them ever had an unpleasant experience with a police officer?

"A. No.

"Q. Now, any other reason that you were ever in court?

"A. No.

"Q. You put on your questionnaire that you received a speeding ticket, not unlike a lot of people, but when was that?

"A. Um, when I was younger I got a couple of speeding tickets. I had to go to court for them.

"Q. Did you actually go to court?

"A. I never went into court, I just spoke to the D.A.

"Q. And what happened?

"A. She reduced the ticket. She didn't nolle it, but she just reduced it.

"Q. In both cases?

"A. In both cases, yes.

"Q. Was that in Meriden?

"A. Yes.

"Q. As far as your meeting with the prosecutor, anything about that that you walked away saying that prosecutor is a real pain in the neck?

"A. No.

"Q. So, you don't have a thing about prosecutors?

"A. No.

"Q. As far as anyone else in your family, sisters or parents or close friends or relatives, anyone who has ever been to court for any type of significant case, civil or criminal?

"A. No.

"Q. Now, as far as this particular case, there are a couple of rules that apply, [G.D.]: Number one, we have to prove our case beyond a reasonable doubt. The judge told you yesterday that's less than 100 percent certainty. Do you realize you don't have to be 100 percent certain to convict? Do you understand that?

"A. Yes, I do.

"Q. There are very few things in life that you can be 100 percent certain of. Do you recognize that?

"A. Yes, I do.

"Q. Sentencing, are you aware that the jury has nothing to do with sentencing?

"A. Yes, I am.

"Q. Did you know that before you came to court yesterday?

"A. No, I found that out yesterday.

"Q. Good. The way it works, as you now know, if the jury convicts, then it's the judge who imposes the appropriate sentence. That's how it works, and it falls from that that you're not supposed to worry about the sentence or what the judge would do or let it influence your judgment. You're not supposed to look over at [the defendant] and think, 'Gee, if I vote guilty, the judge will put him in jail. That will bother me, so I will vote not guilty.' Do you understand you're not supposed to worry about the sentence at all. You have nothing to do with that?

"A. Yes, I do.

"Q. And you can accept that?

"A. Yes.

"Q. As far as being on a jury, you're put in a position of judging other people, judging the accused. Do you have any religious or moral reservations about sitting on a criminal jury and judging someone else?

"A. No.

"Q. Have you ever been the victim of a crime, had your car broken into or vandalized, your apartment broken into, theft of property, pocketbook snatched, anything?

"A. No.

"Q. How about any of your sisters or your parents?

"A. A sister.

"Q. Can you tell us about that.

"A. It was just spousal abuse.

"Q. When she was married or a boyfriend?

"A. Married.

"Q. And did she actually—was an arrest made?

"A. Yes, there was.

"Q. And did she have to go to court?

"A. I believe so, yes.

"Q. How long ago was that?

"A. I don't think it was a court thing. I think it was just a court for divorce, divorce court. I don't know how long ago, maybe about three or four years ago.

"Q. So, she is divorced from her husband?

"A. Yes.

"Q. Anything about that that would affect your judgment here as far as police officers or prosecutors or the court, that you think your sister wasn't treated fairly or the system didn't work well? Anything about that?

"A. No.

"Q. Anything else as far as being a victim of a crime, any of your other family members?

"A. No.

"Q. Do you have any friends who might have been victims of crimes, any type of crime, an assault or even a homicide, anyone that you know that has been murdered or arrested for a homicide?

"A. Yeah, I know a couple of people, not friends, people I know. That's about it.

"Q. Arrested or actually victims?

"A. A couple of both.

"Q. A couple of both?

"A. Yeah.

"Q. Are these people that you knew when you were at Maloney?

"A. No, people I played football with, usually on Sundays. That's how I know them, just to play football.

"Q. Tell us about any—the people who have been victims of homicides that you know, can you tell us about those situations, who they are, when it occurred?

"A. The homicide was someone who was like three years ahead of me in high school. He was shot by another person that went to our high school, and that's it. He was on the football team. I just knew of him, just a couple of 'hi's, 'bye's. That's it.

"Q. So, you weren't familiar with either the victim or the shooter?

"A. Just knew them by name. We never went out.

"Q. I assume the fellow was arrested and prosecuted for the shooting?

"A. Yes.

"Q. Did you follow the case at all?

"A. At the beginning, but not at the end, no.

"Q. This was about three years ago?

"A. Um, less than three; maybe two.

"Q. Do you remember the name of the fellow who was arrested for the shooting?

"A. Tony Lyons, I think.

"Q. Do you know what happened to him?

"A. I believe he's in jail.

"Q. Anything about that that might affect your judgment in this case?

"A. No.

"Q. Do you feel—obviously that is a tragedy. Do you feel Mr. Lyons was treated unfairly or the police didn't

respond properly? Anything that you know about the case that might affect your judgment?

"A. No.

"Q. Anyone else, as far as either being the victim or someone who was arrested for a homicide or an assault?

"A. No.

"Q. Now, how about a witness to a crime, ever see someone commit a crime? You weren't the victim, but maybe you saw someone else, their car was broken into or their house was broken into?

"A. I saw someone do a hit-and-run, hit another car and then take off.

"Q. Did you give a statement to the police?

"A. Yeah. It was after a party, graduation. I went up to the guy's door, I knocked on it and I said, 'someone just hit your car.' I looked quick enough so I could see the license plate. I gave the guy the license plate, and the next day the police officer called up at my house to verify what I saw. I identified the car and the license plate, and that was as far as I heard of it.

"Q. Did you ever hear anything more? Were you ever asked to go to the police department or go to court?

"A. No, I wasn't.

"Q. Did you know the fellow who was driving the car?

"A. No, I didn't.

"Q. Have you ever given a statement to the police in any other situation, other than that?

"A. No, just beside that friend that I told you about.

"Q. In Middletown?

"A. Yes.

"Q. Now, as far as the evidence in this case, it may be unpleasant. There may be a photograph of . . . the two victims. There may be testimony by the medical examiner, who did an autopsy, describing the wounds and the cause of death. This will be upsetting, I am sure, to most people, but is there anything about that that would be so upsetting that you do not think that you could sit on this case fairly?

"A. No.

"Q. As far as some of the laws that apply, in terms of murder, in order for us to prove murder, we have to prove [the defendant], with intent to cause the death of another, caused that person's death. Translated into the allegations here, we have to prove at the time he pulled the trigger, he intended to kill, but what we don't have to prove, [G.D.], is that he planned it in advance. We don't have to prove that he went to the office intending to shoot someone. We don't have to prove ten minutes before the shooting, he intended it, only at the time of the shooting he intended to do it. Do you understand that?

"A. Yes.

"Q. Most people think murder means that you have to plan it, but that is not the case. As far as motive, as far as the reason he committed the crime, we don't have to prove motive. We don't have to prove why he did it. I recognize that a jury would like to know why, but legally, we are not bound to prove it. Can you understand that?

"A. Yes.

"Q. Now, that case is almost two and one-half years old. May 4, 1992, was over thirty months ago. Without knowing the reason for the delay in this case going to trial, do you think it's unfair to either side to try a case this long after the offense?

"A. No.

"Q. So, you're not going to sit there and say it's not fair for the state to try him two and one-half years later and hold it against us?

"A. No.

"Q. As far as insurance companies, I mentioned yesterday that our allegation was that [the victims] were public insurance adjusters, and that the meeting was set up to discuss a claim filed by [the defendant's] mother. Have you ever filed a claim against an insurance company or had a claim filed against you by an insurance company, the most common example being an automobile accident?

"A. No, I haven't.

"Q. You have never been involved with an insurance company, one way or another, other than medical—

"A. Well, I had a claim filed against me. I also filed one when someone hit me in an accident.

"Q. Were you satisfied with the resolution of the claim?

"A. Yes.

"Q. How about any of your sisters or your parents or close friends or relatives?

"A. Same thing.

"Q. Nothing else?

"A. No.

"Q. Are you familiar with the difference between a public insurance adjuster and an insurance company adjuster? Have you ever heard of the two types of adjusters?

"A. I have never heard of it, but I think I can base an opinion on the evidence.

"Q. As you sit there now, you don't have a feeling now that insurance companies are all thieves or that they are out to expose other people or—you don't have an ax to grind with insurance companies, I assume?

"A. No.

"Q. As far as the defense in this case, you heard both myself and the defense mention as possible witnesses several—a couple of psychiatrists and a psychologist. [G.D.], it's no secret in this case that the defense may offer a psychiatric defense, and in our state, our law recognizes, under certain circumstances, a psychiatric defense as appropriate. The question is whether the circumstances apply here. So my question to you is, as you sit there now, do you have any feeling about the use of a psychiatric defense in a criminal case?

"A. No.

"Q. You've never given it any thought?

"A. No.

"Q. So, you could treat that type of defense fairly?

"A. Yes.

"Q. Also in our law, not to confuse this, and if you don't understand the question, please tell me, in our law, we have to prove our case beyond a reasonable doubt. If the defense chooses to offer a psychiatric defense, they have to prove that defense by a preponderance of the evidence. So, there is a burden on the defense. It's their obligation to prove that defense. So there are two burdens: we have to prove our case, they have to prove their defense, if they offer that. Can you understand the two burdens?

"A. Yes.

"Q. And can accept—the judge tells you all this stuff, and you don't take my word for it, but at some point the judge will explain the law. He will explain that to you, about the two burdens. Can you accept that concept of the two burdens in our law?

"A. Yes.

"Q. Have you or a member of your family or close friend, [G.D.], ever retained the services of a psychologist or a psychiatrist or psychotherapist or counselor?

"A. Again, my sister went to a counselor when she was abused.

"Q. Was that a marriage counselor, domestic violence counselor?

"A. I think both, she went to both of them.

"Q. Did she ever discuss with you her opinion about whether those people helped her at all?

"A. Not really sit down and have a big discussion, but she briefly indicated what was happening.

"Q. Did she feel it was worthwhile going to counselors?

"A. Yeah.

"Q. Based·on what little you know about the case, you know that we've charged [the defendant] with going to a meeting and shooting two people. Based on what little you know, do you have a feeling that he must have been nuts? Are you already starting to decide that that guy, in order to do it, must have been crazy? Are you starting to think that way?

"A. No.

"Q. So, you could sit and listen to the case?

"A. Yes.

"Q. As I recall yesterday, I think you indicated, [G.D.], that you have never heard about this case?

"A. Right.

"Q. Do you have any feeling at all about someone who has any type of mental problem, any feeling that they should never be held accountable for what they do, that if you have a mental problem, that you can do whatever you want without being held accountable? Do you think that way?

"A. No.

"Q. Have you ever given this—most people never thought about this. Have you ever thought about this? Is this an area that interests you or that you read about?

"A. No.

"Q. Let's assume that you are selected, [G.D.], and you listen to all the evidence and you sit here, you listen to everything that goes on and what the judge tells you the law is, what the rules are that apply to your deliberations, and then you deliberate and you're convinced that we have proven [the defendant] guilty in the shooting death of [the victims]. If you're convinced we have proven him guilty beyond a reasonable doubt, do you think you could actually vote guilty for the crime of murder?

"A. Yes.

"Q. Can you think of anything that might in any way prevent you from being fair on this case or treating this case fairly?

"A. No.

"Mr. Dearington: Okay. Thank you.

"VOIR DIRE EXAMINATION BY [THOMAS ULL-MANN, DEFENSE COUNSEL]:

"Q. Good morning. How are you today?

"A. Fine, thanks.

"Q. I have some additional questions to ask of you. They are [not] meant to pry into your personal affairs. If you feel they do, please tell the judge. That is not the purpose of the questions, nor Mr. Dearington's. We are both looking at the form that you filled out, and I apologize in advance if I cover some territory that he has already gone over. If you could just raise your voice so everyone in the courtroom could hear you.

"A. Okay.

"Q. We try to estimate as best as possible how long this trial will last, and we think it will get started some time next week and it will span through approximately December 16. We could be off by a couple of days on the short end or on the long end. We try to let jurors know that so they can plan accordingly. Is there anything of a personal, professional or financial hardship that you feel would make it difficult for you to sit on the case during that period of time?

"A. No.

"Q. I assume that you understand that we need to have people who can focus their attention on what is going on in the courtroom and not be distracted by anything that's going on in their personal or professional lives. Can you assure us that you would give us that attention?

"A. Yes.

"Q. You have never gone through this process before?

"A. No.

"Q. Never been on jury duty before?

"A. No.

"Q. Now, you were born and raised in Meriden?

"A. Yes.

"Q. You live with—

"A. My parents.

"Q. They own their own home?

"A. Yes, they do.

"Q. What part of the city of Meriden do you live in, what's it called? What's it referred to?

"A. Meriden-Wallingford town line.

"Q. Is that where you have been for your entire life?

"A. No, I was on the west side for like my first eleven years. I have lived there for the last twelve.

"Q. When your sisters were undergraduates in Gordon, what were their majors in school?

"A. I believe [one sister's] was science, because she's going into optometry, and [another sister's], I don't know what the major was there.

"Q. She is at UConn?

"A. Yes.

"Q. Is she a full-time student or works on the side?

"A. Full-time.

"Q. Your father, what does he do for Times Fiber?

"A. A tool crib attendant.

"Q. How long has he been there, approximately?

"A. About twenty-five years.

"Q. And your mom does the baby-sitting out of her house or—

"A. Out of her house, yes.

"Q. How long has she been doing that?

"A. Less than a year.

"Q. And at Maloney High School, what was your— did you participate in a lot of different things at the high school? What was your focus at high school? What were your plans, going through high school, in terms of what you would do after that?

"A. Getting it over with. I wasn't really too good of a student. I didn't get too involved with it. I just did my work.

"Q. Were you involved in sports activities?

"A. Yeah, a couple of sports.

"Q. And what were those?

"A. Track and field, cross-country.

"Q. And were you involved in any organizations connected with the high school at all?

"A. No.

"Q. And how would you describe the racial makeup of the school when you were there, in terms of whites, African-American, Hispanic, if you can venture to guess at the percentages?

"A. Probably broken into a pie, maybe forty, thirty, thirty, pretty even.

"Q. How would you describe what the relationships were among the different groups?

"A. Very good.

"Q. And how about the community that you grew up in?

"A. The same.

"Q. Same kind of mix?

"A. Same kind.

"Q. And you're currently living in Meriden?

"A. Yes.

"Q. Any military history at all?

"A. No.

"Q. Any association with any charitable organization or volunteer groups of any kind? I don't mean a donation here and there, I mean active involvement.

"A. No.

"Q. Let me be a little bit more specific as it might relate to this particular case. Any connection at all with gun control organizations or a group like the [National Rifle Association]?

"A. No.

"Q. Do you have any particular hobbies or things that you enjoy doing outside of your work?

"A. Yeah, collectibles like collecting autographs, baseball cards, stuff like that.

"Q. How long have you been doing that?

"A. About ten years.

"Q. Specifically in baseball or other sports?

"A. Baseball.

"Q. And do you enjoy doing a lot of reading or not really?

"A. No.

"Q. Now, did you graduate from high school in the normal period of time?

"A. Yes, I did.

"Q. Which is something you didn't like school?

"A. Yes.

"Q. How about at work, you went to work right after high school?

"A. Yes.

"Q. And you have been there ever since?

"A. Yes.

"Q. Is that the only place that you've worked subsequent to high school?

"A. I worked at a couple of places while I was in high school.

"Q. Doing what kind of things?

"A. I was a cook at the Yankee Silversmith and I was a bank teller.

"Q. Now, at Cytec, how long have you been in this particular position?

"A. About six months.

"Q. What were you doing before that?

"A. Before that I was in building one, it's plastic moldings.

"Q. What's the specific tasks now?

"A. Waste water treatment.

"Q. What do you particularly do?

"A. I take samples of the water and I get the pHs, make sure everything is within range, it's not out of regulation.

"Q. These are waters that have been treated—

"A. Yeah, we treat the water.

"Q. That's done in another building or is it done in your building?

"A. It's done in my plant, not my specific end of the plant, but at the whole facility.

"Q. Yours is sort of a quality control check?

"A. Yes.

"Q. At that point, once it passes you, if it's okay, it goes back into the Main Street?

"A. Yes.

"Q. That's a union position that you have?

"A. Yes.

"Q. And the plant that you work in, how would you describe the racial makeup of the plant there? Would you say there is a fair mix of Caucasians, African-Americans and Hispanics?

"A. Yes.

"Q. Or is it leaning in one direction or the other?

"A. I think it's relatively fair.

"Q. Now, we have two different kinds of cases in our court system, we have civil cases and we have criminal cases. In a civil case the plaintiff, the person who brings the action, has the burden of proof by what is called a fair preponderance of the evidence, kind of tipping the scale one way or the other. In a criminal case the state brings the action and the state has the burden of proof beyond a reasonable doubt. There's a much greater burden of proof in the criminal case. Do you understand the distinction and can apply it if instructed how?

"A. Yes.

"Q. Proof beyond a reasonable doubt does not mean proof to an absolute certainty. Few things in life can be proven to that level of certainty. However, you must be certain that each one of the charges here have been

proven beyond any reasonable doubt. Do you have any problem with that principle or concept?

"A. No.

"Q. Now, obviously the charges here are very serious allegations, as serious as you can get under our laws. Is there anything about the nature of the charges or the kind of testimony that you might expect to hear, given that set of charges, that you feel would predispose you in one direction or another for whatever reason?

"A. No.

"Q. Let me ask you what your reaction was when you heard what the case was about, when you first came in here?

"A. My reaction? I was not shocked, but just—

"Q. Were you surprised?

"A. Surprised, yes.

"Q. And nothing rang a bell at that point because you had not—you didn't remember anything about this?

"A. No.

"Q. And you might expect, as Mr. Dearington indicated, that there would be some rather graphic and unpleasant testimony in this case, photographs depicting deceased individuals with gunshot wounds and medical examiner testimony relating to the cause of death and the tracks of those wounds, nothing that we look at in our day-to-day lives, or talk about. Do you feel that you could put whatever natural emotional reaction you might have aside and not let that affect your objective determination of the facts in the case?

"A. Yes, I do.

"Q. There also will be testimony regarding the recovery of shell casings and bullet fragments, both at the

scene as well as during the course of the autopsies that were performed, and there will also be testimony about the use of a firearm. Is there anything about the nature of that kind of testimony that you feel would affect your ability to be fair and impartial?

"A. No.

"Q. Do you have any strong opinions about guns and the use of guns?

"A. No.

"Q. Do you have any familiarity at all with the location that was mentioned here, the Dixwell Avenue, Chimney Square area?

"A. I just know Dixwell Avenue. I don't know where the Chimney Square area is.

"Q. And Dixwell Avenue you know in what regard? Just from coming to the city every once in a while?

"A. Yeah.

"Q. Can I ask you what your source of news is on a daily basis?

"A. Source of news? ESPN. I am not much of a news man. I like sports.

"Q. So, you're not reading a daily newspaper or watching the local news at night?

"A. No.

"Q. Now, have you heard of my name before at all?

"A. No, I haven't.

"Q. And have you read anything or observed anything concerning the public defender's office recently?

"A. No.

"Q. These days there is a lot in the media, even in headlines, about crime and the use of guns and homicides in our cities and surrounding towns. Is there anything that you have either read, observed, heard or a case that you may have followed that you feel has caused you to form some strong personal opinions about the criminal justice system that you feel would affect how you looked at this case in this courtroom?

"A. I have been reading about the Susan Smith case, just following that a little bit.

"Q. I think everybody was affected by that. Have you formed any opinions at all about either that case or anything else that you've read that you feel would affect how you looked at the facts of this particular case?

"A. No.

"Q. Some people have opinions about the criminal justice system, that there are too many legal technicalities or courts are too lenient, things like that. Do you share any opinions like that?

"A. No.

"Q. Have you had—outside of what you described previously, have you had any prior contact with the criminal justice system for any reason, ever witness an incident—I am excluding what you talked about, the motor vehicle hit-and-run and the other thing that happened with your friend—ever witness any other kind of incident or given a statement to a police officer or testified in a court of law?

"A. No.

"Q. And you never had a lawsuit brought against you?

"A. No.

"Q. And you never brought a lawsuit against anybody else?

"A. No.

"Q. You made a claim regarding damages for a motor vehicle accident?

"A. Yes.

"Q. And I assume you did that with your insurance company?

"A. Yes.

"Q. And have you ever—how many times have you done that, if you can recall, made a claim to an insurance company?

"A. Mine, just once.

"Q. And have you or your family suffered any kind of property damage, like a fire in a home or bodily injury, anything like that?

"A. No.

"Q. Have you ever been the victim of a crime?

"A. No.

"Q. Any family member or close friend that's been the victim of a crime?

"A. Just my sister.

"Q. And how long ago did that occur?

"A. It had to be three to four years ago.

"Q. Is there anything about your sister's victimization, that was the spousal relationship, that you feel would in any way affect your ability to be fair and impartial sitting here in this case?

"A. No.

"Q. I assume she was physically assaulted on some occasions?

"A. Yes.

"Q. And was she living in Meriden at the time, or was she—

"A. Yes, she was.

"Q. She was, okay. Now, have either a colleague at work, a neighbor, a friend or family member been the victim of a homicide, some kind of sexual assault or some kind of other crime of violence?

"A. Just the incident—

"Q. Just what you mention about the people from high school?

"A. Yes.

"Q. How about [besides] that?

"A. No.

"Q. Now, when you said you followed that case initially, they were both people that you weren't friends with but you knew from high school?

"A. Yes.

"Q. How did you follow it? You looked at the news coverage on it.

"A. A little bit [from] hearsay from other friends.

"Q. From people in the community?

"A. And a little bit reading about it.

"Q. Did you have any impressions, either from what you heard from other people or what you read, about the criminal justice system or defense attorneys or prosecutors, anything like that?

"A. No.

"Q. Now, you heard the list of witnesses. They include a number of police officers. Would you have a tendency

to credit a police officer with any greater weight just because they are a police officer?

"A. No.

"Q. And you wouldn't give them any less weight just because they are a police officer?

"A. No.

"Q. Is it a fair statement that a police officer comes into this witness box like anybody else, you listen to what they have to say, what they may have observed, and you scrutinize their testimony like anybody else?

"A. Yes.

"Q. Any relatives or friends that are law enforcement officials, either police officers, attorneys or judges, anything like that?

"A. A couple of friends, a couple of people that I know are police officers, and I know a lawyer, but I think he's just a real estate lawyer.

"Q. And the police officers are Meriden uniform police officers?

"A. Yes.

"Q. Not detectives?

"A. I believe one is a detective now.

"Q. They made detective recently?

"A. Yes.

"Q. Where are they friends from? Are they from high school or growing up in the neighborhood?

"A. No, a couple of people that I play softball with, their fathers are police officers.

"Q. Anything about those relationships at all that you feel would affect, one, how you looked at police officers' testimony, or two, your objectivity here?

"A. No.

"Q. Now, do you think that [the defendant] must have done something wrong because he's sitting in court here today?

"A. I am here to hear the facts. I don't make an assumption that he did something wrong.

"Q. Obviously somebody does think he has done something wrong because he has been arrested and accused. His is presumed innocent like every person would be.

"A. Yes.

"Q. Can you assure us that you would not use the fact that he had been arrested and accused as evidence against him?

"A. Yes.

"Q. The sequence of our trial is such that Mr. Dearington presents the state's case first, and that could go on for awhile. The defense can then choose to put on a case, but doesn't necessarily have to do that. After the close of all the evidence, the lawyers will argue the merits of the case to the jury and then the judge will give you the instructions on the law. That is really the first time that you hear what specific principles of law apply to the facts of this case, and thereafter you will begin to deliberate this case with your fellow jurors. Can you assure us that you would honor the presumption of innocence until such time as you've heard all the witnesses, all the legal arguments and the instructions from the judge?

"A. Yes.

"Q. And then begin your deliberations?

"A. Yes.

"Q. And you can understand the importance of not making up your mind after witness number one or number five or number ten, you wait until you hear the whole case?

"A. Yes.

"Q. Now, a decision hasn't been made whether [the defendant] will testify during the course of the trial. Let's say he did not, would you have a tendency to hold that against him?

"A. No, I would not hold that against him.

"Q. That is an interesting principle, because sometimes, in reality, we kind of sit back and say, 'I really would like to have heard what that guy had to say, if the defense is taking that kind of position,' but that doesn't always happen here in the courtroom. Do you feel you could honor his right not to testify?

"A. Yes.

"Q. You would be instructed that you should draw no unfavorable inference from the fact that he didn't testify. Any problem with that?

"A. No.

"Q. Conversely, if he did testify, I assume you would scrutinize his testimony like any other witness according to the instructions the judge gives you?

"A. Yes.

"Q. Now, the defense is under no burden to put on any evidence whatsoever, we can simply rest after the state's case. Can you assure us that you would hold the state to its burden of proof even if we did not call a single witness?

"A. Yes.

"Q. In other words, the state has to meet that burden of proof irrespective of what the defense does.

"A. Yes.

"Q. Their threshold isn't lower or lesser. Now, every crime we have in our state is defined, and we define them into terms that we call elements. The judge will tell you what the elements are to each of the four offenses here. He will also tell you each and every element of each offense has to be proven beyond a reasonable doubt, and I want to give you a hypothetical for a moment. You're sitting on a case, and unlike this one, which has four charges, you only have to make a decision on one charge. You sit and listen to all the testimony, you listen to the lawyers make their arguments to you. Now the judge is giving you the instructions on the law, and among the instructions you receive are the following: that this one offense is made up of three separate elements and that each one of those three elements has to be proven beyond a reasonable doubt, okay? Now it's time for you to go back into that room and deliberate with your fellow jurors and it's your opinion, based on what you observed and what you heard in the courtroom, that there's plenty of evidence about element number one, well beyond a reasonable doubt, and there's plenty of evidence about element number two, also well beyond a reasonable doubt, but you have a doubt about element number three, it could be based on the evidence or lack of the evidence. Would you have any hesitation in returning a not guilty verdict under those circumstances?

"A. No hesitation.

"Q. I assume that's because that if the judge tells you that an offense is comprised of three elements and all three have to be proven, two out of three is not enough?

"A. Right.

"Q. Even though it sure looks like something was wrong. That is a very important principle. That analysis applies to each one of the four charges here because each charge has their own set of elements, and the jury is required to return a verdict on each one. What that means, in a case like this with multiple charges, the jury could come back with any number of different verdicts: it could be not guilty on everything, it could be guilty of everything, it could be not guilty on some, guilty on some, or vice versa, or you may hear some instructions from the judge regarding what is called lesser included offenses such as manslaughter, or you may not be able to reach a unanimous verdict with your fellow jurors. Any problem with that scenario?

"A. No problem.

"Q. Now, if you were selected as a juror in this case, would you voice your own opinion when it came time to discuss this case with your fellow jurors?

"A. Yes.

"Q. Are you the kind of person that would stand by your own opinion even if you were in the minority?

"A. Yes.

"Q. I assume you would listen to what other people would have to say?

"A. Yes.

"Q. If they reasonably persuaded you, that would be one thing, but you wouldn't just change your vote because of the numbers?

"A. Yes.

"Q. How do you feel about working in a group situation with the jury? Do you feel you would speak out, speak your mind?

"A. Yes.

"Q. Do you—let's say the vote was eleven to one and you were the one, how do you feel you would handle that situation?

"A. Well, I would make sure that everyone knows why I am voting against it or for it, whatever. If I was in the minority, I would try to see if they would see my point of view.

"Q. Again, you would listen to what their position would be, and you would not change your vote just because of the numbers, it doesn't matter whether you're voting for guilty or for not guilty, correct?

"A. Right.

"Q. Now, every case has issues of credibility that come up during the course of the case, both civil and criminal, and this case will be no different. One of the— and the judge will provide you with a series of factors to take into account in assessing a witness' credibility and believability. Many of them are what we use in our everyday judgments of people in general. One of the things not to use is sympathy, and there could be a lot of sympathy in a case like this. You have two deceased individuals, you have family members present in court, and will be for the duration of the trial. [The defendant] is sitting here, he's facing very serious allegations and repercussions for those allegations, and family members of his will be present as well. Can you assure us that you could put whatever natural sympathies you might have aside and not let that affect your objective determination of the facts in this case?

"A. Yes.

"Q. Now, have you ever studied or read books in the field of psychology or psychiatry or psychotherapy, anything like that?

"A. No.

"Q. And you indicated to Mr. Dearington the only time that a family member has utilized the services of a therapist was when your sister was going through the marital dissolution with her husband?

"A. Yes.

"Q. How long did she attend therapy, do you know?

"A. It's hard to determine how long it was. It was for a couple of months, I think.

"Q. Has there been any other instance at all, within the family, in which either a psychotherapist or mental health worker or psychiatrist has been utilized?

"A. No.

"Q. And can I ask you what your impressions are of the field of psychiatrist or psychology or psycho-therapy?

"A. My impressions?

"Q. Yes.

"A. I don't really understand. I don't understand how they go. I never witnessed someone analyze someone.

"Q. You don't really know?

"A. Right.

"Q. Some people feel that it's not a qualified profession or they don't pay it a lot of attention or they don't give it a lot of respect. Do you have any feelings like that?

"A. No.

"Q. Now, how do you feel about the use of, or do you have any opinions about the use of, psychiatric testimony in a courtroom?

"A. No.

"Q. And let me extend it one step further. Do you have any opinions concerning the use of psychiatric testimony in a criminal case?

"A. No.

"Q. Some people feel that when the defense introduces psychiatric testimony regarding state of mind, that that shouldn't be allowed, that that's a legal technicality and it shouldn't be allowed in a courtroom, even though the law allows it. Do you have any kind of feelings like that at all?

"A. No.

"Q. Do you feel that you would listen to psychiatric testimony fairly, that was presented in this case, look at it and scrutinize it carefully?

"A. Yes.

"Q. And are you coming in with any kind of preconceived notions that evidence like that has two strikes against it to start off with?

"A. Evidence of what?

"Q. Of a psychiatric nature.

"A. No.

"Q. I think it's obvious that if the defense attorney is listing a psychiatrist and a psychologist and the prosecutor is listing a psychologist and you're being asked questions about that, it's obvious that the defense will not contest that [the defendant] was involved in the shootings in this case. Does that offend you or bother you in that the defense would rely on psychiatric testimony, the relevance of that testimony, to a state of mind?

"A. No.

"Q. So, I assume that you could scrutinize that testimony, listen to the instructions that the judge provides and make your decisions based on that?

"A. Yes.

"Q. Obviously [the defendant] is black. Is there any underlying prejudice at all that you feel would in any way affect your ability to be fair and impartial sitting on his case in this courtroom?

"A. No.

"Q. Both deceased individuals are both white males. Is there anything about the fact that the case presents a situation where a black man is accused of killing two white men that you feel presents any difficulties for you at all?

"A. No.

"Q. And the defense psychiatrist, Dr. Ezra Griffith, is a black male. Is there anything about that fact that you feel in any way would affect how you looked at his testimony?

"A. No.

"Q. Okay, we all, in society, are consumers of goods and services. Have you ever felt taken advantage of in purchasing goods or services?

"A. Yeah.

"Q. Does anything stand out in your mind about that?

"A. Buying a car, buying something that's falsified, like a collectible show.

"Q. Do you feel that you were taken advantage of because of race or your professional status or lack of professional status, or by the status of the person who was selling the goods?

"A. Taken advantage of because of lack of knowledge, because I didn't know about it.

"Q. Can you assure [the defendant] that you would give him a fair trial in this case?

"A. Yes.

"Q. Any question about that?

"A. No.

"Mr. Ullmann: Okay. Thank you, sir.

"The Court: Would you be good enough to step into the jury room right behind you, for just a moment.

"(Whereupon the juror stepped out of the courtroom.)"

See appendix B of this dissent for the argument of trial counsel regarding the *Batson/Holloway* challenge.

## APPENDIX B

The transcript of the entire argument by counsel with respect to the *Batson/Holloway* hearing—which in my view demonstrates that the trial court never gave a meaningful review of the claim—is as follows:

"The Court [addressing G.D.]: Would you be good enough to step into the jury room right behind you, for just a moment.

"(Whereupon the juror stepped out of the courtroom.)

"[Michael Dearington, State's Attorney]: Excused.

"The Court: Bring him back.

"[Thomas Ullmann, Defense Counsel]: I would like to be heard on this. I would like to ask for—I know that [G.D.] is not a member of the defendant's race, but he is a minority, a Hispanic minority, and I would ask for a racially neutral reason for that challenge.

"The Court: Mr. Dearington.

"Mr. Dearington: Our law provide[s] that one must be a member of the defendant's minority for the *Batson* rule to kick in, or the *Batson* case. I don't think I am obligated to do that.

"The Court: Do you have any reason otherwise? Do you have any other reasons?

"Mr. Dearington: Yes, I do.

"The Court: Why don't you recite them for the record.

"Mr. Dearington: In terms of his ability to, his intellectual ability to understand a psychiatric defense bothers me. I think he was never put in a position where he had to make decisions. He admitted that his high school career was less than illustrious. His position at work doesn't demonstrate a position where he has to make decisions. That concerns me.

"Again, the psychiatric defense, I have a feeling that he might be overwhelmed by the testimony by all of the doctors, if not one of them. That concerns me. I am not sure how the fact that a friend of his or an acquaintance was murdered, and he knows the fellow that murdered him, how it took place. He indicated that he initially did follow the case and I guess lost interest. He was obviously exposed to an unpleasant experience with a police officer, and I know he says that would not play a part in this case, [but] one never knows subconsciously how that would play in his judgment in this case.

"I mentioned his education. Although we have taken people with twelve years of education, I have a sense in this case that—I just don't feel that he would be up to understanding the evidence in this case and dealing with it, as I have already elaborated on that.

"Also, he being one of [seven] children, the other [six] of them sisters, he being near the youngest, that's something that I find of some interest in terms of how he would look at this case. Those are a few of the reasons, Your Honor.

"The Court: Thank you.

"Mr. Ullmann: Your Honor, I guess it's okay to take a Romanian citizen [in reference to W.V., a juror who was selected] [who has] a fifth grade education, who worked on cars in his backyard for his entire life, but a man with a twelfth grade education [who is] working for five years at Cytec, he's got problems understanding that? I strongly disagree.

"I think that the United States Supreme Court has indicated that in addition to the *Batson* case ground for racially neutral explanations, that minority members have rights in themselves as jurors to be seated on a jury, and I am exercising that right on behalf of [G.D.]; and I think that under our own case law in the state of Connecticut, which has exceeded the *Batson* requirements and which the court, our Supreme Court, has stated they have supervisory control of this particular issue in seating minority members on juries, that they would frown upon the excuses that were made by Mr. Dearington regarding [G.D.].

"[G.D.] is a working man. He graduated from high school. He is someone who grew up in Meriden. He didn't say he was friends, he said he knew these people, and other than that, he had no connection with those particular individuals.

"I don't think there's the slightest basis for excusing [G.D.] from this particular case, and I really find the state's position outrageous. I am asking the court to seat [G.D.] in the case and reject the explanation that was raised by Mr. Dearington.

"Mr. Dearington: We did select someone who had less than twelve years education, but he was substantially older than this gentleman, who is twenty-three. I am just citing our Connecticut law, that a *Batson* showing must include evidence that the defendant is a member of a cognizable racial group, and this prosecutor has exercised a peremptory challenge to remove the venireman, who is not a member of the defendant's race. I mean the law is clear.

"Mr. Ullmann: Is Mr. Dearington suggesting that people can be eliminated based on racial or religious or sexual grounds if they are somewhat different in terms of their racial makeup than the defendant? I don't think that's the case law, I don't think that's United States Supreme Court case law, and I don't think that our Connecticut Supreme Court would tolerate that explanation at all particularly under *State* v. *Holloway* [supra, 209 Conn. 636] in which this Supreme Court went further than the United States Supreme Court in *Batson* in exercising its supervisory capacity on this particular issue. So, I don't think that the citation or authority there would apply to this particular instance.

"The Court: All right, the court is satisfied that the use of the peremptory challenge here was not racially motivated and that the reasons advanced by the state are sufficient in the court's judgment and not pretextual. So, bring him back, please.

"(Whereupon the juror returned to the courtroom.)

"The Court: [G.D], you have been excused from service in this particular case. Since you were carried over from yesterday, that means that your jury service is completed. We appreciate your coming back, but please go back to the ninth floor and tell them that you're all done. Thank you very much.

"(Whereupon the juror [G.D.] was excused and left the courtroom.)"